Steve W. Berman (*pro hac vice forthcoming*)
Robert F. Lopez (*pro hac vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com

Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
bens@hbsslaw.com

Joseph M. Vanek (*pro hac vice forthcoming*)
Eamon P. Kelly (*pro hac vice forthcoming*)
SPERLING & SLATER, P.C.
55 W. Monroe Street, 32nd Floor
Chicago, IL 60603
Telephone: (312) 676-5845
Facsimile: (312) 641-6492
jvanek@sperling-law.com
ekelly@sperling-law.com

*Attorneys for Plaintiff and the Proposed Classes*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| PURE SWEAT BASKETBALL, INC., an Illinois corporation, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> GOOGLE LLC, a Delaware limited liability company; GOOGLE IRELAND LIMITED; GOOGLE COMMERCE LIMITED; GOOGLE ASIA PACIFIC PTE. LTD.; and GOOGLE PAYMENT CORP., <br><br> Defendants. | No. <br><br> **CLASS ACTION COMPLAINT** <br><br> COMPLAINT FOR VIOLATION OF THE SHERMAN ACT AND CALIFORNIA UNFAIR COMPETITION LAW <br><br> **DEMAND FOR JURY TRIAL OF ALL ISSUES SO TRIABLE** |

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ............................................................................................ 1

II.    JURISDICTION .............................................................................................. 9

III.    PARTIES ....................................................................................................... 10

    A.    The plaintiff ........................................................................................ 10

    B.    The defendants ................................................................................... 11

IV.    RELEVANT FACTS ...................................................................................... 12

    A.    The Google Play store is the official Android OS app store. ........................ 13

    B.    While the Android OS is superficially open-source, Google maintains an iron grip on its commercial aspects. ...................................................... 15

    C.    Google is a monopolist in the U.S. market for Android OS app stores, and, accordingly, in the markets for app (and in-app) distribution services and in-app payment processing. ....................................... 19

    D.    Google is an attempted monopolist in the U.S. market for Android OS app stores, and, accordingly, in the markets for app (and in-app) distribution services and payment processing services for U.S. Android app developers. ............................................................... 20

    E.    Apple offers no market constraints via its iOS app store, through which it distributes incompatible apps. ................................................. 21

    F.    Google engages in unlawful behavior in order to restrain trade and to maintain and grow its monopoly in the markets at issue. ........................... 22

        1.    Google was recently fined over $5 billion for practices related to Google Play. ............................................................. 22

        2.    Google has used contracts with device manufacturers as means to its anticompetitive ends. ................................................ 24

    G.    Google's practices with respect to Google Play further restrain and injure competition in the market for U.S. Android OS app stores, where already there are high barriers to entry. .......................................... 26

        1.    There are high barriers to entry into the market for Android OS app stores. .......................................................... 26

        2.    Google manipulates security fears in order to maintain and further its market power in U.S. Android OS app stores. ................. 27

        3.    Google's refusal to permit app-store clients into Google Play means that only a hardy few will attempt installation of alternative stores. .................................................... 30

        4.    Even if a consumer succeeds in loading an alternative app-store client onto his or her device, Google may try to shut down access, which harms competition and developers. .......................... 34

H. Google's unlawful practices harm developers and competition.................................36

    1. Google's behavior stifles innovation..............................................36

    2. Google harms developers by killing competition and diminishing consumer choice. ................................................39

    3. Google also harms developers and competition by depressing output. ..............................................................................39

    4. Google harms developers by causing supracompetitive pricing of distribution services for Android OS apps and in-app add-ons, including subscriptions. .............................................40

V. INTERSTATE TRADE AND COMMERCE ........................................................45

VI. RELEVANT MARKETS ....................................................................................45

VII. CLASS ALLEGATIONS ..................................................................................49

VIII. APPLICABILITY OF CALIFORNIA LAW .....................................................52

FIRST CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT - MONOPOLIZATION OF MARKET FOR ANDROID DISTRIBUTION SERVICES (15 U.S.C. § 2)........................................................................................53

SECOND CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT – ATTEMPTED MONOPOLIZATION OF MARKET FOR ANDROID DISTRIBUTION SERVICES (15 U.S.C. § 2)...................................................54

THIRD CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT - MONOPOLIZATION OF MARKET FOR ANDROID IN-APP PAYMENT PROCESSING SERVICES (15 U.S.C. § 2) ............................................................56

FOURTH CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT – ATTEMPTED MONOPOLIZATION OF MARKET FOR ANDROID IN-APP PAYMENT PROCESSING SERVICES (15 U.S.C. § 2)....................................57

FIFTH CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT – RESTRAINT OF TRADE RE: IN-APP PAYMENT PROCESSING (15 U.S.C. § 1) .......................................................................................................59

SIXTH CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT – ALTERNATIVE BASIS FOR TYING AS TO IN-APP PAYMENT-PROCESSING  (15 U.S.C. § 1) .........................................................................60

SEVENTH CAUSE OF ACTION VIOLATION OF THE UNFAIR COMPETITION ACT (CAL. BUS. & PROF. CODE §§ 17200 *ET SEQ.*)...........................................62

PRAYER FOR RELIEF ................................................................................................63

JURY TRIAL DEMANDED .........................................................................................64

For its suit against defendant Google LLC, Google Ireland Limited, Google Commerce Limited, Google Asia Pacific PTE. Ltd. and Google Payment Corp. (collectively, Google), plaintiff, on its own behalf and that of all similarly situated U.S. Android OS application developers, alleges as follows:

## I.      INTRODUCTION

1.      Native applications—apps of various sorts programmed for and downloaded to a mobile device—bring smartphones and tablets to life.  In turn, add-ons for apps—items such as consumables (for example, extra lives in an adventure game), or subscriptions for full-fledged mobile productivity apps—make apps more fun or useful.  Developers, with their ingenuity, training, investment, and hard work, create these apps and extras.  And certainly there are many device users to buy them.  As of June 2019, for example, 81% of Americans owned smartphones, and 52% owned tablets.[1]  And so the two dominant (albeit not mutually competitive) stores—Google Play for Android Operating System (OS) products, and the App Store for Apple iOS products —generate billions of dollars in annual revenue for their owners, Apple Inc. and Google, respectively.[2]  And what a system it is: because apps for iOS and Android devices are incompatible,[3] with all the barriers and switching costs entailed, these two corporate giants can split the lucrative mobile apps world neatly between them, with enormous ongoing profits for each.

---

[1] http://www.pewinternet.org/fact-sheet/mobile/ (last accessed Aug. 15, 2020).

[2] *See, e.g.*, https://www.statista.com/statistics/296226/annual-apple-app-store-revenue/ ("In the last reported year, customers spent an estimated 54.2 billion U.S. dollars on in-app purchases, subscriptions, and premium apps in the Apple App store. (last accessed Aug. 15, 2020); https://www.statista.com/statistics/444476/google-play-annual-revenue/#:~:text=This%20statistic%20the%20worldwide%20app,spending%20in%20the%20previous%20year. (reporting study indicating that Google Play spending in 2019 was some $29.3 billion, which would translate to roughly $9.76 billion, based on the 30% Google revenue share discussed below) (last accessed Aug. 15, 2020).  Alphabet, Google's parent, reported in its 10-K for 2019 that "other revenue," including that generated from Google Play, Google hardware, and YouTube subscriptions, amounted to $17.014 billion for 2019. (https://abc.xyz/investor/static/pdf/20200204_alphabet_10K.pdf?cache=cdd6dbf (Alphabet 2019 10-K at 32) (last accessed Aug. 15, 2020).)

These are global figures.  Neither Apple nor Google publishes U.S. figures.

[3] https://yourbusiness.azcentral.com/apple-apps-compatible-android-20369.html (last accessed Aug. 15, 2020).

2.      Because each store operates in its own discrete sphere, neither places any competitive pressure on the other, including as to the prices that Google charges developers for app distribution services and in-app services, the latter of which primarily entails the processing of consumers' payments for add-ons, including subscriptions, that they purchase via apps distributed through Google Play.

3.      This suit concerns Google Play, Google's store for Android OS apps, and the in-app add-ons or other digital products, including subscriptions, that developers make available for sale via their apps.[4]  It concerns Google's improper attainment and maintenance of a monopoly in the U.S. market for Android OS app stores and distribution services.  And it concerns Google's improper attainment and maintenance of a monopoly in the U.S. market for in-app product distribution services, which services consist primarily of payment processing for items purchased in-app.  It concerns the harm caused by Google's ongoing abuse of its market power, including the exclusion of competition, the stifling of innovation, the inhibition of consumer choice, and Google's imposition on app developers of a supracompetitive 30% transaction fee.[5]

4.      In fact, the CEO of Google's corporate parent, Alphabet, has admitted that Google's supracompetitive transaction fee is anything but an outcome of competition.  Instead, it has "been the industry standard"—in other words, it is what Google's fellow monopolist Apple imposes in its parallel, closed iOS universe, so Google imposes it its own Android sphere.  And as plaintiff will demonstrate, Google's transaction fees have remained unlawfully high for all these years because Google has willfully—and effectively—excluded competition for developer services in its discrete Android universe.[6]

---

[4] *See, e.g.*, https://play.google.com/store?hl=en (Google Play web page) (last accessed Aug. 15, 2020).

[5] This is the default rate.  *See* n.22 for a description of a variation for certain subscription payments made via Google's in-app purchase mechanism.

[6] Alphabet Inc. (Goog) (Google) Q4 2018 Earnings Conf. Call Transcript, available at: https://www.fool.com/earnings/call-transcripts/2019/02/04/alphabet-inc-goog-googl-q4-2018-earnings-conferenc.aspx (last accessed Aug. 15, 2020).

CLASS ACTION COMPLAINT                                    - 2 -
Case No.:
010803-11/1334529 V1

**Acquisition of monopoly (or monopsony) power in Android app and in-app markets**

5.     Google's Android OS[7] is one of the two dominant mobile device operating systems.[8] Google Play is the 1,000-pound gorilla of app providers to the many tens of millions of Android OS device consumers.  While Google does not publish its share among app stores for the Android mobile operating system, in the European Economic Area, it's at "more than *90%*."[9]

6.     But Google has not attained and maintained such dominance because its app store is somehow unique or better than any potential competition.   Rather, as demonstrated below,[10] Google has attained and maintained monopoly status in the U.S. market for Android OS app stores through a series of anticompetitive contracts, strategic abuses of its dominance in other[11] Android software applications, deficits in consumer knowledge and information, and the cultivation and exploitation of device users' fear of malware.

7.     *First*, Google has attained monopoly status in the U.S. market for Android OS app stores in part by bundling the Google Play store with its other must-have apps (themselves made must-have by Google's forced-bundling practices).  If a manufacturer of an Android OS device wanted (or wants) to pre-install the popular YouTube or Google Maps apps on devices sold in the U.S., it has to take the Google Play store as well.  This results in the pre-installation of Google Play on tens of millions of U.S. devices every year.[12]  And of course, the ubiquity of these pre-

---

[7] *See* Alphabet's (Google's parent) 2017 10-K, https://abc.xyz/investor/pdf/20171231_alphabet_10K.pdf, at 3 (referring to Google's acquisition of Android, and referring to Android as one of its "core products")

[8] The other is Apple's iOS.  In July 2020, Android's U.S. market share was at 41.03%, versus 58.78% for iOS.  (http://gs.statcounter.com/os-market-share/mobile/united-states-of-america (last accessed Aug. 15, 2020).)

[9] https://ec.europa.eu/commission/presscorner/detail/en/IP_18_4581 (last accessed Aug. 15, 2020).

[10] *See* Secs. IV.F-IV.H, *infra*.

[11] Google Play is itself a software application, known in the instant context as a client.  *See* https://en.wikipedia.org/wiki/Client_(computing)#:~:text=In%20computing%2C%20a%20client%20is,by%20way%20of%20a%20network. (last accessed Aug. 15, 2020).

[12] For example, one study indicates that at least 27.5 million Android devices were sold in the U.S. in Q3 2017.  (*See* Data 29.5 Million US Smartphone Shipments in Q3, 2017, Android Headlines, available at: https://www.androidheadlines.com/2017/11/data-39-5-million-us-smartphone-shipments-in-q3-2017.html (last accessed Aug. 15, 2020).)  Samsung, LG, ZTE, and Motorola alone sold 23.5 million of these devices.  (*Id.*)  And each of these manufacturers preloads

installations only reinforces Google Play's status as the perceived official app store for Android apps.

8.    *Second*, Google maintains and reinforces its monopoly status in the field by banning the distribution of other Android app-sale clients in Google Play.  For example, Amazon runs an app store for Android OS apps, but there is no easy or readily available way for the typical Android OS device owner to buy anything from it.  Google's practices require the vast majority of users to sideload[13] the Amazon Appstore by locating the client online; figuring out the sideload process; and changing a security setting on his or her device that allows a practice that Google, as the owner of the standard Android operating system, strongly discourages (enabling the ominous-sounding "Unknown sources" download capability).  As Google well knows, hardly any members of its enormous Google Play install base will go to this trouble, if they even know such a process may be available.  And still others will heed Google's security warnings and not go through with the installation.[14]  No wonder app developers feel bound to sell in Google Play, whatever the cost.

9.    *Third*, by so-called anti-fragmentation contractual terms, Google prohibits licensees of apps such as YouTube and Google Play from manufacturing or selling even a single smart device using a so-called forked version, *i.e.*, a non-Google variant, of Android.[15]  Amazon is the author and distributor of Fire OS, an Android variant.  This Android fork powers Amazon's tablets.[16]  Yet because Google's anticompetitive contracts prohibit players large and small from deploying Fire OS, it has not reached its competitive potential; it remains essentially an Amazon-only OS, despite other

---

Google Play on some, if not all or most, of its U.S. devices.  According to the European Commission, the Google Play Store is pre-installed by device manufacturers on practically all Android mobile devices sold outside of China.

[13] "Sideloading is the installation of an application on a mobile device without using the device's official application-distribution method." (https://searchmobilecomputing.techtarget.com/definition/sideloading (last accessed Aug. 15, 2020).)

[14] *See, e.g.*, "Download apps to your Android device," available at: https://support.google.com/android/answer/7391672?hl=en&ref_topic=7311596 (last accessed Aug. 15, 2020) (setting forth official safety warnings for those who would venture outside Google Play).

[15] *E.g.*, https://developer.amazon.com/docs/fire-tv/fire-os-overview.html (last accessed Aug. 15, 2020).

[16] It is also the operating system for Amazon's Fire Phone, a now-discontinued device of which Amazon sold very few.  *See* https://www.phonearena.com/phones/Amazon-Fire-Phone_id8731 (last accessed Aug. 15, 2020).

1    manufacturers' reported interest in adopting it.[17]   Because Google regularly prohibits almost all

2    Android device manufacturers from pre-installing Fire OS on their phones and tablets, it's further

3    limited the Amazon Appstore's competitiveness (which otherwise would be pre-installed on those

4    additional Fire OS devices).

5          10.    Google's abuse of its power regarding Google Play is part of the behavior that led

6    Europe to fine Google a record €4.34 billion, then about $5.1 billion.[18]  In fact—in Europe—due to

7    the E.U.'s action, Google has recently de-coupled Google Play and other popular apps from its

8    Search and Chrome apps, the latter of which were part and parcel of its monopolistic dominance in

9    mobile search.  And Google also will cease its practice of refusing to license its apps to

10   manufacturers who want to build devices with an Android-forked OS—but in Europe, not in the U.S.

11         11.    *Fourth*, Google makes overblown, self-serving, and unjustifiable claims regarding

12   security in order to dissuade consumers from downloading and trying competitors' app stores.  Not

13   content to rely solely on its huge install base for Google Play, which itself was obtained by

14   anticompetitive means, Google also uses official Android warnings, warnings on devices, and

15   security mechanisms on Android OS devices to convince consumers that it is too risky to try its

16   competitors' stores.  And if all of these security warnings are not enough, then Google will use its

17   security systems to interfere with the ability of users to make purchases from other stores.

18         12.    For example, its abuse of power on ostensible security grounds has recently led to an

19   injunction issued by a Portuguese court, applicable throughout Europe, barring Google from using

20   purported security measures to dissuade consumers from using an alternative Android OS app store,

21   and from going so far as to disable it on devices on which users had found a way to install it.[19]

22   Google, it appears, will take most any step to protect and bolster its multi-billion dollar Android app-

23   store business.

24

25         [17] *See* https://ec.europa.eu/commission/presscorner/detail/en/IP_18_4581 ((last accessed Aug. 17, 2020).

26         [18] *See. e.g.*, https://www.nytimes.com/2018/07/18/technology/google-eu-android-fine.html (last accessed Aug. 15, 2020).

27         [19] *See* https://www.androidpolice.com/2018/10/23/aptoide-gains-injunction-google-latest-antitrust-case-compensation-follow/ (last accessed Aug. 15, 2020).

28

CLASS ACTION COMPLAINT                              - 5 -
Case No.:
010803-11/1334529 V1

**Abuse of monopoly (or monopsony) power through Google Play**

**Generally**

13.     Having gained monopoly power by anticompetitive means in the U.S. market for Android OS app stores, Google abuses that power by continuing to stifle innovation and consumer choice.  Its overbearing contracts and practices steal oxygen even from well-resourced competitors such as Amazon, robbing the marketplace of innovative means of distributing apps at lower costs to developers.  And by stifling competition, Google deprives consumers of readily accessible and vibrant choices in the U.S. market for Android OS app stores.  Moreover, as described herein, Google correspondingly has willfully and unlawfully acquired, maintained, and abused monopoly market power, and otherwise acted improperly and unlawfully, in the U.S. Android developer distribution and payment processing markets as alleged herein.

**30% default transaction fee**

14.     Google has abused its unlawfully gained dominance to impose supracompetitive pricing: a default *30%* service fee[20] paid by developers on each sale of non-zero-priced Android OS app purchases[21] made at its Google Play store, and, as the case may be, on sales of in-app digital add-ons, including subscriptions, distributed via apps sold in Google Play.[22]  So if an app or in-app add-

---

[20] Google's current and past 70% (developer) / 30% (Google) revenue split is memorialized at paragraph 3.4 of its Google Play Developer Distribution Agreement by reference to a Service Fee, which in turn is linked to Google's "Service fees" schedule.  (*See* https://play.google.com/about/developer-distribution-agreement.html (Dev. Agr.) (last accessed Aug. 15, 2020), available at: https://support.google.com/googleplay/android-developer/answer/112622?hl=en ("For apps and in-app products offered through Google Play, the service fee is equivalent to 30% of the price. You receive 70% of the payment. The remaining 30% goes to the distribution partner and operating fees.") (last accessed Aug. 15, 2020).)

[21] Google has modified its service-fee structure with respect to subscriptions. (https://support.google.com/googleplay/android-developer/answer/112622?hl=en  ("As of January 1, 2018, the transaction fee for subscription products decreases to 15% for any subscribers you retain after 12 paid months. If a subscriber has been active as of this date, that time will be counted. For example, if a subscriber has been active for 4 months, the transaction fee will be reduced to 15% after 8 more paid months.").)

[22] Google also charges developers a $25 fee to set up a Google Play developer account.  (https://support.google.com/googleplay/android-developer/answer/6112435?hl=en) ("There is a $25 USD one-time registration fee . . . .") (last accessed Aug. 15, 2020).)  This fee helps offset costs that Google may claim as justification for its incredibly high 30% service fee, especially considering the sheer number of developers from whom Google collects it.

on in Google Play costs $1.99, Google takes nearly *$.60*.[23]  As for in-app sales, this charge is essentially for payment-processing services, which could be purchased from other providers at much cheaper rates,[24] and with faster payments to developers, if only Google permitted developers to use them.  Tellingly, Google has succeeded in maintaining this astounding and exploitative 30% take rate (with the exception noted) since it opened its app store in 2008, despite, *e.g.*, accrued economies of scale.

15.     By imposing this unjustified default 30% tax rate on paid Google Play transactions, including as to in-app digital product distributions, and by inserting the requisite terms into its contracts with developers, Google extracts more money from developers than they would otherwise have to pay for the distribution of Android OS apps and add-ons sold via in-app purchase, including subscriptions.  But for Google's exclusionary behavior, including as to in-app payment processing as alleged herein, the Android app distribution market (as well as the tied payment processing market) would have more, and more meaningful and effective, competition.

16.     Even more evidence of Google's supracompetitive pricing has emerged via the developer of Fortnite, a currently popular game.  This developer, Epic Games, decided to forego sales of Fortnite in the Google Play store and to distribute the game on its own—in spite of the need for the difficult sideload process engendered by Google's anticompetitive behavior.  Epic has divulged information, discussed below,[25] further demonstrating that Google's 30% levy on Google Play transactions far exceeds the bounds of even a generous profit.  Epic eventually opted to return to Google Play, due to the effects and obstacles brought about by Google's anticompetitive conduct and policies, including as to the deliberately complicated and fraught way in which Fortnite must be

---

[23] Or, alternatively, a sum calculated on the basis of a still-supracompetitive 15% commission on certain subscriptions, *see* n.22, *supra*, for what amounts to payment processing services that could be purchased much cheaper from other provider, if Google permitted developers to use them.

[24] The cost of alternative electronic payment processing tools, which Google does not permit to be used for the purchase of in-app digital content or within Android games, can be one tenth of the 30% cost of Google Play Billing. For example, the base U.S. rate for electronic payment processing tool PayPay is 2.9%, for Stripe it is also 2.9%, for Square it is 2.6%-3.5%, and for Braintree it is 2.9%. That is particularly so for PayPal's microtransaction rates (for developers whose sales average under $10), the latter of which do not include a separate fee on top of the percentage-of-sale-price charge.

[25] *See* Section IV.H.4, *infra*.

loaded onto affected devices.  What is more, as explained below, *see* ¶¶ 118-19, *infra*, Google removed Epic from Google Play a few days ago, after Epic dared to offer a cheaper way for consumers to purchase virtual currency for use in Fortnite, via Epic's own payment processing system. Use of that system meant that Epic could avoid payment Google's supracompetitive fee for the forced use of its own payment processing system.

17.     Other compelling evidence of supracompetitive pricing comes from Google's own Chrome Web Store, in which it charges developers not 30%, but 5% transaction fees.[26]

18.     Furthermore, Google's behavior depresses output.  But for Google's abusive behavior, developers would have more pricing flexibility in the hugely dominant Google Play store—and pricing flexibility is, of course, useful.[27]  There would be more distribution transactions but for Google's anticompetitive behavior.  Therefore, Google's abusive behavior depresses output of transactions in the U.S. market for Android OS app stores.  App developers would create and sell more product but for Google's supracompetitive default 30% tax.

### $.99 minimum-price agreement

19.     Google also abuses its unlawfully obtained monopoly power by way of minimum price fixing.  Through its adhesive contracts with developers, it requires that regularly priced paid apps, in-app purchases, and subscriptions for U.S. consumers be priced no lower than $.99.  So, for example, there can be no regularly priced $.69 apps or in-app products sold in Google Play.

20.     There is no pro-competitive justification for this minimum-price requirement. Minimum price fixing in Google Play has no salutary effects on inter-brand competition, a typical purported justification for such requirements.  Rather, this mandatory pricing term was designed for the purpose of enabling Google to earn at least 30 cents on every dollar spent in the Google Play store.

21.     Google's minimum-price mandate also depresses output.  In light of consumers' demonstrably strong preference for low-priced apps and related products, developers would sell more apps and app-related products but for this requirement.

---

[26] *See* Section IV.H.4, *infra*.

[27] *See, e.g.*, discussion in Sections IV.G and IV.H.

CLASS ACTION COMPLAINT                - 8 -
Case No.:
010803-11/1334529 V1

22.     In sum, Google's willful acquisition and maintenance of monopoly power in the markets identified, and its abuse of that power, *inter alia*, to impose its supracompetitive distribution and in-app payment processing fees on U.S. Android OS developers such as the plaintiff, are harmful to competition and harmful to developers specifically.  Alternatively, if Google is determined to be the purchaser of digital products from Android OS developers that in turn sells these products to end-users, via Google Play or otherwise, then Google (also) acts as a monopsonist, or attempted monopsonist.  (A monopsonist is a buy-side monopolist.)  The circumstances, effects, and allegations are essentially the same for monopoly or attempted monopoly: By Google's behavior as alleged herein, Google uses its monopsony power to underpay Android OS developers below the price they would obtain in a competitive market for their apps and in-app products.  Therefore, plaintiff's allegations herein should be understood to also plead in the alternative claims based on monopsony, both for plaintiff and the putative classes.  In either alternative—and as otherwise pled herein—Google's behavior violates antitrust and consumer protection law.  Plaintiff seeks monetary relief to redress the injuries caused by Google's past and ongoing conduct, and it seeks injunctive relief to stop Google's ongoing improper, unlawful, and harmful behavior in the relevant markets.

## II.     JURISDICTION

23.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiff alleges violations of federal law, namely, the federal Sherman Act.  The Court has supplemental jurisdiction over the plaintiff's state law claim pursuant to 28 U.S.C. § 1367(a).

24.     This Court has personal jurisdiction over the Defendants. Google LLC and Google Payment are headquartered in this District.  All Defendants have engaged in sufficient minimum contacts with the United States and have purposefully availed themselves of the benefits and protections of United States and California law, such that the exercise of jurisdiction over them would comport with due process requirements. Further, the Defendants have consented to the exercise of personal jurisdiction by this Court.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Google LLC and Google Payment maintain their principal places of business in the State of California and in this District, because a substantial part of the events or omissions giving rise to Epic's claims occurred in

this District, and because, pursuant to 28 U.S.C. § 1391(c)(3), any Defendants not resident in the United States may be sued in any judicial district and their joinder with others shall be disregarded in determining proper venue. In the alternative, personal jurisdiction and venue also may be deemed proper under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, because Defendants may be found in or transact business in this District. Furthermore, the Google Play Terms of Service incorporates the Google Terms of Service by reference, and the latter designates this judicial district as the federal venue for this action.[28]

26. <u>Intradistrict Assignment</u>: Assignment to the San Jose division of this Court is appropriate because Defendants Google LLC and Google Payment have their headquarters and/or principal place of business in Mountain View, Santa Clara County, California, which is located in this division of the Northern District of California. Also, it is believed and therefore alleged that many members of the proposed class reside or do business in the San Jose division of the Northern District of California.

### III. PARTIES

**A. The plaintiff**

27. Plaintiff Pure Sweat Basketball is an Illinois corporation with its principal place of business in Crystal Lake, Illinois. It is the developer of the Pure Sweat Basketball Workout App. Pure Sweat Basketball is a party to the developer contracts referenced in this complaint. These agreements specify the commission rate and pricing and other mandates described herein. Also, in order to be permitted to make its app available in Google Play, and to sell non-zero priced subscriptions through its app, Pure Sweat Basketball has paid Google's $25 developer fee. To the best of its knowledge, Pure Sweat Basketball's last distributions of its app through Google Play, and sales of subscriptions at non-zero prices through the app, have occurred this year. Pure Sweat

---

[28] *See* Google Play Terms of Service, available at: https://play.google.com/about/play-terms/index.html, which incorporates the Google Terms of Service, the latter of which is available at: https://policies.google.com/terms ("California law will govern all disputes arising out of or relating to these terms, service-specific additional terms, or any related services, regardless of conflict of laws rules. These disputes will be resolved exclusively in the federal or state courts of Santa Clara County, California, USA, and you and Google consent to personal jurisdiction in those courts.") (last accessed Aug. 15, 2020).

CLASS ACTION COMPLAINT                                    - 10 -
Case No.:
010803-11/1334529 V1

Basketball charges $4.99 monthly for its digital subscription product, or $49.99 annually, and it has paid Google's supracompetitive 30% commission on each sale.

28.    Alternatively, Google paid Pure Sweat Basketball what amounts to an artificially low wholesale price for digital products sold via Google Play.

29.    Furthermore, Pure Sweat Basketball's in-app subscription sales (like the app, if sold at above-zero prices) have always been subject to Google's requirement that app transactions be priced at a minimum of $.99, as well as other pricing mandates.  Google has denied Pure Sweat Basketball the ability to choose to sell digital products at price points below $.99, in efforts to achieve maximum sales and effect business plans as it would elect, to plaintiff's detriment.

**B.    The defendants**

30.    Defendant Google LLC is a Delaware limited liability company with its headquarters and principal place of business in Mountain View, California.  It is the owner of Google Play, from and by which developers of Android apps sell paid applications, music, movies, books and in-app products to Android device owners.  Its parent, Alphabet Inc., was number 15 on last year's U.S. Fortune 500,[29] with 2019 revenues of nearly $137 billion and net income of $30.736 billion.[30]

31.    Defendant Google Ireland Limited is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and a subsidiary of Google LLC. Google Ireland contracts with all app developers that distribute their apps through Google Play and is therefore a party to the anticompetitive contractual restrictions at issue in this complaint.

32.    Defendant Google Commerce Limited is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and a subsidiary of Google LLC. Google Commerce contracts with all app developers that distribute their apps through Google Play and is therefore a party to the anticompetitive contractual restrictions at issue in this complaint.

33.    Defendant Google Asia Pacific Pte. Ltd. is a private limited company organized under the laws of Singapore with its principal place of business in Mapletree Business City, Singapore, and a subsidiary of Google LLC.  Google Asia Pacific contracts with all app developers that distribute

---

[29] https://fortune.com/fortune500/2019/alphabet/ (last accessed Aug. 15, 2020).

[30] *Id.*

CLASS ACTION COMPLAINT                           - 11 -
Case No.:
010803-11/1334529 V1

their apps through Google Play and is therefore a party to the anticompetitive contractual restrictions at issue in this complaint.

34.     Defendant Google Payment Corp. is a Delaware corporation with its principal place of business in Mountain View, California, and a subsidiary of Google LLC.  Google Payment provides in-app payment processing services to Android app developers and Android users and collects a 30% commission on many types of processed payments, including payments for apps sold through Google Play and in-app purchases made within such apps.

## IV.     RELEVANT FACTS

35.     Google has injured plaintiff, the putative class of U.S. developers it seeks to represents, and competition in the relevant markets define herein, *see* Part VI, by way of its unlawful behavior in the U.S. sale of paid Android OS apps from its Google Play store and in-app sales of in-app add-ons, including but not limited to subscriptions.  As the holder of an unlawfully obtained monopoly in the U.S. market for Android OS app stores, Google's behavior has resulted in developer overcharges in these transactions due to its imposition of a supracompetitive 30% fee on each paid sale from its store.  Also, Google's aggressive and improper monopolization (or attempted monopolization) of the U.S. Android OS app[31] store market has stifled competition by strongly inhibiting the emergence of vibrant, and viable, competitors, which reinforces and strengthens its pernicious and overbearing market power.

36.     Additionally, Google requires app developers to sell at minimum prices.  There is no pro-competitive justification for this practice, and certainly none in an environment where Google Play already is overwhelmingly dominant in the U.S. space for Android OS app stores.

---

[31] Throughout this complaint, references to Android OS apps also refer to in-app purchases and paid subscriptions.

**A.     The Google Play store is the official Android OS app store.**

**History**

37.     Google introduced its app store, then known as Android Market, in or about August 2008.[32]  On or about October 22, 2008, Google, HTC, and T-Mobile released the first Android OS smartphone, the T-Mobile G-1.[33]  This very first released-to-consumer Android OS smartphone came pre-loaded with the Android Market client.  As T-Mobile's September 2008 press release explained:

> **Android Market:**
>
> The T-Mobile G1 is the first phone to offer access to Android Market, which hosts unique applications and mash ups of existing and new services from developers around the world. With just a couple of short clicks, customers can find and download a wide range of innovative software applications — from games to social networking and on-the-go shopping — to personalize their phone and enhance their mobile lifestyle. When the phone launches next month, dozens of unique, first-of-a-kind Android applications will be available for download on Android Market . . . .[34]

38.     Next, on or about March 6, 2012,[35] Google introduced its Google Play store.  Google Play both succeeded and subsumed its predecessor, Android Market, adding digitized music and books to the store's offerings.[36]  It now carries movies and television programs as well.[37]

**How Google Play works**

39.     For their products to be sold in the Google Play store, application developers[38] enter into the Google Play Developer Distribution Agreement.[39]  The developer then uploads its product to

---

[32] Google launched Android Market, Google Play's predecessor for Android OS Apps, on or about August 28, 2008.  (*See, e.g.*, https://www.cnet.com/news/google-announces-android-market-for-phone-apps/ (dated Aug. 28, 2008) (last accessed Aug. 15, 2020).)

[33] "T-Mobile Unveils the T-Mobile G1—the First Phone Powered by Android," dated September 22 (and 23), 2008, available at: https://www.t-mobile.com/news/t-mobile-unveils-the-t-mobile-g1-the-first-phone-powered-by (last accessed Aug. 15, 2020).

[34] *Id.*

[35] https://googleblog.blogspot.com/2012/03/introducing-google-play-all-your.html (last accessed Aug. 15, 2020).

[36] *Id.* ("Starting today, Android Market, Google Music and the Google eBookstore will become part of Google Play. On your Android phone or tablet, we'll be upgrading the Android Market app to the Google Play Store app over the coming days.").

[37] https://play.google.com/store/apps/details?id=com.google.android.videos&hl=en_US (last accessed Aug. 15, 2020).

[38] Except presumably Google, which also offers its own products—including paid products—in the Google Play store.  (*See* https://play.google.com/store/apps/details?id=com.google.android.apps.youtube.music&hl=en

Google servers for review, testing (if any), limited release (if any), and production-release for sale to consumers in the store.[40]  As part of the process, the developer "grant[s] to Google a nonexclusive and royalty-free license to distribute [the developer's] Products in the manner indicated in the Play Console."[41]

40.     Developers ostensibly set prices for products sold in the Google Play store.  But, as described above, Google's developer contract (more specifically, its incorporated terms or policies) requires that paid products be sold to U.S. consumers at a regular price of no lower than $.99 (and a $400 maximum).[42]  Therefore, developers cannot sell regularly priced apps at $.69, for example.  The contract has, however, allowed for lower minimum prices for 18 other countries' purchasers since November 2015 (or earlier in 2015 for India).[43]  For example, an app that must be priced for U.S. consumers no lower than $.99 can be priced at approximately $.13 for Indian purchasers, as of the exchange rate on Aug. 15, 2020.[44]  There is no evidence that Google is somehow losing money by way of this contractual practice.  But even if one posits hypothetically that it is, then U.S.

(offering YouTube Music app in Google Play, and referring to the paid Music Premium version that is also available) (last accessed Aug. 15, 2020).

[39] Dev. Agr. (current agreement, effective as of Feb. 26, 2018) (Dev. Agr.) (last accessed Aug. 15, 2020).  For the pre-Feb. 26, 2018 version, *see* https://play.google.com/about/developer-distribution-agreement/archive.html (last accessed Aug. 15, 2020).

[40] *Id.*, ¶ 4.2 ("You are responsible for uploading Your Products to Google Play, providing required Product information and support to users, and accurately disclosing the permissions necessary for the Product to function on user Devices.") (last accessed Aug. 15, 2020); https://support.google.com/googleplay/android-developer/answer/113469?hl=en ("Upload an app") (last accessed Aug. 15, 2020); https://support.google.com/googleplay/android-developer/answer/7159011? ("Prepare & roll out releases") (last accessed Aug. 15, 2020).

[41] Dev. Agr., ¶ 5.1.

[42] Dev. Agr., ¶ 5.2 (referring to sales to be made "in the manner indicated in the Play Console"). The Play Console, and Play Console help sections, set forth the minimum pricing requirements: *see* https://support.google.com/googleplay/android-developer/answer/6334373?hl=en ("Set up prices & app distribution") (last accessed Aug. 15, 2020); https://support.google.com/googleplay/android-developer/table/3541286? ("Supported locations for distribution to Google Play users") (last accessed Aug. 15, 2020).

[43] *See, e.g.*, "Google slashes minimum app prices to way below $0.99 in 17 countries," *Mashable*, Nov. 18, 2015, available at: https://mashable.com/2015/11/18/google-minimum-app-prices/#JIuQdT6ebEqd (last accessed Aug. 15, 2020).

[44] https://support.google.com/googleplay/android-developer/table/3541286 (apps for Indian consumers may be priced from between 10.00 INR to 26,000.00 INR, or approximately $.13 to $347.11, as of Aug. 15, 2020—*see* https://transferwise.com/us/currency-converter/inr-to-usd-rate?amount=10 (last accessed Aug. 15, 2020)).

1   developers (and consumers) are subsidizing consumers from other countries by way of the higher

2   U.S. minimum prices and the sums that Google collects thereby, such that U.S. developers (and

3   consumers) are paying more than they ought to be paying as a result of this restraint of trade.

4       41.     Developers sell their apps, in-app products,[45] and subscriptions[46] directly through the

5   Google Play store.  Consumers select apps from the displays that Google organizes and sets up;

6   tender their payments to Google; and download the apps from Google to their devices.[47]

7       42.     Developers, in turn, pay Google 30% of each paid sale of an app or in-app product.

8       43.     In other words, developers are direct purchasers of Google's distribution services, and

9   they are damaged directly by the overcharge on each sale between Google's supracompetitive fee

10  vehicles. A fee subject to competition but for Google's restraints and abusive behavior.

11  **B.     While the Android OS is superficially open-source, Google maintains an iron grip on its**
    **commercial aspects.**

12      44.     Google owns and controls the Android OS.  Ostensibly, the code for the operating

13  system itself is open-source.  According to Google, anyone can download, use, and modify the

14  Android OS source code, as long as Google allows it.  Google calls this aspect of its OS the Android

15  Open Source Project (AOSP).  As Google[48] puts it:

16          Android is an open source operating system for mobile devices and a
            corresponding open source project led by Google. This site and the Android Open
17          Source Project (AOSP) repository offer the information and source code needed to

18  _____

19  [45] *See, e.g.*, https://support.google.com/googleplay/answer/1061913?hl=en&ref_topic=7049688#
    ("Make in-app purchases in Android apps") ("With some apps, you can buy additional content or
    services within the app.  We call these 'in-app purchases.'  Here are some examples of in-app
20  purchases: A sword that gives you more power in a game . . . .") (last accessed Aug. 15, 2020).

21  [46] https://support.google.com/googleplay/answer/2476088?hl=en&ref_topic=1689236
    ("Subscribe to services or content") (referring to subscriptions to magazines, newspapers, and other
22  material, and explaining how to subscribe) (last accessed Aug. 15, 2020).

23  [47] *See, e.g.*,
    https://support.google.com/googleplay/answer/4355207?hl=en&ref_topic=3364260&co=GENIE.Plat
    form%3DAndroid&oco=1 ("Get started with Google Play"-Android) (last accessed Feb. 1, 2019);
24  https://support.google.com/googleplay/answer/113409?hl=en&ref_topic=3365058 ("Get Android
    apps and digital content from the Google Play Store") ("1. Open the Google Play Store app. 2.
25  Search or browse for content. 3. Select an item. 4. Tap Install (for free items) or the item's price. 5.
    Follow the onscreen instructions to complete the transaction and get the content.") (last accessed
26  Aug. 15, 2020).

27  [48] "Android was originated by a group of companies known as the Open Handset Alliance, led by
    Google. . . .   The Android Open Source Project is led by Google, who maintains and further develops
28  Android."  (https://source.android.com/setup/ (last accessed Aug. 15, 2020).)

CLASS ACTION COMPLAINT                          - 15 -
Case No.:
010803-11/1334529 V1

create custom variants of the Android OS, port devices and accessories to the Android platform, and ensure devices meet the compatibility requirements that keep the Android ecosystem a healthy and stable environment for millions of users. . . .[49]

45.    But the open-source code only enables a device's most basic functions.  As Google explains: "The Android Open-Source Project (AOSP) is the core software stack behind the Android OS and consists of the operating system, middleware, and open-source apps like a phone dialer, email, and messaging.  Mobile operators, device makers, and developers can use this to build devices and apps."[50]

46.    What makes a mobile device marketable and attractive to modern consumers are its apps.  Google has developed several popular apps, including YouTube, Google Maps, Gmail as well as the Google Play client, among others.  These are proprietary apps, and they are decidedly not open-source.  Manufacturers must sign agreements to pre-install them on their Android OS devices, and in the U.S., they come bundled together as a suite—manufacturers who want to pre-install any one of them must pre-install all of them.[51]  Google refers to this program as Google Mobile Services. As Google touts it:

The best of Google, right on your devices

Google Mobile Services brings Google's most popular apps and APIs to your Android devices.

Google's most popular apps, all in one place

Google Mobile Services (GMS) is a collection of Google applications and APIs that help support functionality across devices. These apps work together seamlessly to ensure your device provides a great user experience right out of the box.[52]

47.    GMS is an element of how Google dominates the entire Android ecosystem. Over time, it has moved more and more apps into its proprietary, non-open-source universe of apps, as

---

[49] https://source.android.com/ (last accessed Aug. 15, 2020).

[50] "Understanding Android," available at: https://www.android.com/everyone/facts/ (last accessed Aug. 15, 2020).

[51] "After building an Android compatible device, consider licensing Google Mobile Services (GMS), Google's proprietary suite of apps (Google Play, YouTube, Google Maps, Gmail, and more) that run on top of Android. GMS is not part of the Android Open Source Project and is available only through a license with Google."  (https://source.android.com/compatibility/overview (last accessed Aug. 15, 2020).)

[52] https://www.android.com/gms/ (last accessed Aug. 15, 2020).

well as services that make third-party apps work effectively, in ways that users have come to expect (*e.g.*, by calling up map services, now through the proprietary Google Maps).  As one analyst describes Google's machinations:

> Over time, Google began migrating applications – like Search, Music, and the Calendar – out of AOSP and into GMS. Any OEM wanting to use AOSP to build its own Android fork would now have to build their own versions of these apps, on top of email, maps, and so on. (*Ars Technica* has a good rundown of the application migration here[53].) On top of that, the device would lack the Google services APIs that lots of third-party apps need. And Google didn't stop there. Google Mobile Services mutated into Google Play Services[54] in September 2012.

> A fork in the road: Why Google Play Services is key to understanding the 'forking' question

> Back in May 2013 at the Google I/O Keynote there was no mention of an Android upgrade. Instead, Google announced a bunch of new features to be rolled out to Android devices via Google Play Services. Google had started to move away from Android-as-platform to Play Services-as-platform. As Ron Amadeo writes: 'Play Services has system-level powers, but it's updatable. It's part of the Google apps package, so it's not open source. OEMs are not allowed to modify it, making it completely under Google's control… If you ever question the power of Google Play Services, try disabling it. Nearly every Google App on your device will break.' It is 'a single place that brings in all of Google's APIs on Android 2.2 and above.' Things like Play Game services, Google Cloud Messaging and fused location services are all handled by Play Services, and not the OS.

48.     One important condition for access to GMS is that manufacturers agree to comply with so-called compatibility requirements.  As Google puts it:

---

[53] https://arstechnica.com/gadgets/2018/07/googles-iron-grip-on-android-controlling-open-source-by-any-means-necessary/ (last visited Dec. 10, 2018).

[54] Google Play services is different from the Google Play store.  In fact, one method of distribution is via Google Play.  (*See, e.g.*, https://play.google.com/store/apps/details?id=com.google.android.gms&hl=en_US ("Google Play services is used to update Google apps and apps from Google Play.  This component provides core functionality like authentication to your Google services, synchronized contacts, access to all the latest user privacy settings, and higher quality, lower-powered location based services.") (last accessed Aug. 15, 2020).)  In its Overview of Google Play Services, Google writes:

> With Google Play services, your app can take advantage of the latest, Google-powered features such as Maps, Google+, and more, with automatic platform updates distributed as an APK through the Google Play store. This makes it faster for your users to receive updates and easier for you to integrate the newest that Google has to offer.
>
> * * *
>
> The client library contains the interfaces to the individual Google services and allows you to obtain authorization from users to gain access to these services with their credentials.

https://developers.google.com/android/guides/overview (last accessed Aug. 15, 2020).

CLASS ACTION COMPLAINT                                  - 17 -
Case No.:
010803-11/1334529 V1

We ask GMS partners to pass a simple compatibility test and adhere to our compatibility requirements for their Android devices. In turn, your users enjoy greater app reliability and continuity.[55]

49.      Ostensibly, Google seeks compatibility in order to help assure that software works across a variety of devices.  But Google has gone further than merely requiring compatibility testing for devices on which manufacturers wish to install the GMS suite.  As part of its strategy to maintain as much dominance over the Android ecosystem as possible, Google refuses to license GMS to manufacturers who develop so-called Android forks—variants of the official Android OS published by Google.  As the European Commission put it with respect to the record antitrust fine it imposed on Google last summer (discussed *infra*[56]):

Google has prevented device manufacturers from using any alternative version of Android that was not approved by Google (Android forks). In order to be able to pre-install on their devices Google's proprietary apps, including the Play Store and Google Search, manufacturers had to commit not to develop or sell even a single device running on an Android fork. The Commission found that this conduct was abusive as of 2011, which is the date Google became dominant in the market for app stores for the Android mobile operating system.[57]

According to the European Commission, this has thwarted even as powerful a potential competitor as Amazon.  Manufacturers who want access to GMS are prohibited by way of their anti-fragmentation contractual terms with Google from building even a single device based on Amazon's Android OS fork, known as Fire OS.  As discussed below, this means that Amazon is denied another way to distribute its own Android OS app store.[58]

---

[55] *Id*.

[56] *See* Section IV.F.1, *infra*.

[57] *See* "Antitrust: Commission fines Google €4.34 billion for illegal practices regarding Android mobile devices to strengthen dominance of Google's search engine," July 18, 2018, available at: http://europa.eu/rapid/press-release_IP-18-4581_en.htm (last accessed Aug. 15, 2020).

[58] Per the European Commission:

This practice reduced the opportunity for devices running on Android forks to be developed and sold. For example, the Commission has found evidence that Google's conduct prevented a number of large manufacturers from developing and selling devices based on Amazon's Android fork called "Fire OS".

*In doing so, Google has also closed off an important channel for competitors to introduce apps and services*, in particular general search services, *which could be pre-installed on Android forks*.

http://europa.eu/rapid/press-release_IP-18-4581_en.htm (emphasis added).

50.     There is no justifiable basis for Google's restraints with regard to Android forks.  As the European antitrust authorities found, Google's stated aim—to help ensure that software works across various Android OS devices—does not require or justify the restraints on competition that Google forces upon device manufacturers:

> The Commission also assessed in detail Google's arguments that these restrictions were necessary to prevent a "fragmentation" of the Android ecosystem, and concluded that these were not well founded. First, Google could have ensured that Android devices using Google proprietary apps and services were compliant with Google's technical requirements, without preventing the emergence of Android forks. Second, Google did not provide any credible evidence that Android forks would be affected by technical failures or fail to support apps.[59]

**C.     Google is a monopolist in the U.S. market for Android OS app stores, and, accordingly, in the markets for app (and in-app) distribution services and in-app payment processing.**

51.     Google's anticompetitive strategies around Android have worked.  Via Google Play, Google is, and long has been, a monopolist in the U.S. market for app stores selling Android OS apps and in-app purchases (and subscriptions as well), as explained herein.  And, accordingly, it is a monopolist in the markets for Android app (and in-app) distribution and in-app payment processing services for U.S. Android app developers as well.

52.     While Google keeps a tight hold on information regarding its Android OS app store market power in the U.S., its high percentage of market share can be inferred from the tens of millions of Android devices deemed "Android compatible,"[60] such that Google Play can be (and usually is) pre-installed[61]—inferentially, far more than any other app store.[62]

53.     Google was first to market in 2008 with its app store, Android Market (which morphed into Google Play).  The Amazon Appstore, for example, would not open until March 22,

---

[59] *Id.*

[60] *See, e.g.*, https://source.android.com/setup/start/faqs (frequently asked questions, providing details re: Android compatibility certification) (Devices that are 'Android compatible' may participate in the Android ecosystem, including Google Play . . . .") (last accessed Aug. 15, 2020).

[61] *See, e.g.*, https://support.google.com/googleplay/answer/1727131?hl=en (Google Play Help screen, providing 852-page list of supported devices, including devices manufactured by Samsung, HTC, LG, and Motorola, among many others) (last accessed Aug. 15, 2020).

[62] According to the European Commission, the Google Play Store is pre-installed by device manufacturers on practically all Android mobile devices sold outside of China.

CLASS ACTION COMPLAINT                          - 19 -
Case No.:
010803-11/1334529 V1

2011.[63]  But Google was not content to build on its earlier start fairly; instead, it unlawfully and abusively acted to procure and attain monopoly status as alleged herein.

54.     According to the European Commission:

> Google is dominant in the *worldwide* market (excluding China) for app stores for the Android mobile operating system.  *Google's app store, the Play Store, accounts for more than 90% of apps downloaded on Android devices.*  This market is also characterized by high barriers to entry . . . .[64]

These facts powerfully support the conclusion that Google is a monopolist in its home (U.S.) market for Android OS app stores—and a monopolist in the markets for Android app (and in-app) distribution and in-app payment processing services for U.S. Android app developers, as explained herein.

55.     Further, the technical barriers that strongly inhibit the sideloading of other app stores, along with Google's "security" measures and cautions, also support the proposition that Google has attained and wields monopoly power in the markets for Android app (and in-app) distribution and in-app payment processing services for U.S. Android app developers.

**D.     Google is an attempted monopolist in the U.S. market for Android OS app stores, and, accordingly, in the markets for app (and in-app) distribution services and payment processing services for U.S. Android app developers.**

56.     Alternatively, for the foregoing reasons, Google is an attempted monopolist in the U.S. market for app stores selling Android OS apps and in-app purchases (and subscriptions as well). While the facts alleged amply support a finding that Google already has attained monopoly status in this U.S. market, at the least, they support a finding that Google is attempting to monopolize this market by improper means.

---

[63] "Amazon's Appstore for Android is well-executed and poised for success," *Forbes*, March 22, 2011, available at: fortune.com/2011/03/22/amazons-appstore-for-android-is-well-executed-and-poised-for-success/ (last accessed Aug. 15, 2020).

[64] "Antitrust: Commission fines Google €4.34 billion for illegal practices regarding Android mobile devices to strengthen dominance of Google's search engine," July 18, 2018, available at: http://europa.eu/rapid/press-release_IP-18-4581_en.htm (last accessed Aug. 15, 2020) (emphasis added).

**E.    Apple offers no market constraints via its iOS app store, through which it distributes incompatible apps.**

57.    Nor does Apple, via its iOS mobile operating system, or its iOS apps or iOS App Store, provide any constraints to Google's market power.  The apps are incompatible.  Therefore, Android SO developers cannot sell their Android apps to Android device wieners via Apple's iOS app store.

58.    Furthermore, the switching costs between Android and iOS are high.  Device owners have great sunk costs in their individual spheres: the cost of their phones or tablets; the learning curve inherent in each; and the money and time invested in apps and in-app purchases which, due to technical incompatibilities, they cannot take to iOS devices, to name some.  Also, many owners of Android OS devices will not be able to afford Apple hardware, which is sold at premium prices, or they will not find the potential switch economically sensible, so they decline to make it.

59.    Europe is in accord.  Per the European Commission:

> As a licensable operating system, Android is different from operating systems exclusively used by vertically integrated developers (like Apple iOS or Blackberry). Those are not part of the same market because they are not available for licence by third party device manufacturers.

> Nevertheless, the Commission investigated to what extent competition for end users (downstream), in particular between Apple and Android devices, could indirectly constrain Google's market power for the licensing of Android to device manufacturers (upstream). The Commission found that this competition does not sufficiently constrain Google upstream for a number of reasons, including:

> end user purchasing decisions are influenced by a variety of factors (such as hardware features or device brand), which are independent from the mobile operating system;

> Apple devices are typically priced higher than Android devices and may therefore not be accessible to a large part of the Android device user base;

> Android device users face switching costs when switching to Apple devices, such as losing their apps, data and contacts, and having to learn how to use a new operating system; and

> even if end users were to switch from Android to Apple devices, this would have limited impact on Google's core business. That's because Google Search is set as the default search engine on Apple devices and Apple users are therefore likely to continue using Google Search for their queries.[65]

---

[65] *See* "Antitrust: Commission fines Google €4.34 billion for illegal practices regarding Android mobile devices to strengthen dominance of Google's search engine," available at: http://europa.eu/rapid/press-release_IP-18-4581_en.htm. (last accessed Aug. 15, 2020).

60.     Regarding app stores specifically, the European Commission has stated:

> Google is dominant in the worldwide market (excluding China) for app stores for the Android mobile operating system. Google's app store, the Play Store, accounts for more than 90% of apps downloaded on Android devices. This market is also characterised by high barriers to entry. *For similar reasons to those already listed above, Google's app store dominance is not constrained by Apple's App Store, which is only available on iOS devices.*[66]

**F.     Google engages in unlawful behavior in order to restrain trade and to maintain and grow its monopoly in the markets at issue.**

61.     Google maintains monopoly status in the U.S. Android OS app store market, which ensures that the vast majority of Android OS mobile and tablet owners will purchase paid apps and in-app items from Google Play.

62.     Cornering the market for Android OS app stores translates to colossal profits, as alleged herein.

**1.     Google was recently fined over $5 billion for practices related to Google Play.**

63.     As previewed above, Google's anticompetitive behavior, grounded in its voracious appetite for profit derived from its Android ecosystem, recently led to a €4.34 billion, or $5.1 billion, fine from the European Commission.[67]

64.     As the Commission explained, Google bought "the original developer of the Android operating system [in 2005] and has continued to develop Android ever since."[68] "When Google develops a new version of Android it publishes the source code online." But

> [t]he openly accessible Android source code covers basic features of a smart mobile operating system . . . not Google's proprietary Android apps and services. Device manufacturers who wish to obtain Google's proprietary Android apps and services need to enter into contracts with Google, as part of which Google imposes a number of restrictions. Google also entered into contracts and applied some of these restrictions to certain large mobile network operators, who can also determine which apps and services are installed on devices sold to end users.[69]

---

[66] *Id.* (emphasis added).

[67] *See* http://europa.eu/rapid/press-release_IP-18-4581_en.htm (last accessed Aug. 15, 2020).

[68] *See* n. 65, *supra*.

[69] *Id.*

65.     Thus, a manufacturer of an Android OS smartphone or tablet must obtain a license from Google to pre-load popular Google apps including YouTube,[70] Google Maps, Gmail, and Google Play, among others, all of which come bundled in a take-one/take-all suite.[71]  Google knows that buyers of Android OS devices expect to see popular Google apps such as YouTube and Google Maps pre-loaded onto their phones and tablets.  This bundling practice, which is not grounded on any technical need, ensures an enormous and growing base of Google Play installations and users.  It also reinforces the notion that Google Play is the official Android store, even though competing app stores could serve their needs equally well—if Google didn't unfairly shut them out of the market.

66.     As the European Commission's findings illustrate, Google's aggressive use of GMS, including Google Play; its refusal to distribute competing app store clients via Google Play; and its anti-fragmentation terms, which have the effect of depressing forked Android OS system distribution, thereby further inhibiting the distribution of competing app stores (such as Amazon's Fire OS and Appstore), have led to its 90%+ share of the market for Android OS app stores.[72]  As none of Google's management is either technically or economically necessary, it is plain that Google has maintained monopoly power in the market through anticompetitive means, which has enabled it to maintain the supracompetitive 30% transaction fee that it charges developers on Google Play app and in-app product sales.

---

[70] Consumers want and expect the YouTube app on their Android OS devices.  In fact, a 2013 study confirmed that smartphone users prefer to view video with apps such as the YouTube app versus viewing via their browsers (*i.e.*, by browsing to the YouTube website and viewing video there).  ("Do Smartphone Users View Video with YouTube App or Browsers?" dated March 29, 2013, available at: https://jmango360.com/wiki-pages-trends/mobile-app-vs-mobile-website-statistics/ (last accessed Aug. 17, 2020).)

[71] *See, e.g.*, "The best of Google, right on your devices—Google Mobile Services brings Google's most popular apps and APIs to your Android devices," available at: https://www.android.com/gms/ (last access date cited above).

[72] *See id.*

CLASS ACTION COMPLAINT          - 23 -
Case No.:
010803-11/1334529 V1

**2.    Google has used contracts with device manufacturers as means to its anticompetitive ends.**

67.    Previously, leaked copies of Google's contracts with device manufacturers, called MADAs, provided details of Google's abusive market manipulation.  Upon information and belief, the same or similar contracts, or those with the same intent or restrictions, remain in play today.[73]

68.    If a smartphone or tablet manufacturer such as Samsung or HTC wishes, for example, to pre-load Google's popular and exclusive YouTube app on a given Android OS phone or tablet, then Google requires that the manufacturer agree via its MADA to pre-load Google Play on the device as well.  This results in a tremendous advantage for Google in that yet more devices will carry its store client.[74]

69.    Additionally, such a manufacturer must agree via this contract that it will pass a so-called Android Compatibility Test as to that device, which Google administers and controls in its sole discretion.[75]  This ties to Google's restraint on the production of devices using Android forks as

---

[73] *See* https://www.einfochips.com/blog/how-to-obtain-googles-gms-license-for-android-devices/# (current website of company providing Android compatibility services to entities who want to deploy Google's GMS suite and have already obtained a prospective MADA from Google) (last accessed Aug. 15, 2020).

[74] But Google is still not satisfied.  In fact, Google Play competitors have faced other anticompetitive behavior by Google.  In 2014, for example, a Portuguese firm operating a much smaller app store than Google Play filed an antitrust complaint with the European Commission regarding Google's anticompetitive practices in the app store field.  (*See, e.g.*, http://online.wsj.com/articles/google-faces-fresh-antitrust-complaint-in-europe-1402941192 (last accessed Aug. 15, 2020).)  According to *The Wall Street Journal*, "Aptoide claim[ed] that Google creates obstacles for users to install third-party app stores onto its Android platform, bundles services that are essential to its operating system with Google, and blocks access to Aptoide websites in its Chrome Web browser." (*Id.*)

Aptoide won an antitrust injunction against Google, as detailed below.  (*See* ¶ 92, *infra*.)

[75] *See* Complaint for Violation of the Sherman Act, Clayton Antitrust Act, California Cartwright Act, and California Unfair Competition Law, *Feitelson v. Google Inc.*, Case No. 14-cv-02007, May 5, 2014 (N.D. Cal.) Ex. A (MADA between Google and Samsung), ¶¶ 2.1 ("Devices may only be distributed if all Google Applications  (excluding any Optional Google Applications) authorized for distribution in the applicable Territory are pre-installed on the device, unless otherwise approved by Google in writing."), 2.7 ("The license to distribute Google Applications in Section 2.1 is contingent upon the Device becoming an Android Compatible Device."), 3.4 (providing that "Google Phone-top Search must be set as *the default search provider for all search access points on the Device* providing for the prime placement of Google Applications" (emphasis added) and also providing for the prime placement of "Google Applications"), 3.8(c) ("Company shall configure Network Location Provider to be the default network-based location provider on all Android Compatible Devices."); Ex. B (MADA between Google and HTC), ¶¶ 2.1 (same as ¶ 2.1 in Google-Samsung agreement), 2.7

1   their operating systems, which in turn restricts avenues for distribution of competing app-store

2   clients, as discussed herein.[76]

3         70.    Plaintiff does not yet have sufficient information to identify all other manufacturers

4   beyond Samsung and HTC that have, or have had, MADAs with Google containing these specific (or

5   functionally equivalent) terms. But the Joint Submission of Corrected Exhibit List submitted in a

6   matter called *Oracle v. Google* lists MADAs between Google and a who's who of Android OS

7   device manufacturers, including LG and Sony.[77] Unfortunately, these MADAs are not available for

8   public inspection because they were not entered into evidence in the case. It appears likely,

9   however, that Google has insisted on similar arrangements with some or all of these other

10   manufacturers, in violation of federal and state law, and to the detriment of competition and

11   consumers.

12         71.    Furthermore, Google also currently provides a long list of brands whose devices are

13   equipped with the GMS suite (including, of course, Google Play).[78] As alleged herein, Google

14   requires entry into a MADA or MADA-like contract to license GMS.

15         72.    Because of Google's secrecy, plaintiff is unaware as to whether MADAs as such, or

16   updated versions, continue to be the specific operative documents between Google and

17   manufacturers. But plainly Google continues to bundle its apps, including Google Play, into a suite

18   (the GMS suite) for U.S. distribution, and plainly they can only be licensed by contract.[79]

19

20

---

21   (same as ¶ 2.7 in Google-Samsung agreement), 3.4 (same as ¶ 3.4 in Google-Samsung agreement),
3.8(c) (same as ¶ 3.8(c) in Google-Samsung agreement).

22       [76] *See* ¶¶ 47-50, 66.

23       [77] *See Oracle America, Inc. v. Google Inc.* (N.D. Cal. No. 3:10-cv-03561), ECF No. 923 at
entries 83-85, 286, 2742-56, and 2772-93.

24       [78] *See* https://www.android.com/certified/partners/ (last accessed Aug. 15, 2020).

25       [79] *See* https://www.android.com/gms/ (referring to Google Mobile Services (GMS)—"a
collection of Google applications and APIs that help support functionality across devices.") (last
26   accessed Aug. 15, 2020). As Google puts it, "While the Android Open Source Project (AOSP)
provides common, device-level functionalities such as email and calling, GMS is not part of AOSP.
27   GMS is only available through a license with Google and delivers a holistic set of popular apps and
cloud-based services. . . ." (*Id.*) Further, Google "ask[s] GMS partners to pass a simple
28   compatibility test and adhere to [its] compatibility requirements for their Android devices. . . ." (*Id.*)

73.     Google is willing to run afoul of antitrust and unfair competition law because of the importance of its Google Play client.  Google uses its MADAs or similar contracts to restrain and quash competition in the Android OS app store market. There is no lawful reason to compel manufacturers wishing to pre-load the YouTube or Google Maps app onto a device, to pre-load Google Play as well.  These restraints give Google a *de facto* monopoly because most users won't know how to, or will not, sideload an alternative app store onto a phone (if they even know that is a possibility). Google's practice is a pure power play designed to maintain and extend its monopoly in the Android OS app store market.  Its aim, of course, is to impose its super-high 30% transaction fee on developers who have no choice but to pay it.

**G.     Google's practices with respect to Google Play further restrain and injure competition in the market for U.S. Android OS app stores, where already there are high barriers to entry.**

**1.     There are high barriers to entry into the market for Android OS app stores.**

74.     Google's unlawful practices in aid of its monopoly restrain and injure competition in the Android app store market, where already there are high barriers to entry.[80]  A market-participant hopeful must have the resources: to build and maintain the app store client, to program and maintain the requisite software and algorithms going forward, to advertise the client and the steps needed to install it, to keep the marketplace safe, and to process payments at a high volume.

75.     Google keeps the barriers high by refusing to permit distribution of alternative clients via Google Play, which is pre-installed on most Android OS devices by default thanks to Google's GMS bundling practices.  It also keeps them from gaining users by distribution with Android forks, by way of its exclusionary Android anti-fragment terms.

76.     The European Commission also has concluded that there are high barriers to entering the market for Android OS app stores.[81]  The same factors it cited as high barriers to entry in "the

---

[80] *See also* ¶¶ 54-55, 60, *supra*.

[81] *See* "Antitrust: Commission fines Google €4.34 billion for illegal practices regarding Android mobile devices to strengthen dominance of Google's search engine," available at: http://europa.eu/rapid/press-release_IP-18-4581_en.htm.  (*Id.* ("Google is dominant in the worldwide market (excluding China) for app stores for the Android mobile operating system. Google's app store, the Play Store, accounts for more than 90% of apps downloaded on Android devices. This market is also characterised by high barriers to entry. . . .").)  Further, while plaintiff's complaint is

worldwide market (excluding China) for licensable smart operating system," where Google's

Android OS was estimated in 2018 to have "a market share of more than 95%," apply as well with

respect to entry into the U.S. market for Android OS app stores:

> There are high barriers to entry in part due to network effects: the more users use a smart mobile operating system, the more developers write apps for that system – which in turn attracts more users. Furthermore, significant resources are required to develop a successful licensable smart mobile operating system.[82]

### 2. Google manipulates security fears in order to maintain and further its market power in U.S. Android OS app stores.

77.     But Google does not depend solely on high barriers to entry in the app-store

marketplace.  Instead, Google actively manipulates security fears in order to maintain and further its

monopoly in U.S. Android OS stores.

#### a. Google steers consumers to Google Play by scaring them away from alternative sources for Android OS apps.

It isn't enough for Google that Google Play is pre-installed on hundreds of millions of

devices, such that it offers ready access to millions of apps[83]—Google also steers consumers away

from all alternative websites by issuing security warnings from the official Android website.[84]  The

message is that Google Play is safe and protects users; other app stores are very risky, and to be

avoided.  In its "Download apps to your Android device guidance," Google writes:

- You can download free and paid apps from Google Play on your Android Phone. We recommend that you get apps from Google Play. You can also get them from other sources.

- Your phone has a security setting (*Google Play* Protect) that checks for potentially harmful apps, warns you, and removes apps if necessary. Learn how to help protect against harmful apps.

- Download apps from other sources

---

not based on Google search dominance, nonetheless, Google search is germane because Google Play is bundled with Google search products, which has aided in achieving Google Play's monopoly status in the U.S.

[82] *Id.*

[83] https://www.statista.com/statistics/266210/number-of-available-applications-in-the-google-play-store/ ("The number of available apps in the Google Play Store was most recently placed at 2.96 million apps in June 2020, after surpassing 1 million apps in July 2013.") (last accessed Aug. 15, 2020).

[84] https://support.google.com/android/answer/7391672?hl=en&ref_topic=7311596 (last accessed Aug. 15, 2020).

CLASS ACTION COMPLAINT                          - 27 -
Case No.:
010803-11/1334529 V1

**Important**: If you download apps from unknown sources, your device and personal information can be at risk.

- Your phone could get damaged or lose data.

- Your personal information could be harmed or hacked.

- Help Google protect against bad apps from other sources

If you install apps from outside of Google Play, your phone can send Google information about those apps.

This information helps Google better protect everyone from harmful apps. The information can include log information, URLs related to the app, device ID, Android version, and IP address.[85]

78. Google issues these warnings indiscriminately. Like Google Play, the Amazon Appstore is monitored and curated.[86] But no matter. According to Google, it's really too risky to use (assuming the consumer even knows about it). These warnings ring hollow, however, for Google Play itself has proven vulnerable to malware that could harm consumers,[87] in spite of Google's high revenues and profits from which it could draw to better protect its users.

        **b.**     **Google will not permit distribution of alternative app-store clients via Google Play on the false premise that it is too risky for consumers.**

79. In order to become a viable app store, a market hopeful must find a way to persuade Android device owners to sideload the client onto their phones or tablets—after first making a sizeable number aware of its existence. This is no easy task. Users must take obscure and unnecessary steps to access other app stores because Google has decreed it so in order to protect its monopoly power in Android OS app sales. Google will not permit distribution of alternative app-store clients via the *de facto* Google Play acquisition and installation method because it falsely claims that it would be too risky for consumers if it did.

---

[85] *Id*. (emphasis added).

[86] *See, e.g.*, "Amazon Appstore Content Policy," available at: https://developer.amazon.com/docs/policy-center/understanding-content-policy.html (last accessed Aug. 15, 2020).

[87] *See, e.g.*, "Android security: Malicious apps sneak back into Google Play after tweaks," May 9, 2018, available at: https://www.zdnet.com/article/android-security-malicious-apps-sneak-back-into-google-play-after-tweaks/ (last accessed Aug. 15, 2020).

80.     In its "Understanding Android" piece, Google states as "Android Fact #12"[88]:

"Because third-party stores don't always adhere to the strict Google Play Store security checks for apps, Google Play doesn't allow other app stores to be downloaded directly through the Play Store. . . ."  But this self-serving justification does not withstand scrutiny.

81.     First, Google offers no explanation for shutting out *all* app-store clients from Google Play, including those run by well-resourced companies such as Amazon or Samsung.  Further, Google could scrutinize each app-store client as it does other apps before allowing it into Google Play.

82.     And second, Google itself touts initiatives to safety-check and even quarantine or delete *all* apps on Android OS devices, wherever they are obtained.  For example, in its February 2016 white paper titled, "How we keep harmful apps out of Google Play and keep your Android device safe,"[89] Google states:

> Even though we do a lot of work to make Google Play apps safe before they reach you, Google works hard to protect you—no matter where your app comes from. We sandbox each application to constrain bad behavior and if an app wants new permissions, we ask you to confirm at runtime.
>
> In addition to multiple layers of security built into the platform, Android also includes a feature called Verify Apps. Verify Apps continually scans for potentially harmful apps. If an app is discovered later to be potentially harmful, Verify Apps will disable the app and request for you to remove it.
>
> Verify Apps also checks apps you install from outside of Google Play.  If we see an app that looks malicious, we warn you before the installation proceeds. Verify Apps is available on every Android device (2.3+) that has Google Play installed.[90]

83.     As for its more security regime, Google Play Protect, the defendant assures:

> Google Play Protect helps you keep your device safe and secure.
>
> - It runs a safety check on apps from the Google Play Store before you download them.
>
> - It checks your device for potentially harmful apps from other sources. These harmful apps are sometimes called malware.

---

[88] https://www.android.com/everyone/facts/ (last accessed Aug. 15, 2020).

[89] This white paper was linked from the Understanding Android piece cited in paragraph 80 of this complaint.

[90] https://docplayer.net/15116445-How-we-keep-harmful-apps-out-of-google-play-and-keep-your-android-device-safe.html at 4 (last accessed Aug. 15, 2020).

- It warns you about any detected potentially harmful apps found, and removes known harmful apps from your device.

- It warns you about detected apps that violate our Unwanted Software Policy by hiding or misrepresenting important information.

- It sends you privacy alerts about apps that can get user permissions to access your personal information, violating our Developer Policy.[91]

84.     If these assurances are to be believed, then Google already monitors the security of all apps that would be obtained from any competing app store.  These assurances, therefore, alone or coupled with the vetting that Google already performs before releasing any app in Google Play, undercut Google's stated reason for keeping all competing app-store clients out of Google Play.

**3.      Google's refusal to permit app-store clients into Google Play means that only a hardy few will attempt installation of alternative stores.**

85.     By keeping other app-store clients out of Google Play, and by scaring potential users, Google assures that only a hardy few will ever attempt to load another app store front onto their Android OS devices.

86.     The following is an example of the steps Android device consumers must take if they wish to do so—assuming they ever learn of the alternative store's existence, and assuming they consider themselves technically savvy enough to try.  To access the Amazon Appstore, consumers must first obtain a link from an Amazon website.  Then the consumer must do the following:



Step 1

# Download Amazon Appstore

---

[91]
https://support.google.com/android/answer/2812853?p=playprotect_download&hl=en&visit_id=636801711322579028-4051903200&rd=1 (last accessed Aug. 15, 2020).

1. Use link sent to you in email to navigate to the Amazon Appstore download page
2. Tap on "Get Amazon Appstore" button
3. Follow instructions



Step 2

# Enable Unknown Sources

1. In your phone Settings page, tap on "Security" or "Applications" (varies with device)
2. Enable "Unknown Sources" permission
3. Confirm with "OK"



Step 3

# Install and Launch Amazon Appstore

1. In your device's "Download" folder, find and tap on the "Amazon_app.apk" file
2. Tap "Install" on the Android Installer screen
3. Launch the Amazon Appstore[92]

87.     Because of Google's refusal to allow competitors to distribute app-store clients via

Google Play, and because of Android's security features—whose configuration Google controlled as

---

[92] https://www.amazon.com/gp/feature.html/ref=sxts_snpl_1_1_b122686d-95c7-451e-a41b-8f08ca46cdcb?pf_rd_p=b122686d-95c7-451e-a41b-8f08ca46cdcb&docId=1000626391&pf_rd_r=ZSYBJ5ZEY4SCVPB0YXB5&pd_rd_wg=Ou2nJ&pd_rd_w=l6Ci1&qid=1597568508&pd_rd_r=1f985501-51cf-4e11-8fdc-4d076ac56dbb (last accessed Aug. 15, 2020).

the leader of the AOSP—consumers wishing to install an alternative app store had to be willing to turn on the "Unknown Sources" permission referenced in Amazon's Step 2 above. In Android versions released before the Oreo variant, the user first had to find a screen looking like this:



88.     Then, if she opted to turn the switch to the right, she would be greeted with this ominous warning:

If she dared to leave the "Unknown sources" toggle to the on position, she would then have opened her device to all sorts of vulnerabilities—all because she wanted to use another app store to buy apps that might be cheaper than the purchase price in Google Play.

89.     As of Android 8.0, code-named Oreo, Google has changed the permissions structure so that users can authorize downloads from only one source at a time.[93]  It is believed, and therefore alleged, that many Android OS devices in operation today still run on pre-Oreo Android versions, with their scary app permission toggle and warning.  But even with the change brought with Oreo, Google knows and intends that most device users will not know how to access stores and apps

_____

[93] (https://www.android.com/versions/oreo-8-0/ ("Hostile downloader apps can't operate without permission; users now permit the installation of APKs per-source.") (last accessed Aug. 15, 2020).) Oreo was not released to the public until August 21, 2017.  (https://android-developers.googleblog.com/2017/08/introducing-android-8-oreo.html (last accessed Dec. 10, 2018).) As of October 26, 2018, well over a year later, Oreo's worldwide install base was at a mere 21.5%, not counting China.  (https://developer.android.com/about/dashboards/ (last accessed Dec. 10, 2018).)

CLASS ACTION COMPLAINT                                    - 33 -
Case No.:
010803-11/1334529 V1

outside of Google Play, and it knows and intends that they still will be frightened away by having to change a permission switch, given its continued warnings in various guises. For example, users who wish to sideload might see this warning (after first receiving a pre-warning): "Your phone and personal data are more vulnerable to attack by unknown apps. By installing apps from this source, you agree that you are responsible for any damage to your phone or loss of data that may result from their use."[94] Such is the case no matter how reputable the store operator (or other developer). The message Google is plain: you should not risk it; better to stay with Google Play.

**4.** **Even if a consumer succeeds in loading an alternative app-store client onto his or her device, Google may try to shut down access, which harms competition and developers.**

90. If all else fails—if a consumer learns of another app store, figures out how to acquire the client, educates herself on how to install it, and steels himself against Google's dire security warnings, Google may attempt to shut down the consumer's access.

91. Aptoide is a competing Android OS app provider.[95] As such, Google has denied it distribution via Google Play.

92. Google forced Aptoide to go to court to seek an antitrust injunction for sweeping up its distribution app in its Google Play Protect sweeps. And Aptoide won. According to Aptoide's press release:

**EU National Court rules against Google in Anti-Trust process**

*Lisbon, October 19th, 2018*

The Portuguese Courts issued today a decision against Google in relation to the injunction filed by Aptoide. It is applicable on 82 countries including UK, Germany, USA, India, among others. Google will have to stop Google Play Protect from removing the competitor Aptoide's app store from users' phone without users' knowledge which has caused losses of over 2.2 million users in the last 60 days.

The acceptance of the injunction is totally aligned with Aptoide's claim for Google to stop hiding the app store in the Android devices and showing warning messages to the users. Aptoide is now working alongside its legal team to next week fill in courts the main action, demanding from Google indemnity for all the damages caused.

---

[94] "Android Q currently disables 'Install uknown apps' permission after every use," available at https://9to5google.com/2019/04/04/android-q-install-unknown-apps/ (last accessed Aug. 17, 2020).

[95] http://www.aptoide.com/.

- 34 -

This action is part of a complaint against foul play by Google, directed to Android's antivirus software, Google Play Protect. Google's anti-malware system was wrongly identifying Aptoide as a potentially malicious app, hiding and uninstalling it from Android smartphones without user consent.

Aptoide, with over 250 million users, 6 billion downloads and one of the top stores globally, also presented last July, a formal complaint to the European Union's anti-trust departments against Google.

Paulo Trezentos, Aptoide's CEO, says that "For us, this is a decisive victory. Google has been a fierce competitor, abusing his dominant position in Android to eliminate App Store competitors. Innovation is the reason for our 200 million users base. This court's decision is a signal for startups worldwide: if you have the reason on your side don't fear to challenge Google."

According to Carlos Nestal, head of the legal team that worked in the case:

"This case, to our knowledge, is the first of an EU national Court that enforces a clear separation of Android layer and the Services layer. Court is clearly stating that Google's control of the Operating System cannot be used as a competitive advantage in the Services market. We believe this may apply to other situations where Google has competition."[96]

93.     Reports indicate that Samsung's small app store also was caught up in Google's dubious security net.  As androidsage.com reported on June 18, 2018, "[S]ince today, a bunch of Samsung users have reported of Google Play Store flagging the official Samsung Galaxy App Store as potentially dangerous and fake at the extent of even blocking it."[97]  This action no doubt resulted in some number consumers fleeing the store rather than risking continued access to it.  But for those who wanted to keep it, androidsage.com offered a "temporary fix" for those inclined to disregard Google's warnings.[98]

94.     There is no good reason that a company as technologically sophisticated as Google could not whitelist or otherwise continue to permit unimpeded access to competitors' app stores on Android OS devices, including those run by well-known operators such as Amazon and Samsung.  Again, Google is bound and determined to maintain its ill-gotten monopoly market power which allows it to impose its default 30% transaction fee on developer approved in-app product sales.

___

[96] Press release available at, *inter alia*: https://www.androidpolice.com/2018/10/23/aptoide-gains-injunction-google-latest-antitrust-case-compensation-follow/ (last accessed Aug. 15, 2020).

[97] https://www.androidsage.com/2018/06/18/google-play-protect-blocking-galaxy-app-store-how-to-fix/ (last accessed Aug. 15, 2020).

[98] *See id.*

**H. Google's unlawful practices harm developers and competition.**

95. Google's practices in aid of maintaining or attempting a monopoly in the Android OS app store market harm developers and competition by depressing output of transactions in the U.S. market for Android OS app stores. They also directly harm developers by requiring them to pay supracompetitive distribution fees.

**1. Google's behavior stifles innovation.**

96. Google's abusive behavior also stifles innovation in the U.S. market for Android OS app stores.[99]

97. For example, Amazon devised an alternative way of distributing Android OS apps, Amazon Underground, which makes apps and in-app purchases "actually free" to consumers.[100] Amazon pays developers according to how much time consumers spend interacting with the apps.[101] Yet Google's developer terms will not allow Amazon to distribute the client for this app via Google Play (even as Amazon distributes several other apps through the store).[102]

98. In fact, shortly after Amazon introduced Amazon Underground by integrating it into its larger shopping app, Google changed its developer terms to prohibit distribution of an app store in that manner.[103] This forced Amazon to remove its Appstore from its shopping app—and to lose that promising avenue of distribution.

---

[99] *E.g.*, Stephen D. Houck, *Injury to Competition/Consumers in High Tech Cases*, St. Johns L. Rev. Vol. 5, Iss. 4, 593, 598 (2001) ("Any assessment of a restraint's anticompetitive impact, however, will be incomplete if limited to price and output effects. The restraint's impact on consumer choice and innovation must also be considered.").

[100] *See, e.g.*, "Amazon Underground innovates with free apps but faces challenges," available at https://technology.informa.com/550085/amazon-underground-innovates-with-free-apps-but-faces-challenges (last accessed Oct. 7, 2015).

[101] *Id.*

[102] *See id.*

[103] *See, e.g.*, "[Update: Confirmed] Google Forced Amazon To Remove Its Main Shopping App From The Play Store Because Of Its Appstore Integration," Dec. 11, 2014, available at: https://www.androidpolice.com/2014/12/11/google-may-have-forced-amazon-to-remove-its-main-shopping-app-from-the-play-store-because-of-its-appstore-integration/ (last accessed Dec. 10, 2018).

99.     Surely Google's aggressive, anticompetitive behavior is one reason why Amazon shuttered Amazon Underground in 2019.[104]  Industry analysts perceived Amazon's extreme uphill battle from the outset.  One put it this way:

> The first issue is scale. For a system like this you need critical mass and scale in terms of audience and content. Amazon's hands were tied because they weren't able to make Underground readily available on iOS (obviously) or Google devices.
>
> That means they were always going to be limited to those people with Fire devices or who were motivated enough to use more than one app store. . . .[105]

100.    Another analyst put it thus:

**User acquisition is still the biggest challenge**

> Amazon's revamped plans offer app publishers an innovative new model for monetising certain apps but it may not be enough to address its major challenge: how to persuade Android users to download an alternative store to Google Play. . . .

**Strong app store competition**

> The app store competition is extremely strong. The Google Play Store offers a catalogue of than more one million apps (far greater than Amazon) and comes preinstalled on almost all Android smartphones outside China. The Google Play store is more than sufficient for most users' needs and Google reported more than 1.4bn active devices in September 2015.
>
> Beyond Amazon's own Fire branded smartphone (now discontinued) and tablets, Amazon's store does not come preinstalled on any devices[106] and so app publishers correctly focus first on providing content for Google's store rather than Amazon's.
>
> To download the Amazon Underground app, as with its previous Appstore for Android, users have to change their Android permissions to enable non-Google Play downloads which is a step too far for most customers. Amazon needs to have its store pre-installed on Android smartphones if it is to drive increased adoption. Smartphone brands that wish to reduce their dependency on Google should be open to such a relationship.

**Other stores are unlikely to follow suit, for now**

---

[104] *See, e.g.,* "Why is Amazon shutting down its Underground Initiative?" May 9, 2017, available at: https://www.pocketgamer.biz/mobile-mavens/65694/why-is-amazon-shutting-down-its-underground-initiative/ ("It was part of a long-term strategy with bold ambitions to change the way mobile developers made games, but two years on Amazon has announced that Underground will no longer feature on the Amazon Appstore as of Summer 2017, with the program officially ending in 2019.") (last accessed Aug. 15, 2020).

[105] *Id.* (quoting Oscar Clark, "Author, Consultant and Independent Developer Rocket Lolly Games").

[106] This was as of October 2015, when the referenced article was published.

CLASS ACTION COMPLAINT                          - 37 -
Case No.:
010803-11/1334529 V1

Amazon's Underground app program is a response challenging market position. As a challenger store with limited market share, Amazon has to innovate to attract users. It also needs to give developers a reason to provide content for its store. Amazon can offset the costs of running the Underground program by tying its users more closely into its ecosystem and driving retail transactions and other content revenues; Amazon Prime Video and its retail store are available alongside mobile apps in Underground. Market leaders Apple and Google do not struggle to attract users or app publishers and the share they take from app transactions have become significant revenue streams, so there is no incentive for them to adopt a similar program.[107]

101.    And as Google has done what it can to shut out even a well-resourced potential competitor such as Amazon, Amazon itself continues to soldier on by way of its Amazon Coins program, which allows consumers to buy apps at a discount in the Amazon Appstore.[108] For example, on Aug. 15, 2020, the popular game Minecraft for Android OS is priced at the same nominal sum of $6.99 in both Google Play and the Amazon Appstore.[109]  But by using Amazon Coins, a purchaser could save 20%, bringing her price to approximately $5.59:

# Minecraft

by Mojang
Rated: Guidance Suggested
*4.4 out of 5 stars*83,176 customer ratings

Price: **$6.99**

*Save up to 20%* on this app and its in-app items when you purchase **Amazon Coins**. Learn More

---

[107] *See* "Amazon Underground innovates with free apps but faces challenges," Oct. 7, 2015, available at: https://technology.ihs.com/550085/amazon-underground-innovates-with-free-apps-but-faces-challenges (last accessed Aug. 15, 2020).

[108] Amazon's presumptive revenue split in its own Appstore is also 70% developer / 30% store operator, as with Google and Apple.  On the other hand, its Amazon Coins program allows consumers to save money on the purchase price of apps everyday while developers continue to earn their 70% developer share.  (*See* https://www.amazon.com/dp/B018HB6E80/ref=twister_B009CDKIA8?_encoding=UTF8&psc=1#where (explaining Amazon Coins programs and noting: "The More You Buy, the More You Save. Amazon Coins come in denominations from 300 to 50,000 Amazon Coins. Bigger denominations always have bigger discounts. The savings on an order of 50,000 Coins is always larger than on an order of 300 Coins."); https://www.amazon.com/Amazon-Coins-Apps-Games/b?ie=UTF8&node=13927674011 (more on Coins program) (last accessed Aug. 17, 2020).

[109] *Compare* https://play.google.com/store/apps/details?id=com.mojang.minecraftpe (last accessed Aug. 15, 2020) *with*, https://www.amazon.com/Mojang-Minecraft/dp/B00992CF6W/ref=sr_1_1?s=mobile-apps&ie=UTF8&qid=1549260798&sr=1-1&keywords=minecraft (last accessed Aug. 15, 2020).

CLASS ACTION COMPLAINT                            - 38 -
Case No.:
010803-11/1334529 V1

Sold by: Amazon.com Services LLC.[110]

102.    Unfortunately, there is no evidence that any of these innovative programs has dented Google's market share to any serious degree, which is not surprising considering Google's abusive behavior, including its refusal to permit access via Google Play.

103.    Google's hogging of the U.S. app-store market also stifles innovation in apps—another way it hurts competition generally.  Other vibrant app stores would mean more places for featuring apps.  With so many apps available on the market, product can and does get lost in Google Play.  Developers and competition generally, not to mention individual end-users, would benefit from other venues that would surface good, new product and encourage the development of yet more and better apps—all of which would engender more output in the market here at issue.

### 2.    Google harms developers by killing competition and diminishing consumer choice.

104.    Google's aggressive, anticompetitive behavior diminishes the choice offered by endeavors such as Amazon Underground, which lowered prices (even to zero, with its Actually Free component), while also offering developers another way to earn from their work.  If even another corporate giant could not make the model work given Google's policies and the Google Play behemoth, there is little hope for other prospective competitors to gain significant market share unless Google is required to change its contracts and practices.

### 3.    Google also harms developers and competition by depressing output.

105.    Evidence shows that consumers of app-store products are quite price sensitive.[111]  Google's high transaction fees, therefore, inhibit sales of products sold via Google Play, which has

---

[110] https://www.amazon.com/Mojang-Minecraft/dp/B00992CF6W/ref=sr_1_2?dchild=1&keywords=minecraft&qid=1597603583&s=mobile-apps&sr=1-2 (last accessed Aug. 16, 2020).

[111] *See, e.g.*, "The History of App Pricing, And Why Most Apps Are Free," July 18, 2013, available at: https://flurrymobile.tumblr.com/post/115189750715/the-history-of-app-pricing-and-why-most-apps-are ("Conventional wisdom (backed by a variety of non-Flurry surveys) is that Android users tend to be less affluent and less willing to pay for things than iOS users. Does the app pricing data support that theory? Resoundingly.  As of April 2013, the average price paid for Android apps (including those where the price was free) was significantly less than for iPhone and iPad apps . . . .") (last accessed Aug. 15, 2020); "Only 33% of US Mobile Users Will Pay for Apps This Year," Feb. 5, 2015, available at: https://www.emarketer.com/Article/Only-33-of-US-Mobile-Users-Will-Pay-Apps-This-Year/1011965 ("Put a dollar sign in front of an app, and the number of

the lion's share of the U.S. market for Android OS app stores.[112]  In other words, they depress output.  Developers understand that paying Google's high distribution fees denies them the ability to lower prices as they choose, which deters many from investing in app development and distribution.  Thus, output is depressed.

106.    Furthermore, Google crams too many apps into what is the monopoly Google Play store.  With so many apps in one store, consumers cannot discover the vast majority of them.  They are lost in the forest.  Google's monopoly practices render it impossible to maintain viable alternative stores at any scale; therefore, there are no reasonable alternatives for surfacing good apps elsewhere.  Again, because of the way in which Google willfully makes sideloading a non-alternative for the vast majority of consumers, output is depressed by way of the hiding of apps through overcrowding in Google Play.

107.    Google's $.99 minimum price for U.S. app sales also depresses output.  Google itself recognizes this by way of contractual terms that permit lower minimum prices in 18 other countries[113]: lower prices move more apps.  Again, developers lose volume and real money as a result.  There is no good or pro-competitive reason to deny them pricing flexibility for minimum-priced apps.

**4.    Google harms developers by causing supracompetitive pricing of distribution services for Android OS apps and in-app add-ons, including subscriptions.**

108.    There is no good, pro-competitive, or otherwise justified reason for the 30% fee that Google charges to U.S. app developers for app and in-app product distribution services, the rate of which it has maintained since the opening of its Android OS app store.[114]  Nor is there justification

---

people who are willing to download and install it drops dramatically. According to a new forecast from eMarketer, 80.1 million US consumers will pay for mobile apps at least once this year, representing only 33.3% of all mobile users.") (last accessed Aug. 15, 2020).

[112] *See* ¶¶ 54-55, 60, *supra.*

[113] *See, e.g.*, ¶ 40, *supra.*

[114] *See, e.g.*, "A decade on, Apple and Google's 30% app store cut looks pretty cheesy," Aug. 29, 2018, available at: https://www.theregister.co.uk/2018/08/29/app_store_duopoly_30_per_cent/ ("Apple unveiled the App Store in July 2008, and Android Market the following month, opening with the first Android device that October. Apple set the 30 per cent rate, Google simply followed suit.") (last accessed Aug. 15, 2020); *see also* https://support.google.com/googleplay/android-developer/answer/112622?hl=en ((last accessed Aug. 15, 2020).

CLASS ACTION COMPLAINT                    - 40 -
Case No.:
010803-11/1334529 V1

for its 15% distribution-services fee as to certain subscriptions in place for over a year, the rate of which Google began to offer sometime in 2018. In fact, that Google offers the 15% rate for certain subscriptions only underscores the supracompetitive nature of Google's default 30% commission rate. This unnatural price stability, under the circumstances alleged herein, including what surely is the accrual of economies of scale and pertinent lower costs for various inputs as time has progressed, is a sure sign of Google's unlawful acquisition of monopoly power and the abuse of that market power. Google immediately imposes this charge on developers by way of its contracts of adhesion.

109. Nor do the circumstances give rise to any pro-competitive justification for Google's contractual terms requiring $.99 minimum pricing for paid apps and in-app add-ons. This pricing mandate, too, is an abuse of Google's monopoly power.

### 30% default transaction fee

110. In spite of not having to carry physical inventory (as distinct from a mere bit of digital storage for uploaded content); having such a large and growing pre-install base for the Google Play store, which has multiplied not by building more physical stores but simply by replicating an app; and economies of scale that have grown over time, Google has continued to take from developers nearly a third of every dollar spent as a fee for all covered Google Play transactions. Given how large the market is, there is plainly enough revenue to support app-store functions while providing a healthy profit in the event the 30% transaction fee were lowered to a reasonable rate—one the market could generate on its own but for Google's improperly acquired monopoly in the U.S. market for Android OS app stores and the historic and ongoing abuses of its market power.

### Epic Games

111. In its August 29, 2018 article entitled, "A decade on, Apple and Google's 30% app store cut looks pretty cheesy," *The Register* raised several important points and asked as many hard questions with regard to Google's long-standing fee structure. The impetus for the article was the developer Epic Games' decision to distribute its popular Fortnite game to Android device owners outside of Google Play.[115]

---

[115] https://www.theregister.co.uk/2018/08/29/app_store_duopoly_30_per_cent/ (last accessed Aug. 15, 2020). The article's subtitle and URL refer to a "duopoly." There is no duopoly in a legal

112.    As reported in the article, Epic's CEO, Tim Sweeney, told *Forbes*[116] that "[a]voiding the 30 percent [Google Play] 'store tax' is a part of Epic's motivation."[117]  "It's a high cost in a world where game developers' 70 per cent must cover all the cost of developing, operating, and supporting their games.  And it's disproportionate to the cost of the services these stores perform, such as payment processing, download bandwidth, and customer service."[118]  In a previous *Register* article, Mr. Sweeney put it this way: "[F]rom the [developer's] 70 percent, the developer pays all the costs, of developing the game, operating it, marketing it, acquiring users and everything else.  For most developers that eats up the majority of their revenue."[119]

113.    After noting that one reader of a previous *Register* article had written: "I learned something.  Google take[s] 30%.  That is some serious gouging," the later article stated: "More pertinently, after a decade, is the question why Apple and Google *still* take a 30 per cent cut.  In a competitive marketplace, wouldn't that rate have been whittled down over the years?"[120]  Indeed.

114.    While the scale of Epic's own endeavor—not only the sale of Fortnite outside of Google Play, but [121]a new game store for Android OS device owners—will be small compared to

---

sense, given the incompatibility between Android OS apps on the one hand and Apple iOS apps on the other.

[116] *See* "From 'Fortnite' To 'Fallout 76,' Publishers Are Sick Of Google, Apple and Steam's Store Cuts, Aug.13, 2018, available at: https://www.forbes.com/sites/insertcoin/2018/08/13/from-fortnite-to-fallout-76-publishers-are-sick-of-google-apple-and-steams-store-cuts/#1c118ff2578c (last accessed Aug. 15, 2020) ("Epic announced that Fortnite would indeed be coming to Android, but it would not be sold through the Google Play store. Players would have to (somewhat clunkily) download it from Epic's website on their phones, and the game would then update itself independently of the Play store going forward.").

[117] https://www.theregister.co.uk/2018/08/29/app_store_duopoly_30_per_cent/.

[118] *Id.*

[119] "Game over for Google: Fortnite snubs Play Store, keeps its 30%, sparks security fears, Aug. 3, 2018," Aug. 3, 2018, available at: https://www.theregister.co.uk/2018/08/03/fortnite_security_fears/ (last accessed Aug. 15, 2020). The security fears of which the article also speaks could be avoided if Google Play permitted the distribution of alternative game-store clients through Google Play.

[120] https://www.theregister.co.uk/2018/08/29/app_store_duopoly_30_per_cent/.

[121] *Id.*  The piece goes on to note that Amazon's Appstore might be considered "fairly shabby" today, but points out that it might not remain so "if it could provide incentives to app developers to submit apps[.]"  (Citation omitted).  "Submitting to more than one app store has a very low marginal cost to the developer, so this would make a good proof point for any remedy."  (Citation omitted.)

Google Play, its owners have provided information illustrating the supracompetitive nature of Google's 30% transaction fee. For their own store, Epic will employ a *12%* transaction fee.

115.     This is plenty to achieve a reasonable profit, as explained by Epic's CEO. Per an *MCV* article entitled, "New Epic Games Store takes on Steam with just 12% revenue share – Tim Sweeney answers our questions"[122]:

> "While running Fortnite we [Epic] learned a lot about the cost of running a digital store on PC. The math is quite simple: we pay around 2.5 per cent to 3.5 per cent for payment processing for major payment methods, less than 1.5 per cent for CDN costs (assuming all games are updated as often as Fortnite), and between 1 and 2 per cent for variable operating and customer support costs." Sweeney told us.

> "Fixed costs of developing and supporting the platform become negligible at a large scale. In our analysis, stores charging 30 per cent are marking up their costs by 300 to 400 per cent," he reveals. "But with developers receiving 88 per cent of revenue and Epic receiving 12 per cent, this store will still be a profitable business for us," he explains.[123]

116.     That a newcomer like Epic can run a store profitably with a 12% fee demonstrates how supracompetitive Google's 30% transaction fee truly is. Given Google's experience, huge pre-installation base for Google Play, and its other economies of scale, it's likely that Google could earn a healthy profit by charging even less than 12% per covered transaction.

117.     Notably, Epic's CEO indicates above that the rates are "around 2.5 percent to 3.5 percent . . . for major payment methods." Yet Google charges 30% as its Google Play default rate for in-app purchases (with some subscription rates at 15%, as referenced herein). And this matters deeply to Android developers. The ability for consumers to pay in-app is critical to app developers, who may otherwise forego purchasing app add-ons if they cannot readily do it with the developer's app.[124]

118.     Epic has repeatedly tried to do something about this rate, imposed by Google the monopolist, to no avail. In fact, only last week, Epic tried to offer a lower rate to consumers for

---

[122] https://www.mcvuk.com/business/new-epic-games-store-takes-on-steam-with-just-12-revenue-share-tim-sweeney-answers-our-questions (dated Dec. 4, 2018) (last accessed Aug. 15, 2020).

[123] *Id.*

[124] Complaint for Injunctive Relief, *Epic Games, Inc. v. Google, et al.*, No. 20-cv-05671 (N.D. Cal.), filed Aug. 13, 2020, ECF No. 1, ¶ 134.

virtual currency in its popular Fortnite app for Android, which is distributed via Google Play.[125] Epic offered consumers a choice: pay through Google's payment processing system, or pay 20% less through Epic's.[126]  Within hours, Google, in an exercise of its enormous market power, responded by kicking Fortnite out of Google Play.[127]

119.    Epic responded by filing suit against Google later that day.  Epic's complaint includes Sherman Act monopolization claims and state claims as well.  It seeks injunctive relief against Google.[128]

### Chrome Web Store

120.    Another comparator comes from Google itself.  Google has for years operated the Chrome Web Store, whereby it sells certain apps for use on computers, such as Windows laptops and desktops.[129]  Google's transaction fee for purchases of paid apps or in-app products is only 5%,[130] not Google Play's 30%.  There is no indication that the Chrome Web Store is an eleemosynary venture, or that Google is losing money by way of transaction fees set at 5%.

121.    Tellingly, however, when so-called ARC apps are concerned, the fee goes up to 30% for in-app (and one-time[131]) payments.  ARC stands for App Runtime for Chrome, which is a Google project introduced in 2014 to bring Android apps to devices running Google's Chrome OS.[132] According to Google:

---

[125] *Id.* ¶ 28.

[126] *Id.*

[127] *Id.* ¶ 29.

[128] *Id.* ¶¶ 135-238.

[129] *See* https://chrome.google.com/webstore/category/extensions (last accessed Aug. 15, 2020).

[130] https://developer.chrome.com/webstore/pricing#seller ("Each time someone buys your app using Chrome Web Store Payments, Google charges you a 5% transaction fee.  For example, if you charge $1.99, you'll receive $1.89; if you charge $9.99, you'll receive $9.49.") (last accessed Aug. 15, 2020); https://developer.chrome.com/webstore/money (same transaction fee for in-app payments when using the Chrome Web Store API) (last accessed Aug. 15, 2020).

[131] This is evidently equivalent to charging some amount for the app itself.  (*See* n. 135, *infra*.)

[132] "First set of Android apps coming to a Chromebook near you," Sep. 11, 2014, available at: https://chrome.googleblog.com/2014/09/first-set-of-android-apps-coming-to.html (last accessed Aug. 15, 2020).

> **Note:** In-app payments for ARC apps are subject to a 30% transaction fee. For
> example, if you charge $1.99 for an item offered in an ARC app, you'll receive $1.39.
> *This is to ensure a consistent pricing structure with in-app payments made in apps
> available on Google Play.* ARC does not currently support other purchase models
> including up-front payments, subscriptions and in-app version upgrades; as these
> types of purchases require provisioning from Google Play which is not currently
> enabled. . . .[133]

In other words, Google *could* charge much less, but it is all-important for it to maintain the 30%

Google Play fee.

### Minimum pricing

122.    The minimum price fixing that Google requires via its adhesive developer contract

likewise is unlawful.  Low-price apps sell especially well, but the developer contract will not allow

regular pricing in the U.S. to fall below $.99, to the detriment of developers who must forego

volumes of lower-price sales.

## V.      INTERSTATE TRADE AND COMMERCE

123.    The activities of Google as alleged in this complaint were within the flow of, and

substantially affected, interstate commerce.  Google Play sells distribution and payment-processing

services across, and without regard to, state lines.

## VI.      RELEVANT MARKETS

### First relevant market

124.    The antitrust injuries alleged herein, including harm to developers and competition,

have occurred in the U.S. market for distribution of Android OS apps, *i.e.*, for distribution services

provided to U.S. Android App Developers.[134]  This market is heavily dominated, to the point of

monopoly status, by Google, including by way of its Google Play store, thanks to Google's willful

and anticompetitive behavior as described in this complaint.  As the European Commission has

found, Google and Google Play, via various anticompetitive practices, have acquired some 90

---

[133] https://developer.chrome.com/webstore/money (last accessed Aug. 15, 2020).

[134] *Cf.* "Antitrust: Commission fines Google €4.34 billion for illegal practices regarding Android
mobile devices to strengthen dominance of Google's search engine," July 18, 2018, available at:
http://europa.eu/rapid/press-release_IP-18-4581_en.htm ("Google is dominant in the worldwide
market (excluding China) for app stores for the Android mobile operating system. Google's app
store, the Play Store, accounts for more than 90% of apps downloaded on Android devices.").

CLASS ACTION COMPLAINT                                  - 45 -
Case No.:
010803-11/1334529 V1

percent of the market worldwide in Android app stores.[135]  There is no reason to believe that Google's share is less than that in the U.S.  Accordingly, Google's share of the relevant market for Android app and in-app distribution services is believed, and therefore alleged, to have reached a similar level of dominance.

125.    Competitors in the relevant market exist, such as Amazon, Aptoide, and Samsung, but they are weak in terms of their own market power.  Each is and has been starved of competitive oxygen by Google's unlawful contracts, policies, and actions.  None has made a serious dent in Google's market share.

126.    Furthermore, due to the incompatibility of Apple's iOS with Google's Android OS, and the resultant incompatibility of iOS and Android OS apps; due to Google's status as a bottleneck retailer; and due, *inter alia*, to the high switching costs among end users, as well as plaintiff and putative class members, Apple's App Store and corresponding distribution services for iOS apps offers no competition to, and is not a substitute for, Google's distribution services for Android OS apps.  Developers, industry, and governments understand that the Android market alleged herein is a discrete one, which Google monopolizes.

127.    For the reasons alleged herein, including the foregoing, the relevant market is a single-brand market or, alternatively, a submarket of a larger market that includes, *inter alia*, Apple's iOS app distribution services.

128.    Google's restraints on competition directly impact the U.S. market for Android OS distribution services as alleged herein.  Google permits and encourages U.S. app developers to sell their apps via Google Play to non-U.S. nationals, and U.S. developers, including the plaintiff, do so.  Upon information and belief, these developers' business relationship and dealings are primarily with Google LLC and Google Payment Corp., which are U.S. entities.  Therefore, the Foreign Trade Antitrust Improvement Act does not apply.  Alternatively, its exceptions apply, including because the

---

[135] *See* European Commission, *Google Android*, Case AT 40099, Commission Decision of 18 July 2018, at 92-97, available at https://ec.europa.eu/competition/antitrust/cases/dec_docs/40099/40099_9993_3.pdf (last accessed Aug. 17, 2020).

1   conduct alleged has a direct, substantial, and reasonably foreseeable effect on trade

2   or commerce which is not trade or commerce with foreign nations.

3        129.    Google is a direct seller of distribution services to Android developers for the sale of

4   apps in or via the Google Play store and for add-ons and other products sold in those apps.[136]

5        130.    Plaintiff seeks relief on behalf of themselves and other developers. Insofar as Google

6   Play may be or is a two-sided platform, lower prices would not lead to any discernible negative

7   indirect network effects under the circumstances described herein. For example, unlike on credit-

8   card transaction platforms, lower fees or prices would not mean less money available to pay rebates

9   or rewards to consumers. To the contrary, Google does not share its transaction fees with

10  consumers. Here, Google's restraints do not help to establish or enhance participation *inter se*

11  developers and consumers, nor do they help to prevent erosion in participation. In fact, Google can

12  point to no considerations that countervail the propriety of the monetary and injunctive relief that

13  Plaintiff seeks.

14        **Second relevant market**

15       131.    The antitrust injuries alleged herein, including harm to developers and competition,

16  have occurred in the U.S. market for Android in-app payment processing, *i.e.*, for payment

17  processing provided to U.S. Android App Developers.[137] Google has enormous power in this

18  market, thanks to its willful and anticompetitive behavior as described in this complaint. As the

19  European Commission has found, Google and Google Play, via various anticompetitive practices,

20  have acquired some 90 percent of the market worldwide in Android app stores.[138] And with few

21  exceptions, Google requires the use of its in-app payment system for in-app product distributions.

22

23     [136] *See, e.g.*, https://play.google.com/store (offering various digital products to consumers for
24  purchase, including apps, at various price points) (last accessed Aug. 15, 2020). The Google Play
    mobile client is installed on hundreds of millions of Android OS devices, as alleged herein, and
    similarly offers various products, including apps, for purchase and sale.

25     [137] *Cf.* "Antitrust: Commission fines Google €4.34 billion for illegal practices regarding Android
26  mobile devices to strengthen dominance of Google's search engine," July 18, 2018, available at:
    http://europa.eu/rapid/press-release_IP-18-4581_en.htm ("Google is dominant in the worldwide
27  market (excluding China) for app stores for the Android mobile operating system. Google's app
    store, the Play Store, accounts for more than 90% of apps downloaded on Android devices.").

28     [138] *See* n.135, *supra*.

1    There, Google's share of the relevant market for Android in-app payment processing is believed, and

2    therefore alleged, to have reached monopoly status.

3        132.    Competitors in the relevant market exist, but their share is exceedingly small given

4    Google's insistence that Android app developers use its own payment processing system for digital

5    products sold in apps acquired from Google Play.  These competitors, such as PayPal, Stripe, and

6    Square, charge many magnitudes less than Google,[139] and they provide better service, including

7    quicker access to funds.[140]  Each is and has been starved of competitive oxygen in the market for

8    Android in-app payment processing by Google's abusive contracts, policies, and actions.  And given

9    the high sales and monetary value of in-app products,[141] certainly the effect on commerce in the

10   market for these services is substantial.

11       133.    For again, due to Google's exclusivist contracts and policies, these competitors offer

12   no substitute for, Google's payment processing services.  Developers, industry, and governments

13   understand that the Android market alleged herein is a discrete one, which Google monopolizes.

14       134.    Based on the reasons alleged herein, including the foregoing, the relevant market is a

15   single-brand market.

16       135.    Google's restraints on competition directly impact the U.S. market for Android in-app

17   payment processing as alleged herein.  Google permits and encourages U.S. app developers to sell

18   their in-app products (in apps purchased in or via Google Play) to non-U.S. nationals, and U.S.

19   developers, including the plaintiff, do so.  Upon information and belief, these developers' business

20   relationship and dealings are primarily with Google LLC and Google Payment Corp., which are U.S.

---

21       [139] In fact, PayPal has a microtransactions program for sellers whose transactions average less

22   than $10.  Its rate is __, without additional per-transaction charges.  Where funds come from a
     PayPal account in the U.S., Paypal charges a fee of 5.0% of the transaction plus a fixed fee based on

23   currency.  *See* "Micropayment Fees," https://www.paypal.com/us/webapps/mpp/merchant-fees (last
     accessed Aug. 17, 2020).

24       [140] *Cf.* "Receiving Payout," available at: https://stripe.com/docs/payouts#payoutschedule

25   (referring to two-business-day and seven-calendar-day payout schedule for U.S. accounts, depending
     on assessed risk level, for the payment processor Stripe) (last accessed Sept. 27, 2019).

26       [141] *See, e.g.*, *Consumer Spending in Mobile Apps Grew 17% in 2019 to Exceed $83 Billion

     *Globally*, SensorTower (Jan. 6, 2020), https://sensortower.com/blog/app-revenue-and-downloads-

27   2019 ("An estimated $61.7 billion was spent in mobile games across both stores last year, 12.8
     percent more than 2018's total of $54.7 billion. This was 74 percent of all in-app spending for

28   2019[.]") (last accessed Aug. 17, 2020).

CLASS ACTION COMPLAINT        - 48 -
Case No.:
010803-11/1334529 V1

entities.  Therefore, the Foreign Trade Antitrust Improvement Act does not apply.  Alternatively, its exceptions apply, including because the conduct alleged has a direct, substantial, and reasonably foreseeable effect on trade or commerce which is not trade or commerce with foreign nations.

136.    Google is a direct seller of Android in-app payment processing services to Android developers for the sale of apps in or via the Google Play store and for add-ons and other products sold in those apps.[142]

137.    Plaintiff seeks relief on behalf of themselves and other developers.  Insofar as Google Play may be or is a two-sided platform, lower prices would not lead to any discernible negative indirect network effects under the circumstances described herein.  For example, unlike on credit-card transaction platforms, lower fees or prices would not mean less money available to pay rebates or rewards to consumers.  To the contrary, Google does not share its transaction fees with consumers.  Here, Google's restraints do not help to establish or enhance participation *inter se* developers and consumers, nor do they help to prevent erosion in participation.  In fact, Google can point to no considerations that countervail the propriety of the monetary and injunctive relief that plaintiff seeks.

## VII.    CLASS ALLEGATIONS

138.    Plaintiff brings this proposed class action pursuant to Fed. R. Civ. P. 23(b)(1), (2), and (3).

139.    Plaintiff brings this action on its own behalf and the following nationwide class, for monetary and injunctive relief based on violations of the federal Sherman Act:

> All U.S. developers of: (a) any paid Android OS app sold in or via the Google Play store, or (b) any paid in-app product (including subscriptions) sold in the Google Play store or via apps distributed in or via the Google Play store.

Excluded from this proposed class are the defendants; defendants' affiliates and subsidiaries; defendants' current or former employees, officers, directors, agents, and representatives; and the

---

[142] *See, e.g.*, https://play.google.com/store (offering various digital products to consumers for purchase, including apps, at various price points) (last accessed Aug. 15, 2020).  The Google Play mobile client is installed on hundreds of millions of Android OS devices, as alleged herein, and similarly offers various products, including apps, for purchase and sale.

district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

140.     Plaintiff also brings this action on its own behalf and the following nationwide class, for monetary and injunctive relief based on violations of California's Unfair Competition Law:

> All U.S. developers of: (a) any paid Android OS app sold in or via the Google Play store, or (b) any paid in-app product (including subscriptions) sold in the Google Play store or via apps distributed in or via the Google Play store.

Excluded from this proposed class are the defendants; defendants' affiliates and subsidiaries; defendants' current or former employees, officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

141.     **Numerosity:**  The exact number of the members of the proposed classes is unknown and is not available to the plaintiff at this time, but upon information and belief, the classes will consist of many thousands of members such that individual joinder in this case is impracticable.

142.     **Commonality:**  Numerous questions of law and fact are common to the claims of the plaintiff and members of the proposed classes.  These include, but are not limited to:

a.     Whether Google unlawfully has conditioned the contractual right of any manufacturer of any Android OS mobile telephone or tablet to pre-install desired Google applications such as the YouTube or Google Maps apps on the manufacturer's agreement also to install the Google Play client, with the object of acquiring or maintaining monopoly status in the U.S. market for Android OS app stores (and correspondingly high market shares in the markets for Android OS distribution services and in-app payment processing services);

b.     Whether there is a U.S. antitrust market (or submarket) for Android OS app distribution services, *i.e.*, for distribution services provided to U.S. Android App Developers;

c.     Whether there is a U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android App Developers;

d.     Whether Google has unlawfully monopolized, or attempted to monopolize, the foregoing markets or submarket;

e.       Whether competition in the U.S. market for Android OS distribution services, or payment processing, has been restrained and harmed by Google's monopolization, or attempted monopolization, of such market(s);

f.       Whether Google has imposed contracts on developers that restrain trade as alleged herein;

g.       Whether developers have been harmed, including by way of having paid more for app transaction or distribution fees, or in-app product payment processing fees, than they would have but for Google's unlawful conduct, as a result of Google's unlawful practices;

h.       Whether plaintiff and members of the proposed classes are entitled to declaratory or injunctive relief to halt Google's unlawful practices, and to their attorney fees, costs, and expenses;

i.       Whether plaintiff and members of the proposed classes are entitled to any damages or restitution incidental to the declaratory or injunctive relief they seek, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief; and

j.       Whether plaintiff and members of the proposed classes are otherwise entitled to any damages or restitution, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief.

143.    **Typicality:** Plaintiff's claims are typical of the claims of the members of the proposed classes. The factual and legal bases of Google's liability are the same and resulted in injury to plaintiff and all of the other members of the proposed classes.

144.    **Adequate representation:** Plaintiff will represent and protect the interests of the proposed classes both fairly and adequately. They have retained counsel competent and experienced in complex class-action litigation. Plaintiff has no interests that are antagonistic to those of the proposed classes, and its interests do not conflict with the interests of the proposed class members it seeks to represent.

145.    **Prevention of inconsistent or varying adjudications:** If prosecution of myriad individual actions for the conduct complained of were undertaken, there likely would be inconsistent or varying results. This would have the effect of establishing incompatible standards of conduct for

the defendant.  Certification of plaintiff's proposed classes would prevent these undesirable

outcomes.

146.    **Injunctive and declaratory relief:**  By way of its conduct described in this

complaint, the defendants have acted on grounds that apply generally to the proposed classes.

Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the

classes as a whole.

147.    **Predominance and superiority:**  This proposed class action is appropriate for

certification.  Class proceedings on these facts and this law are superior to all other available

methods for the fair and efficient adjudication of this controversy, given that joinder of all members

is impracticable.  Even if members of the proposed classes could sustain individual litigation, that

course would not be preferable to a class action because individual litigation would increase the

delay and expense to the parties due to the complex factual and legal controversies present in this

matter.  Here, the class action device will present far fewer management difficulties, and it will

provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by

this Court.  Further, uniformity of decisions will be ensured.

## VIII.   APPLICABILITY OF CALIFORNIA LAW

148.    There is a California law provision incorporated by reference in the Google Play

Terms of Service.[143]  Accordingly, plaintiff alleges that California law applies to the state law claims

they assert on their own behalf, and on behalf of the proposed nationwide classes.

149.    Furthermore, upon information and belief, the unlawful conduct alleged in this

complaint, including the drafting, dissemination, and consummation of anticompetitive contracts and

policies, as well as the levying and collection of Google's supracompetitive 30% transaction fee on

Google Play purchases, and the enforcement of minimum-price terms, was effected, implemented,

adopted, and ratified in the state of California, where Google LLC and Google Payment Corp.

---

[143] *See* Google Play Terms of Service, available at: https://play.google.com/about/play-terms/index.html, which incorporates the Google Terms of Service, the latter of which is available at: https://policies.google.com/terms ("California law will govern all disputes arising out of or relating to these terms, service-specific additional terms, or any related services, regardless of conflict of laws rules. These disputes will be resolved exclusively in the federal or state courts of Santa Clara County, California, USA, and you and Google consent to personal jurisdiction in those courts.").

maintain their U.S. headquarters.  Therefore, a substantial part of the anticompetitive conduct took place in California.  For these reasons, too, plaintiff alleges that they and the proposed nationwide classes are entitled to monetary and injunctive relief pursuant to California law.

### FIRST CAUSE OF ACTION
### VIOLATION OF THE SHERMAN ACT - MONOPOLIZATION OF MARKET FOR ANDROID DISTRIBUTION SERVICES
### (15 U.S.C. § 2)

150.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

151.    Plaintiff brings this federal law claim on its own behalf and on behalf of each member of the proposed nationwide class described above.

152.    For this count, the relevant market is the U.S. market for Android OS app and in-app product distribution services, *i.e.*, for distribution services provided to U.S. Android App Developers,

153.    Google possesses monopoly power in the relevant market.

154.    For the reasons stated herein, substantial barriers to entry and expansion exist in the relevant markets.

155.    Google has the power to exclude competition in the relevant market, and it has willfully used that power, including by way of its unlawful practices in restraint of trade as described herein, in order to achieve, maintain, and expand its monopoly power in that market.

156.    Furthermore, in an exercise of its monopoly market power, and in order to willfully obtain, maintain, and enhance that power, Google has tied in-app payment processing via its Google Pay Billing product to Android OS app distribution via Google Play.  Google has done so via policy, practice, and contract as alleged herein.  In-app payments to U.S. developers run to millions of dollars each year, on millions of transactions.  Therefore, the effect on the tied market for in-app payment processing, as on the tying market for distribution services, is substantial.  Accordingly, Google's tying conduct is *per se* unlawful.  And alternatively, it is unlawful under a rule of reason analysis given the facts and circumstances described herein.

157.    Given this tie, Google's immense market power in the tying market for distribution services, and the substantial effect on commerce in the tied market for Android in-app payment processing, is *per se* unlawful.

CLASS ACTION COMPLAINT                              - 53 -
Case No.:
010803-11/1334529 V1

158.     Google's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rivals in the U.S. market for Android OS app and in-app product distribution services, *i.e.*, for distribution services provided to U.S. Android App Developers.

159.     Google has behaved as alleged herein to achieve, maintain, and grow its monopoly in the U.S. market for Android OS app and in-app product distribution services, *i.e.*, for distribution services provided to U.S. Android App Developers, with the effect being that competition is foreclosed and that developer choice is gravely diminished.  So is innovation.  Additionally, Google has abused its market power by imposing supracompetitive 30% developer transaction fees[144] and minimum price fixing.  Further, Google's actions have depressed output as alleged herein.

160.     There is no business necessity or other pro-competitive justification for Google's conduct.  Instead, Google's actions are designed to destroy competition as alleged herein.

161.     Plaintiff and the federal law class have been injured, and will continue to be injured, in their businesses and property as a result of Google's conduct, including by way of overpaying for distribution services.

162.     Finally, developers, including the plaintiff, are inclined to sell Android OS applications, in-app purchases, and subscriptions via Google Play, or apps purchased therein, in the future, in part because of their investment in their development for the Android OS ecosystem, which is incompatible with Apple's iOS ecosystem.  Plaintiff and the federal law class are entitled to an injunction to prevent Google from persisting in its unlawful behavior to their detriment, including the harm that its behavior is causing to their businesses.

**SECOND CAUSE OF ACTION**
**VIOLATION OF THE SHERMAN ACT – ATTEMPTED MONOPOLIZATION OF MARKET FOR ANDROID DISTRIBUTION SERVICES**
**(15 U.S.C. § 2)**

163.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

164.     Plaintiff brings this claim on its own behalf and on behalf of each member of the proposed nationwide federal law class described above.

---

[144] Or, alternatively, a still supracompetitive 15% commission on certain subscriptions, for what amounts to payment processing services that could be purchased much cheaper from other provider, if Google permitted developers to use them.

165.     Google has attempted to monopolize the U.S. market for Android OS app distribution services, *i.e.*, for distribution services provided to U.S. Android App Developers.

166.     Google's anticompetitive conduct has created a dangerous probability that it will achieve monopoly power in the U.S. market for Android OS app distribution services, *i.e.*, for distribution services provided to U.S. Android App Developers.

167.     Google has a specific intent to achieve monopoly power in the U.S. market for Android OS app distribution services, *i.e.*, for distribution services provided to U.S. Android App Developers.

168.     Google has the power to exclude competition in the U.S. market for Android OS app distribution services, *i.e.*, for distribution services provided to U.S. Android App Developers, and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, in an attempt to monopolize that relevant market.

169.     Google's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rivals in the U.S. market for Android OS app distribution services, *i.e.*, for distribution services provided to U.S. Android App Developers.

170.     Google has behaved as alleged herein in a willful attempt to obtain a monopoly in the U.S. market for Android OS app distribution services, *i.e.*, for distribution services provided to U.S. Android App Developers, with the effect being that competition is foreclosed and that consumer choice is gravely diminished.  So is innovation.  Additionally, Google has abused its market power by insisting on 30% transaction fees[145] and minimum price fixing.  Further, Google's actions have depressed output as alleged herein.

171.     There is no business necessity or other pro-competitive justification for Google's conduct.

---

[145] Or, alternatively, a still supracompetitive 15% commission on certain subscriptions, for what amounts to payment processing services that could be purchased much cheaper from other provider, if Google permitted developers to use them.

172.     Plaintiff and the federal law class have been injured, and will continue to be injured, in their businesses and property as a result of Google's conduct, including by way of overpaying for distribution services.

173.     Finally, developers, including the plaintiff, are inclined to sell Android OS applications, in-app purchases, and subscriptions via Google Play, or apps purchased therein, in the future, in part because of their investment in their development for the Android OS ecosystem, which is incompatible with Apple's iOS ecosystem. Plaintiff and the federal law class are entitled to an injunction to prevent Google from persisting in its unlawful behavior to their detriment, including the harm that its behavior is causing to their businesses.

### THIRD CAUSE OF ACTION
### VIOLATION OF THE SHERMAN ACT - MONOPOLIZATION OF MARKET FOR ANDROID IN-APP PAYMENT PROCESSING SERVICES
### (15 U.S.C. § 2)

174.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

175.     Plaintiff brings this federal law claim on its own behalf and on behalf of each member of the proposed nationwide class described above.

176.     For this count, the relevant market is the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android App Developers.

177.     Google possesses monopoly power in the relevant market.

178.     For the reasons stated herein, substantial barriers to entry and expansion exist in the relevant markets.

179.     Google has the power to exclude competition in the relevant market, and it has willfully used that power, including by way of its unlawful practices in restraint of trade as described herein, in order to achieve, maintain, and expand its monopoly power in that market.

180.     Google's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rivals in the relevant market is the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android App Developers.

181.     Google has behaved as alleged herein to achieve, maintain, and grow its monopoly in the relevant market is the U.S. market for Android in-app payment processing, *i.e.*, for payment

processing provided to U.S. Android App Developers., with the effect being that competition is foreclosed and that developer choice is gravely diminished. So is innovation. Additionally, Google has abused its market power by imposing supracompetitive 30% developer transaction fees[146] and minimum price fixing. Further, Google's actions have depressed output as alleged herein.

182. There is no business necessity or other pro-competitive justification for Google's conduct. Instead, Google's actions are designed to destroy competition as alleged herein.

183. Plaintiff and the federal law class have been injured, and will continue to be injured, in their businesses and property as a result of Google's conduct, including by way of overpaying for payment processing services.

184. Finally, developers, including the plaintiff, are inclined to sell Android OS applications, in-app purchases, and subscriptions via Google Play, or apps purchased therein, in the future, in part because of their investment in their development for the Android OS ecosystem, which is incompatible with Apple's iOS ecosystem. Plaintiff and the federal law class are entitled to an injunction to prevent Google from persisting in its unlawful behavior to their detriment, including the harm that its behavior is causing to their businesses.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF THE SHERMAN ACT – ATTEMPTED MONOPOLIZATION OF MARKET FOR ANDROID IN-APP PAYMENT PROCESSING SERVICES**
**(15 U.S.C. § 2)**

185. Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

186. Plaintiff brings this claim on its own behalf and on behalf of each member of the proposed nationwide federal law class described above.

187. Google has attempted to monopolize the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android App Developers.

188. Google's anticompetitive conduct has created a dangerous probability that it will achieve monopoly power in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android App Developers.

---

[146] Or, alternatively, a still supracompetitive 15% commission on certain subscriptions, for what amounts to payment processing services that could be purchased much cheaper from other provider, if Google permitted developers to use them.

189.    Google has a specific intent to achieve monopoly power in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android App Developers.

190.    Google has the power to exclude competition in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android App Developers, and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, in an attempt to monopolize that relevant market.

191.    Google's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rivals in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android App Developers.

192.    Google has behaved as alleged herein in a willful attempt to obtain a monopoly in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android App Developers, with the effect being that competition is foreclosed and that consumer choice is gravely diminished.  So is innovation.  Additionally, Google has abused its market power by insisting on 30% transaction fees[147] and minimum price fixing.  Further, Google's actions have depressed output as alleged herein.

193.    There is no business necessity or other pro-competitive justification for Google's conduct.

194.    Plaintiff and the federal law class have been injured, and will continue to be injured, in their businesses and property as a result of Google's conduct, including by way of overpaying for payment processing services.

195.    Finally, developers, including the plaintiff, are inclined to sell Android OS applications, in-app purchases, and subscriptions via Google Play, or apps purchased therein, in the future, in part because of their investment in their development for the Android OS ecosystem, which is incompatible with Apple's iOS ecosystem.  Plaintiff and the federal law class are entitled to an

---

[147] Or, alternatively, a still supracompetitive 15% commission on certain subscriptions, for what amounts to payment processing services that could be purchased much cheaper from other provider, if Google permitted developers to use them.

injunction to prevent Google from persisting in its unlawful behavior to their detriment, including the harm that its behavior is causing to their businesses.

## FIFTH CAUSE OF ACTION
## VIOLATION OF THE SHERMAN ACT – RESTRAINT OF TRADE RE: IN-APP PAYMENT PROCESSING
## (15 U.S.C. § 1)

196.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

197.    Google's conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 1.

198.    Google requires app developers to enter its standardized DDA, including Developer Program Policies integrated into that Agreement, as a condition of having their apps distributed through Google's monopolized app store, Google Play. The relevant provisions of these agreements unreasonably restrain competition in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android App Developers.

199.    Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, in order to receive payment for apps and content distributed through Google Play. This includes payments related to in-app purchases of digital content. Further, Google's Developer Program Policies, compliance with which Section 4.1 of the DDA makes obligatory, require that apps distributed through Google Play "must use Google Play In-app Billing [offered by Google Payment] as the method of payment" for such in-app purchases. While Google's Policies exclude certain types of transactions from this requirement, such as the purchase of "solely physical products" or of "digital content that may be consumed outside of the app itself," Google expressly applies its anticompetitive mandate to every "game downloaded on Google Play" and to all purchased "game content."

200.    The challenged provisions serve no sufficient legitimate or pro-competitive purpose and unreasonably restrain competition in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android App Developers.

201.    Google's conduct affects a substantial volume of interstate commerce.

202.    Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output

203.    Plaintiff and putative class members have been harmed by Google's anticompetitive conduct in a manner that the antitrust laws were intended to prevent. They have suffered and continue to suffer damages and irreparable injury, including harm to their businesses, and such damages and injury will not abate unless an injunction issues that will stop Google's anticompetitive conduct.

204.    Developers, including the plaintiff, are inclined to sell Android OS applications, in-app purchases, and subscriptions via Google Play, or apps purchased therein, in the future, in part because of their investment in their development for the Android OS ecosystem, which is incompatible with Apple's iOS ecosystem. Plaintiff and the federal law class are entitled to an injunction to prevent Google from persisting in its unlawful behavior to their detriment.

### SIXTH CAUSE OF ACTION
### VIOLATION OF THE SHERMAN ACT – ALTERNATIVE BASIS FOR TYING AS TO IN-APP PAYMENT-PROCESSING
### (15 U.S.C. § 1)

205.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

206.    Google's conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

207.    Google has unlawfully tied distribution services for Google Play to its in-app payment processor, Google Play Billing, through its DDAs with app developers and its Developer Program Policies.

208.    As demonstrated herein, Google has immense, monopoly power in the tying market— the U.S. market for Android OS app and in-app product distribution services, *i.e.*, for distribution services provided to U.S. Android App Developers. Put another way, with Google Play installed on nearly all Android OS devices and over 90% of downloads on Android OS devices being performed via Google Play, Google has overwhelming market power. Google's market power is further evidenced by its ability to extract supracompetitive taxes on the sale of apps via Google Play.

209. The availability of Google Play for app distribution is conditioned on the app developer accepting a second product, Google's in-app payment processing . Google's foreclosure of alternative app distribution channels thus forces developers, including the plaintiff and putative class members, to use Google's in-app payment processing services. Indeed, Google has expressly its use a condition of reaching Android users through its dominant Google Play store.

210. The tying product, Android app distribution, is distinct from the tied product, Android in-app payment processing, because app developers have alternative in-app payment processing options and would prefer to choose among them independently of how an Android app is distributed. Google's unlawful tying arrangement thus ties two separate products that are in separate markets. Google's contract and written policies underscore their separate nature.[148]

211. Google's conduct forecloses competition in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android App Developers. Given the volume of transactions and the money at issue, Google's conduct thus affects a substantial volume of commerce in that market.

212. Google has thus engaged in a *per se* illegal tying arrangement. *See* ¶¶ 155-157, *supra*.

213. In the alternative only, even if Google's tying conduct does not constitute a *per se* violation of the law, a rule-of-reason analysis of Google's tying arrangement also would demonstrate that it violates the law.

214. As an app developer that consumes in-app payment processing services for its in-app subscription product, plaintiff has been harmed by Google's anticompetitive conduct. Plaintiffs and members of the putative class have suffered and continue to suffer damages and irreparable injury, including ongoing harm to their businesses, and such damages and injury will not abate until the Court issues an injunction ending Google's anticompetitive conduct issues

215. Developers, including the plaintiff, are inclined to sell Android OS applications, in-app purchases, and subscriptions via Google Play, or apps purchased therein, in the future, in part because of their investment in their development for the Android OS ecosystem, which is

---

[148] *See* supra ¶¶ 155-57.

incompatible with Apple's iOS ecosystem. Plaintiff and the federal law class are entitled to an injunction to prevent Google from persisting in its unlawful behavior to their detriment.

**SEVENTH CAUSE OF ACTION**
**VIOLATION OF THE UNFAIR COMPETITION ACT**
**(CAL. BUS. & PROF. CODE §§ 17200 *ET SEQ.*)**

216. Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

217. Plaintiff brings this claim on its own behalf and on behalf of each member of the proposed nationwide California law class described above. Alternatively, if the Court does not apply California law on a nationwide basis, Plaintiff brings this claim on their own behalf and on behalf of each member of a California resident class.

218. California's Unfair Competition Law (UCL) defines "unfair competition" to include any "unlawful, unfair, or fraudulent" business act or practice. CAL. BUS. & PROF. CODE §§ 17200 *et seq.* As these are stated in the disjunctive, the UCL sets up three prongs—the unlawful, unfair, and fraudulent prongs—the violation of any of which constitutes a violation of the UCL

219. Google has engaged in, and continues to engage in, acts of unfair competition as defined in California's UCL. More specifically, Google, based upon the conduct alleged herein, has violated the unlawful and unfair prongs of the UCL.

**Unlawful prong**

220. Google's acts of unfair competition include its violations of the Sherman Act as alleged herein. Therefore, Google has violated the unlawful prong of the UCL.

221. Google's conduct has harmed developers, and developers have overpaid for distribution and in-app payment processing fees, due to Google's unlawful behavior as alleged herein. Google's willfully obtained market power has allowed it to impose its supracompetitive fees on developers. But for Google's exclusionary and anticompetitive behavior, developer charges would have been much lower than what they were.

**Unfair prong**

222. Google's acts of unfair competition include its violations of the Sherman Act and the policies underlying it, as alleged herein. Additionally, Google has behaved unfairly and in violation of public policy as alleged herein. Therefore, Google has violated the unfair prong of the UCL.

223.    Google's conduct has harmed developers, and developers have overpaid for distribution and in-app payment processing fees, due to Google's unfair behavior as alleged herein. Google's willfully obtained market power has allowed it to impose its supracompetitive fees on developers.  But for Google's exclusionary and anticompetitive behavior, developer payments would have been much lower than what they were.

224.    Finally, developers, including the plaintiff, are inclined to sell Android OS applications, in-app purchases, and subscriptions via Google Play, or apps purchased therein, in the future, in part because of their investment in their development for the Android OS ecosystem, which is incompatible with Apple's iOS ecosystem.  Plaintiff and the state law class are entitled to an injunction to prevent Google from persisting in its unlawful behavior to their detriment.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff respectfully requests the following relief:

A.    That the Court certify this case as a class action; that it certify the proposed federal law class on a nationwide basis; the proposed California law class on a nationwide basis; or, alternatively with respect to plaintiff's California law claim, and at a minimum, a California resident class based on California law; and that it appoint them as class representatives and their counsel as class counsel;

B.    That the Court award it and the proposed classes all appropriate relief, to include, but not be limited to, injunctive relief requiring that Google cease the abusive, unlawful, and anticompetitive practices described herein (including pursuant to federal antitrust law, *see, e.g.*, 15 U.S.C. § 26, and state law, *see, e.g.*, Cal. Bus. & Prof. Code § 17203, as requested herein); declaratory relief, adjudging such practices unlawful; as well as monetary relief, whether by way of restitution (*see, e.g.*, Cal. Bus. & Prof. Code § 17203) or damages, including treble damages (*see, e.g.*, 15 U.S.C. § 15(a)), or other multiple or punitive damages, or restitution, where mandated by law (including federal antitrust law, *see, e.g.*, 15 U.S.C. § 15(a)) or equity or as otherwise available; together with recovery of their costs of suit, to include their reasonable attorneys' fees, costs, and expenses (including pursuant to federal antitrust law, *see, e.g.*, 15 U.S.C. § 15(a) and/or 15 U.S.C. §

26; *see also* Cal. Code Civ. Pro. § 1021.5)), together with pre- and post-judgment interest to the maximum levels permitted by law or equity;

        C.     That the Court grant such additional orders or judgments as may be necessary to prevent the unlawful practices complained of herein; and

        D.     That the Court award it and proposed classes such other, favorable relief as may be available and appropriate under federal or state law, or at equity.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable.

DATED: August 17, 2020

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP


By ___*/s/ Benjamin J. Siegel*_____
Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
bens@hbsslaw.com

Steve W. Berman (*pro hac vice forthcoming*)
Robert F. Lopez (*pro hac vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com

Joseph M. Vanek (*pro hac vice forthcoming*)
Eamon P. Kelly (*pro hac vice forthcoming*)
SPERLING & SLATER, P.C.
55 W. Monroe Street, 32nd Floor
Chicago, IL 60603
Telephone: (312) 676-5845
Facsimile: (312) 641-6492
jvanek@sperling-law.com
ekelly@sperling-law.com

*Attorneys for Plaintiff and the Proposed Classes*