Steve W. Berman (*pro hac vice*)
steve@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Ave., Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292

Eamon P. Kelly (*pro hac vice*)
ekelly@sperling-law.com
SPERLING & SLATER P.C.
55 W. Monroe, Suite 3200
Chicago, IL 60603
Telephone: 312-641-3200

*Co-Lead Interim Class Counsel for the
Proposed Class and Attorneys for Plaintiffs
Pure Sweat Basketball, Inc. and LittleHoots
LLC*

Bonny E. Sweeney (SBN 176174)
bsweeney@hausfeld.com
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908

*Co-Lead Interim Class Counsel for the
Proposed Class and Attorneys for Plaintiffs
Peekya App Services, Inc. and Scaliso LLC*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| IN RE GOOGLE PLAY DEVELOPER ANTITRUST LITIGATION | Case No. 3:20-cv-05792-JD |
|---|---|
| | **DEVELOPER PLAINTIFFS' MOTION FOR PRELIMINARY SETTLEMENT APPROVAL** |
| | Date: August 4, 2022<br>Time: 10:00 a.m.<br>Courtroom: 11, 19th Floor<br>Judge: Hon. James Donato |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on August 4, 2022, at 10:00 a.m., or as soon thereafter as the matter can be heard by the above-titled court, in the courtroom of the Honorable James Donato located at the Phillip Burton Federal Building and United States Courthouse, Courtroom 11, 19th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Developer Plaintiffs will move the Court, pursuant to Federal Rule of Civil Procedure 23, for preliminary settlement approval. Developer Plaintiffs' Motion is based on this Notice and Motion, the Memorandum of Points and Authorities in Support of Motion, declarations filed in support thereof, the complete records and files of this action, all other matters of which the Court may take judicial notice, and any other such evidence and oral argument as may be made at the hearing of this matter.

Dated:  June 30, 2022                    Respectfully submitted,

By ____*/s/ Steve W. Berman*_____
   Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
Ted Wojcik (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com
tedw@hbsslaw.com

Ben M. Harrington (SBN 313877)
Benjamin J. Siegel (SBN 256260)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
benh@hbsslaw.com
bens@hbsslaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By *s/ Bonny E. Sweeney*
    Bonny E. Sweeney (SBN 176174)
Kyle Geoffrey Bates (SBN 299114)
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908 (main)
Telephone: (415) 633-1953 (direct)
Facsimile:  (415) 358-4980
bsweeney@hausfeld.com
kbates@hausfeld.com

Melinda R. Coolidge (*pro hac vice*)
Yelena W. Dewald (*pro hac vice*)
**HAUSFELD LLP**
888 16th Street, NW, Suite 300
Washington, DC 20006
Telephone: (202) 540-7200 (main)
Telephone: (202) 540-7144 (direct)
Facsimile:  (202) 540-7201
mcoolidge@hausfeld.com
ydewald@hausfeld.com

Katie R. Beran (*pro hac vice*)
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 985-3270 (main)
Telephone: (267) 702-3215 (direct)
Facsimile:  (215) 985-3271
kberan@hausfeld.com

By     */s/ Eamon P. Kelly*
    Eamon P. Kelly (*pro hac vice*)
Joseph M. Vanek (*pro hac vice*)
Alberto Rodriguez (*pro hac vice*)
**SPERLING & SLATER, P.C.**
55 W. Monroe Street, 32nd Floor
Chicago, IL 60603
Telephone: (312) 676-5845
Facsimile:  (312) 641-6492
jvanek@sperling-law.com
ekelly@sperling-law.com
arodriguez@sperling-law.com

*Interim Co-Lead Class Counsel and Proposed
Settlement Class Counsel*

- ii -

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................................. 1

II.   BACKGROUND ...................................................................................................... 2

    A.    Proceedings to Date ...................................................................................... 2

    B.    Parallel Proceedings and Settlement with Apple ........................................ 4

    C.    The Settlement .............................................................................................. 4

        1.    The Settlement Negotiations ............................................................. 4

        2.    The Settlement Consideration and Release of Claims ...................... 5

            a.    Monetary Relief ....................................................................... 5

            a.    Structural Relief ....................................................................... 5

            b.    Settlement Release .................................................................... 7

        2.    Plan of Allocation ............................................................................. 7

        3.    Notice and Implementation of Settlement ........................................ 8

II.   LEGAL STANDARD ............................................................................................ 10

III.  THE SETTLEMENT WARRANTS PRELIMINARY APPROVAL ...................... 11

    A.    The Settlement is Fair, Reasonable, and Adequate. ................................... 11

        1.    The Class Has Been Zealously Represented. .................................. 11

        2.    The Settlement Agreement Resulted from Arm's-Length
            Negotiations. ..................................................................................... 11

        3.    The Settlement Represents Substantial Relief for the Class. .......... 11

        4.    The Settlement Treats Class Members Equitably. ........................... 14

        5.    The Settlement Satisfies the Remaining Factors Set Forth in the
            Northern District's Procedural Guidance ........................................ 14

            a.    The Settlement Class is Appropriately Narrower than
                the Class Pleaded in the Complaint. ........................................ 15

            b.    The Settlement Release Tracks the Claims Alleged in
                the Complaint. ......................................................................... 16

        c.     Angeion Was Selected as Settlement Administrator Through a Competitive Bidding Process............................................. 16

        d.     Angeion Anticipates an Above Average Claims Rate ........................ 17

        e.     Counsel Will Request Reasonable Attorneys' Fees and Reimbursement of Costs........................................................................ 17

        f.     Plaintiffs Intend to Request Reasonable Service Awards for Named Plaintiffs. ............................................................ 19

        g.     Past Settlements ................................................................... 20

    B.    The Settlement Class Merits Certification. .................................................. 20

        1.    Rule 23(a): Numerosity ............................................................. 21

        2.    Rule 23(a): The Case Involves Questions of Law or Fact Common to the Class.................................................................. 21

        3.    Rule 23(a): Plaintiffs' Claims Are Typical of the Claims of the Class. ....................................................................... 21

        4.    Rule 23(a): Plaintiffs Will Fairly Represent the Interests of the Class. .................................................................. 22

        5.    Rule 23(b)(2): Injunctive Relief Is Appropriate for the Entire Class. .......................................................................... 22

        6.    Rule 23(b)(3): Common Questions of Fact or Law Predominate.................................................................... 23

        7.    The Superiority Requirement is Met. .......................................... 23

    C.    The Proposed Notice Program Satisfies Rule 23. ....................................... 24

    D.    The Court Should Appoint Interim Co-Lead Counsel as Settlement Counsel. ...................................................................................................... 25

    E.    Proposed Schedule for Notice and Final Approval ..................................... 25

IV.    CONCLUSION .................................................................................................... 25

DEVELOPER PLAINTIFFS' MOTION FOR PRELIMINARY SETTLEMENT APPROVAL
CASE NO. 3:20-cv-05792-JD

1

## TABLE OF AUTHORITIES

2

**Page(s)**

### CASES

3

*Amador v. Baca,*
   2020 WL 5628938 (C.D. Cal. Aug. 11, 2020) ..................................................................18

4

5

*Amchem Prods., Inc. v. Windsor,*
   521 U.S. 591 (1997) ...............................................................................................15, 23, 24

6

7

*In re Apple Pod iTunes Antitrust Litig.,*
   2008 WL 5574487 (N.D. Cal. Dec. 22, 2008) ...................................................................23

8

9

*B.K. by next Friend Tinsley v. Snyder,*
   922 F.3d 957 (9th Cir. 2019) .............................................................................................21

10

*Bolton v. U.S. Nursing Corp.,*
   2013 WL 5700403 (N.D. Cal. Oct. 18, 2013) ...................................................................20

11

12

*Brown v. Hain Celestial Grp., Inc.,*
   2014 WL 6483216 (N.D. Cal. Nov. 18, 2014) ...................................................................15

13

14

*Castro v. Sanofi Pasteur Inc.,*
   134 F. Supp. 3d 820 (D.N.J. 2015).....................................................................................23

15

*In re: Cathode Ray Tube (CRT) Antitrust Litig.,*
   2015 WL 9266493 (N.D. Cal. Dec. 17, 2015) ..................................................................14

16

17

*In re: Cathode Ray Tube (CRT) Antitrust Litig.,*
   2016 WL 3648478 (N.D. Cal. July 7, 2016) .....................................................................12

18

19

*Churchill Vill., LLC v. Gen. Elec.,*
   361 F.3d 566 (9th Cir. 2004)..............................................................................................24

20

21

*de Mira v. Heartland Emp't Serv., LLC,*
   2014 WL 1026282 (N.D. Cal. Mar. 13, 2014) ..................................................................18

22

*Epic Games, Inc. v. Apple Inc.,*
   559 F. Supp. 3d 898 (N.D. Cal. 2021).................................................................................13

23

24

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998).............................................................................................22

25

*Hesse v. Sprint Corp.,*
   598 F.3d 581 (9th Cir. 2010)...............................................................................................16

26

27

*In re High-Tech Emp. Antitrust Litig.,*
   985 F. Supp. 2d 1167 (N.D. Cal. 2013)........................................................................21, 24

28

DEVELOPER PLAINTIFFS' MOTION FOR PRELIMINARY SETTLEMENT APPROVAL
CASE NO. 3:20-cv-05792-JD

*Hubbard v. RCM Techs. (USA), Inc.*,
    2020 WL 6149694 (N.D. Cal. Oct. 20, 2020) ...................................................... 21

*In re Hyundai & Kia Fuel Econ. Litig.*,
    926 F.3d 539 (9th Cir. 2019) (en banc) ...................................................... 15, 20, 23

*Lerwill v. Inflight Motion Pictures, Inc.*,
    582 F.2d 507 (9th Cir. 1978) .................................................................................. 22

*In re Linerboard Antitrust Litig.*,
    2004 WL 1221350 (E.D. Penn. June 2, 2004) ...................................................... 19

*In re Lithium Ion Batteries Antitrust Litig.*,
    2020 WL 7264559 (N.D. Cal. Dec. 10, 2020). ...................................................... 13

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
    2013 WL 5979327 (N.D. Cal. Nov. 8, 2013) ...................................................... 23

*Nitsch v. DreamWorks Animation SKG Inc.*,
    2017 WL 399221 (N.D. Cal. Jan. 19, 2017) ...................................................... 10

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) .............................................................. 18

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015) ................................................................................ 18

*Pacheco v. JPMorgan Chase Bank, N.A*
    2017 WL 3335844 (N.D. Cal. Aug. 4, 2017) ...................................................... 14

*In re Resistors Antitrust Litig.*,
    2020 WL 2791922 (N.D. Cal. Mar. 24, 2020) ...................................................... 14

*In re Static Random Access (SRAM) Antitrust Litig.*,
    2008 WL 4447592 (N. D. Cal. Sept. 29, 2008) .................................................... 24

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ................................................................................ 18

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod.*
    *Liab. Litig.*,
    2013 WL 12327929 (C.D. Cal. July 24, 2013) .................................................... 12

*Vasquez v. USM Inc.*,
    2015 WL 12857082 (N.D. Cal. Apr. 13, 2015) (Donato, J.).................................. 10

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) .............................................................................. 19

- vi -

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
    229 F. Supp. 3d 1052 (N.D. Cal. 2017)...................................................................................11

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ..............................................................................................................21

**FEDERAL RULES**

Fed. R. Civ. P. 23 ......................................................................................................*passim*

**OTHER AUTHORITIES**

Procedural Guidance for Class Action Settlements (N.D. Cal. 2018)....................................*passim*

University of San Francisco School of Law & The Huntington National Bank, *2018
    Antitrust Annual Report* (May 2019).......................................................................................18

2 William B. Rubenstein, *Newberg on Class Actions* (5th ed. 2018) ..........................................21

## GLOSSARY OF TERMS

| Term | Definition |
|---|---|
| Berman Decl. | Declaration of Steve W. Berman in Support of Developer Plaintiffs' Motion for Preliminary Settlement Approval, dated June 30, 2022 |
| *Cameron* ECF No. | References to Docket Entries, *Cameron v. Apple Inc.*, Case No. 4:19-cv-03074-YGR (N.D. Cal.) |
| Czeslawski Decl. | Declaration of Richard Czeslawski in Support of Developer Plaintiffs' Motion for Preliminary Settlement Approval, dated June 28, 2022 |
| Einwaechter Decl. | Declaration of Francois Einwaechter in Support of Developer Plaintiffs' Motion for Preliminary Settlement Approval, dated June 16, 2022 |
| Ellis Decl. | Declaration of Lacey Thomas Ellis in Support of Developer Plaintiffs' Motion for Preliminary Settlement Approval, dated June 30, 2022 |
| Named Plaintiffs | Pure Sweat Basketball, Inc., LittleHoots, LLC, Peekya App Services, Inc., and Scalisco LLC |
| SAC | Second Amended Consolidated Class Action Complaint for Violation of the Sherman and Clayton Acts (15 U.S.C. §§ 1, 2, 3, 15, 26), Cartwright Act (Cal Bus. & Prof. Code §§ 16700 et seq.) and Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 et seq.), filed January 24, 2022, ECF No. 182 |
| Scalise Decl. | Declaration of Daniel Scalise in Support of Developer Plaintiffs' Motion for Preliminary Settlement Approval, dated June 29, 2022 |
| Weisbrot Decl. | Declaration of Steven Weisbrot of Angeion Group Regarding the Proposed Notice Plan, dated June 30, 2022 |
| Williams Decl. | Declaration of Michael A. Williams, Ph.D., dated June 30, 2022 |

## I.    PRELIMINARY STATEMENT

Developer Plaintiffs are pleased to report their proposed Settlement with Google. The Settlement, if approved, would resolve the claims of a Settlement Class consisting of nearly 48,000 U.S. Android developers with annual Google Play earnings of $2 million or less during the Settlement Class Period.[1] Nearly all U.S. Android developers earning revenues in the Google Play store—more than 99 percent of the pleaded class—fall within the Settlement Class. These developers populate the Google Play store with apps of all types, improving the functionality, performance, and versatility of Android devices. Under the proposed Settlement, these developers stand to receive substantial monetary payments along with structural relief that, going forward, will improve the Google Play store and help developers better monetize their apps and in-app products.

With respect to monetary relief, the proposed Settlement establishes a $90 million non-reversionary fund from which Settlement Class Members will receive distributions. There will be a $250 minimum payment, and further distributions will be *pro rata* based on the dollar value of service fees Settlement Class Members paid to Google above the 15-percent level during the Settlement Class Period. The $90 million Settlement Fund represents between 36 and 38 percent of estimated single damages, an excellent recovery for an antitrust class action settlement.

As for structural relief, Google has made a set of material commitments that add further value to the Settlement. In particular, Google has:

- Agreed to maintain until at least May 25, 2025 for U.S. Developers, its program, launched in 2021, under which developers pay a reduced 15% service fee on their first $1 million in annual revenues, and acknowledged that the pendency of this lawsuit was a factor in its decision to announce this service fee reduction;

- Agreed to develop an "Indie Apps Corner" that highlights apps from independent and small startup developers on the apps tab on the U.S. homepage of the Google Play Store, valuable real estate that will help such developers get quality apps discovered;

- Committed to revise its Developer Distribution Agreement ("DDA") to make clear that developers may use contact information obtained in-app to communicate with users out-of-app about alternatives to Google Play's billing service for products consumable in-app;

---

[1] The term "Settlement Class Period" refers to the August 17, 2016 to December 31, 2021 period described at ¶ 1.27 of the Settlement Agreement. *See* Berman Decl. Ex. B ¶ 1.27.

- Agreed to make changes to the Android 12 operating system that allow auto updates from third-party Android app stores and to maintain these changes for three years from implementation, and acknowledged that the pendency of this lawsuit was a factor in its decision to invest in this aspect of Android 12; and

- Agreed to publish an annual transparency report providing developers with meaningful data regarding the operation of the Google Play store.

Although not all of these reforms can be quantified with precision, they are all beneficial to the Settlement Class. Developer Plaintiffs' damages expert, Dr. Michael Williams, conservatively estimates that the 15% tier commitment alone could save Settlement Class Members up to $109.8 million in service fees. *See* Williams Decl. ¶ 4.

The proposed Settlement is the product of arm's-length negotiations among experienced counsel with the assistance of one of the nation's most trusted mediators, Professor Eric D. Green. The Settlement terms are fair and the Settlement Class's monetary recovery (relative to potential damages) compares favorably to antitrust settlements approved in this district and across the country. Antitrust cases are inherently risky and, while Developer Plaintiffs believe their claims are sound, recovery is far from certain. If approved, the Settlement will deliver assured, substantial relief to a Settlement Class that could receive less value, or nothing at all, from a litigated outcome.

Developer Plaintiffs respectfully request an Order that: (1) preliminarily approves the proposed Settlement; (2) certifies the Settlement Class; (3) appoints Hagens Berman Sobol Shapiro LLP, Sperling & Slater, P.C., and Hausfeld LLP as Settlement Class Counsel; and (4) approves the manner and form of notice and proposed plan of distribution to Settlement Class Members.

## II.   BACKGROUND

This Court is well-versed in the history of this case. Developers Plaintiffs therefore only briefly summarize the proceedings to date before describing the proposed Settlement and, for comparison purposes, an approved settlement developers secured with Apple on comparable claims.

## A.   Proceedings to Date

Developer Plaintiffs filed initial complaints against Google in August 2020, and their operative Consolidated Second Amended Complaint on January 21, 2021. *See* ECF No. 179.

- 2 -

Asserting claims under the Sherman Act, the Cartwright Act, and California's Unfair Competition Law, Developer Plaintiffs contend that Google monopolizes relevant markets for Android app and in-app-product distribution services, including by tying them together. Developer Plaintiffs contend that, as a result of its monopolization and tying conduct, Google charges developers supra-competitive service fees for the distribution of apps and in-app products.

Google moved to dismiss Developer Plaintiffs' complaint, but after briefing was completed, this Court vacated the hearing given Developer Plaintiffs' intention to amend their pleading. *See* ECF No. 123. Google did not move to dismiss subsequent iterations of Developer Plaintiffs' complaint and filed its operative answer on February 11, 2022. *See* ECF No. 189.

Developer Plaintiffs' case was coordinated for pretrial purposes with similar actions brought by consumers and Epic Games (ECF No. 70) and then incorporated into the *In Re: Google Play Store Antitrust Litigation*, which has since expanded to include claims brought by 39 Attorneys General and Match Group, LLC. Case management has been complex, with the parties negotiating more than twenty protocols and joint status submissions, including with respect to discovery coordination, protective orders (several), depositions, and experts. *See* Berman Decl. ¶ 3.

Coordinated discovery has yielded a massive discovery record and required enormous effort. The parties propounded more than 560 Document Requests and Interrogatories. More than 5.7 million documents and 28.7 million pages have been produced. The parties have collectively taken 45 depositions, and Developer Plaintiffs have taken or defended 26 of these. More than 75 third parties have been subpoenaed for either documents or testimony, or both, with third parties alone producing approximately 600,000 documents. Google has produced massive transactional and revenue datasets that total close to 11 terabytes. Three of the Named Plaintiffs responded to 71 document requests each, and a fourth responded to 92. The Named Plaintiffs also responded to eighteen interrogatories and thirteen preservation interrogatories. *See id.* ¶ 4.

Developer Plaintiffs have worked closely with economic, accounting, and technical experts to build their case. After analyzing the record, these experts prepared four opening expert reports, all dated February 28, 2022, addressing issues related to class certification. After Google served two

- 3 -

opposition reports on March 31, 2022, Developer Plaintiffs' experts prepared three rebuttal reports, which were served on Google on April 25, 2022. Developer Plaintiffs' expert reports total 723 pages, exclusive of backup files. *See id.* ¶ 5.

## B.  Parallel Proceedings and Settlement with Apple

During the pendency of this litigation, Developer Plaintiff Pure Sweat Basketball settled comparable claims asserted against Apple on behalf of a class of developers selling apps and in-app products in Apple's App Store. *See Cameron v. Apple Inc.*, 19-cv-3074 (N.D. Cal.) (YGR). The Apple settlement is similar to the Settlement proposed here.

In the Apple case, the settlement class is comprised of small developers earning up to $1 million in annual App Store proceeds. *See Cameron* ECF No. 396-1 ¶ 1.27. The plaintiffs estimated damages to the Apple settlement class to be between $289 and $329 million. *See Cameron* ECF No. 459-7 ¶ 4. Under the settlement, Apple conveyed $100 million to a Small Developer Assistance Fund. *See Cameron* ECF No. 396-1 ¶ 5.3.1. Apple further agreed to make structural reforms to its App Store that would (as with the Google Settlement proposed here) lock in a 15% tier for small developers, modify Apple's anti-steering guidelines, and commit Apple to improving app discoverability while publishing a transparency report for the benefit of developers. *See id.* ¶ 6.2.

The Apple settlement was preliminarily approved by the Honorable Gonzalez Rogers in November 2021 and, following notice, there was only one objection and just 13 opt outs, notwithstanding a settlement class that included 67,440 unique developer accounts. *See Cameron* ECF No. 471-2 ¶¶ 8, 42-43. Judge Gonzalez Rogers granted final approval on June 10, 2022, concluding that the settlement was "fair, adequate, and reasonable." *See* Berman Decl. Ex. C at 1.

## C.  The Settlement

### 1.  The Settlement Negotiations

The parties engaged in two remote mediation sessions with Professor Eric D. Green. The first occurred on March 8, 2021. *See* Berman Decl. ¶ 6. At that initial session, the parties discussed a potential resolution involving a reduced Google service fee for small developers. Although the

parties did not reach agreement, Google announced shortly after this initial session that it would be reducing its service fee to 15% for the first $1 million in annual earnings for all developers.

After more than another year of intensive litigation, the parties mediated again with Professor Green on May 13, 2022. This second session was conducted after the Apple settlement had been preliminarily approved, which provided a framework for discussions. The parties made substantial progress but, after a full day of negotiations, were unable to reach a final resolution. With a potential settlement within reach, the parties agreed to continue their discussions, and, by the end of day May 24, 2022, the parties reached agreement on the principal terms of the Settlement now being presented for preliminary approval. *See id*. ¶ 7 & Ex. B.

### 2. The Settlement Consideration and Release of Claims

The proposed Settlement provides monetary and structural relief in exchange for a release of claims. These elements of the Settlement are addressed in turn below.

#### a. Monetary Relief

Google has committed to pay $90,000,000 into a Settlement Fund for the benefit of the Settlement Class. *See id.*, Ex. B ¶ 5.1. The Settlement Fund is non-reversionary, meaning that no portion of the fund will ever return to Google. *See id.* ¶ 6.3. Payments from the Settlement Fund will be made on a *pro rata* basis with a minimum payment of $250. *See id.* ¶ 6.2.2. The Settlement Fund represents 36 to 38% of the Settlement Class's single damages. *See infra* Section III.A.3.

#### a. Structural Relief

The Settlement also provides valuable structural relief in five areas.

**Service Fees**. In the Settlement Agreement, Google acknowledges that this litigation was a factor in its decision to reduce its service fees to 15% on the first $1 million of developer earnings each year. *See* Berman Decl. Ex. B ¶ 2.6. The Settlement requires that Google maintain this program for U.S. developers through at least May 25, 2025. *See id.* ¶ 5.2.1. This is valuable relief, particularly because it applies to the first $1 million of earnings, regardless of the developers' total annual earnings. As discussed below, Dr. Williams estimates that Google's adoption and extension of its 15% program could save the Settlement Class $109.8 million in service fees. *See infra* at Section

III.A.3. Named Plaintiffs extol the savings this program will deliver. *See* Czeslawski Decl. ¶¶ 5-8; Ellis Decl. ¶ 5; Scalise Decl. ¶¶ 6-11; Einwaechter Decl. ¶¶ 6-10.

**Discoverability**. One of the most significant challenges for small developers is getting their apps discovered. The Settlement improves discoverability by requiring Google to create an "Indie Apps Corner" on the apps tab on the U.S. homepage of Google Play and maintain it for at least two years following final approval. *See* Berman Decl. Ex. B ¶ 5.2.4. This feature will spotlight a revolving roster of apps created by independent and small startup developers. Developers within the Settlement Class will be able to submit their apps for inclusion in the Indie Apps Corner, and Google will select qualifying apps based on objective criteria. *See id.*; *see also* Czeslawski Decl. ¶ 9 (describing value of "Indie Apps Corner"); Ellis Decl. ¶ 6 (same); Scalise Decl. ¶ 12 (same).

**Competing Stores**. Developer Plaintiffs have alleged that one impediment to distributing apps outside of Google Play is that apps downloaded from other Android app stores do not automatically update. *See* SAC ¶¶ 143. The Android 12 operating system, released by Google on October 4, 2021, facilitates auto updates by allowing "installer apps to perform app updates without requiring the user to confirm the action." *See* Berman Decl. Ex. B ¶ 5.2.3. As part of the Settlement, Google has acknowledged that this litigation was a factor behind this feature of Android 12 and agreed to maintain the changes for at least three years following final approval. *See id.* ¶ 2.7.

**Steering**. Developers that distribute their apps on the Google Play store can sell digital content that can be consumed in their apps (e.g., subscriptions for in-app content) on their own websites without using Google's billing service and paying Google a service fee for the transaction. While Google has indicated that it allows developers to use contact information obtained in-app to communicate out-of-app about this option, this is not facially apparent from Google's Developer Distribution Agreement ("DDA"), which states: "You may not use user information obtained via Google Play to sell or distribute Products outside Google Play." *See id.* ¶ 5.2.2. As part of the Settlement, Google agrees to strike this clause from the DDA after final approval, and to continue to allow developers to use contact information obtained in-app to communicate with users out-of-app for a period of at least three years following final approval. *See id.*

**Transparency**. For at least three years from final approval, Google will publish an annual "transparency report" that (at a minimum) will convey meaningful statistics such as apps removed from Google Play, account terminations, and objective information regarding how users interact with Google Play. *See id.* ¶ 5.2.5.

### b.   Settlement Release

In exchange for the monetary and structural relief just described, the Settlement Class would release Google from all past, present, and future claims "that were brought, could have been brought, or arise from the same facts underlying the claims asserted in [this action]." *See id.* ¶¶ 13.1, 13.2. The proposed Release does not relinquish claims of any developer not within the Settlement Class.

### 2.   Plan of Allocation

Developer Plaintiffs propose allocating settlement funds on a *pro rata* basis to Settlement Class Members, based on the dollar value of service fees they paid to Google above the 15-percent level during the Settlement Class Period, with a minimum payment of $250. *See id.* ¶ 6.2.2. That aligns with Developer Plaintiffs' theory of liability and damages because Dr. Williams estimates damages to Settlement Class Members based on the difference between service fees they paid above the 15-percent level and the lower fees they allegedly would have paid but for Google's allegedly unlawful conduct. *See* Williams Decl. ¶ 8. For example, assume for the purposes of illustration only that Settlement Class Members paid a total of $100 million in service fees above 15 percent during the Settlement Class Period. Also assume that Settlement Class Member A paid $1 million of those service fees to Google. In this hypothetical example, Class Member A would be allocated approximately 1 percent of the net settlement funds available for distribution to the Settlement Class. In addition, all Settlement Class Members will receive at least $250. Estimated minimum payments for some class members will exceed $200,000. *See* Weisbrot Decl. Ex. D at 1.

If funds remain after the first round of distribution, Plaintiffs will submit for Court approval a plan for making additional distributions to Settlement Class Members that submitted a valid claim. Any funds remaining after a second distribution will be provided to Code.org. *See* Berman Decl. Ex.

B ¶¶ 6.2.2 – 6.2.4; Berman Decl. ¶ 14 (describing Code.org). Under no circumstances will unclaimed funds revert to Google. *See id.* Ex. B ¶ 6.3.

### 3.   Notice and Implementation of Settlement

Developer Plaintiffs have attached to this motion a declaration from the Settlement Administrator, Angeion, that proposes a comprehensive notice program and includes a proposed Long Form Notice and Summary Notice (both email and postcard). *See* Weisbrot Decl. ¶¶ 11-34, Exs. B-D. The proposed notice program provides direct notice to all reasonably identifiable Settlement Class Members via email and mail, combined with a state-of-the-art digital notice campaign, and the implementation of a dedicated website and a toll-free telephone line where Settlement Class Members can learn more about the Settlement and their options. *See id.* ¶¶ 35-37.

For direct notice, Angeion will send individual direct notice by email to all of the nearly 48,000 members of the proposed Settlement Class whose contact information can be obtained. Google will provide Angeion with email address information it maintains for developers in the class, and it is likely that Angeion will receive email contact information for all or nearly all Settlement Class Members. Angeion will also employ additional methods to help ensure that as many Settlement Class Members as possible receive notice via email. For example, Angeion will engage in an email updating process to help ensure the accuracy of recipient email addresses and to identify email addresses for Settlement Class Members without one on record. *See id.* ¶¶ 15-17.

The content of the direct notice emails will be the Email Summary Notice attached to the Weisbrot Declaration. *See* Weisbrot Decl. Ex. B. Angeion will also send Summary Postcard Notices to each Settlement Class Member with an address on record. Angeion will again employ best practices to maximize the deliverability of the Summary Postcard Notice. *See id.* ¶¶ 18-22. The proposed Summary Postcard Notice is attached to the Weisbrot Declaration as Exhibit C.

These direct notice documents will provide Settlement Class Members with an identification number that they can use on the settlement website to view their estimated settlement distribution amount. *See id.* ¶ 36. Claimants that attest to owning the developer account receiving the payment will be able to choose from digital payment options such as PayPal, Venmo, and virtual prepaid card.

*See id.* These digital payment options will provide Settlement Class Members with convenient access to their settlement funds while reducing the costs of settlement administration. All Settlement Class Members will also have the option to request and receive a paper check. *See id.*

In addition, the proposed notices will provide general information about the lawsuit and Settlement, while informing Settlement Class Members of the options available to them, including the options of objecting to, or opting out of, the Settlement. *See id.* Exs. B & C.

Angeion will establish a case-specific toll-free hotline and a case-specific website, with the domain reserved as www.googleplaydevelopersettlement.com. *See id.* ¶¶ 35-37. On the settlement website, Settlement Class Members will be able to view general information about this class action, read relevant Court documents, and review important dates and deadlines pertinent to the Settlement. For example, the detailed long form notice (Long Form Notice) will be available for download on the website. *See id.* ¶ 35, Ex. D. The settlement website will be designed to be user-friendly and enable Settlement Class Members to easily find information about the Settlement. The website will also have a "Contact Us" page where Settlement Class Members can send an email with any additional questions to a dedicated email address. *See id.* ¶ 36. Finally, as explained in the preceding paragraphs, the settlement website will provide Settlement Class Members with functionality to use a unique identification number to log in and view their estimated minimum settlement distribution amount and choose a form of payment. *See id.*; *see also id.* Ex. E (Claim Form).

The direct notice campaign will be supplemented with a robust digital campaign to ensure that all potential Settlement Class Members receive notice. Angeion will utilize a form of internet advertising known as Programmatic Display Advertising, which is the leading method of buying digital advertisements in the United States. It employs an algorithm to identify and examine demographic profiles and uses advanced technology to place advertisements on the websites where members of the audience are most likely to visit (these websites are accessible on computers, mobile phones, and tablets). *See id.* ¶¶ 24-27. The digital notice campaign will also include a social media campaign utilizing Twitter, Facebook, and Instagram. The plan will include a paid search campaign on Google to help drive Class Members who are actively searching for information about the

Settlement to the settlement website. *See id.* ¶¶ 28-32. The campaign will be purchased on an arms' length basis from Google, and is an effective element of notice campaigns that Angeion has used in many past notice efforts. *See id.* ¶ 31. The costs of notice and administration will be paid from the Settlement Fund. *See* Berman Decl. Ex. B ¶ 6.1.1.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 23(c) requires judicial approval of any compromise or settlement of class action claims. Preliminary approval is not a dispositive assessment of the fairness of the proposed settlement; rather, preliminary approval assesses only whether the proposed settlement falls within the "range of possible approval." *Vasquez v. USM Inc.*, 2015 WL 12857082, at *2 (N.D. Cal. Apr. 13, 2015) (Donato, J.).[2] Preliminary approval establishes an "initial presumption of fairness, such that notice may be given to the class and the class may have a full and fair opportunity to consider the proposed [settlement] and develop a response." *Nitsch v. DreamWorks Animation SKG Inc.*, 2017 WL 399221, at *1 (N.D. Cal. Jan. 19, 2017). A settlement may preliminarily be approved upon a "showing that the court will likely be able to (i) approve the proposal under Rule 23(c)(2); and (ii) certify the class for purposes of judgement on the proposal." Fed. R. Civ. P. 23(c)(1). Factors courts consider under Rule 23(c)(2) include whether:

(A)    the class representatives and class counsel have adequately represented the class;

(B)    the proposal was negotiated at arm's length;

(C)    the relief provided for the class is adequate, taking into account:

   (i)    the costs, risks, and delay of trial and appeal;

   (ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

   (iii)    the terms of any proposed award of attorney's fees, including timing of payment; and

   (iv)    any agreement required to be identified under Rule 23(c)(3); and

(D)    the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(c)(2). All preliminary approval requirements are met here.

---

[2] Internal quotation, bracket and ellipses marks omitted here and throughout.

1

### III.   THE SETTLEMENT WARRANTS PRELIMINARY APPROVAL

2

**A.   The Settlement is Fair, Reasonable, and Adequate.**

3

**1.   The Class Has Been Zealously Represented.**

4

As described above, interim Class Counsel have aggressively pursued this case. Class

5

Counsel prepared a thorough complaint and briefed a motion to dismiss that Google did not renew

6

when the complaint was amended. *See* ECF Nos. 71, 80, 81, 95. After devoting enormous resources

7

to negotiate discovery parameters and protocols, Class Counsel obtained and analyzed a massive

8

discovery record, which includes more than five million documents and terabytes of transactional

9

data. Class Counsel have conducted and/or defended more than 25 depositions and participated in

10

extensive third-party discovery that has yielded more than 600,000 documents. To prepare for class

11

certification and merits proceedings, Class Counsel retained prominent economic, accounting, and

12

technology experts who prepared thorough reports and rebuttal reports. *See* Berman Decl. ¶¶ 3-5. As

13

their accompanying declarations attest, Named Plaintiffs likewise have furthered the interests of the

14

class by reviewing submissions, conferring with Class Counsel, producing documents, and sitting for

15

depositions. The Settlement Class has been adequately represented.

16

**2.   The Settlement Agreement Resulted from Arm's-Length Negotiations.**

17

The Settlement is the product of sustained negotiations between experienced counsel with a

18

track record of success in antitrust and class-action matters. Negotiations occurred at arm's length,

19

over several sessions, including before one of the nation's leading mediators. Having worked on this

20

case for years, as well as parallel litigation against Apple, Class Counsel understand both the risks

21

and potential recovery of further litigation. Counsel's determination that the settlement is fair and

22

reasonable is afforded "great weight" in the approval analysis. *See In re Volkswagen "Clean Diesel"*

23

*Mktg., Sales Pracs., & Prod. Liab. Litig.*, 229 F. Supp. 3d 1052, 1067 (N.D. Cal. 2017).

24

**3.   The Settlement Represents Substantial Relief for the Class.**

25

Preliminary approval requires consideration of whether the "relief provided for the class is

26

adequate." Fed. R. Civ. P. 23(2). It is here.

27

28

The $90 million Settlement Fund is itself substantial and more than adequate relief. For context, if the Settlement Class were to obtain class certification, survive summary judgment and prevail at trial, its members would stand to recover between approximately $236 million and $248 million in single damages. *See* Williams Decl. Table 1. The Settlement Fund represents between 36 and 38 percent of these single damages. That is a substantial monetary recovery, particularly in comparison to other antitrust settlements. In *In re Cathode Ray Tube (CRT) Antitrust Litig.*, for example, the court approved a settlement representing 20% of single damages, citing a survey of 71 settled antitrust cases which showed a weighted mean settlement of 19%. *See* 2016 WL 3648478, at *7 & n.19 (N.D. Cal. July 7, 2016). The settlement fund in the approved Apple developer settlement represented 30 to 34 percent of asserted damages, slightly below the ratio this settlement secures.

Moreover, the relief afforded by this Settlement is not limited to the Settlement Fund. The Settlement's structural relief elements (individually and collectively) confer additional economic and practical benefits on the Settlement Class. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2013 WL 12327929, at *29. N.7 (C.D. Cal. July 24, 2013) (in valuing a settlement, "Plaintiffs' experts appropriately have included the non-monetary benefits"). As set forth above, Google has made substantial commitments to (a) maintain its reduced 15% tier for the first $1 million in annual earnings through at least May 25, 2025; (b) improve app discoverability for small developers by establishing the "Indie App Corner"; (c) maintain changes to Android 12 that make app distribution through rival Android stores more viable; (d) clarify in its guidelines that developers may use contact information obtained in-app to communicate out-of-app about alternative distribution options; and (c) issue an annual transparency report. Judge Gonzalez Rogers found that similar non-monetary relief in the Apple settlement had "significant value." Berman Decl. Ex. C at 13; *id*. at 3. As set forth above, and in the accompanying declarations of Named Plaintiffs, these are important commitments that will allow Settlement Class Members to better monetize their apps and in-app products. *See supra* Section II.C.2.

Developer Plaintiffs do not attempt to quantify the value of each aspect of the structural relief. The 15% tier commitment, however, can be valued and it is appropriate to do so given

- 12 -

Google's acknowledgment that this case was a factor behind the program's adoption. Dr. Williams shows that the 15% program, coupled with Google's commitment to maintain it through at least May 25, 2025, has the potential to save the Settlement Class $109.8 million. *See* Williams Decl. ¶¶ 4, 17.[3]

Developer Plaintiffs recognize that this litigation may not be solely responsible for Google's 15% program on the first $1 million in earnings. In announcing the program, Google also cited its interest in helping developers reinvest in their apps to "scale up." *See* Berman Decl. Ex. A. Weighing the two factors equally would be reasonable, but even assuming the litigation played a lesser role, it still conferred millions of additional dollars. For example, even if the litigation was 20 percent responsible for the 15% tier, that would mean that the litigation delivered an additional $22 million in redeemable value to the Settlement Class. Combining this available savings with the $90 million Settlement Fund yields a total of $112 million, which represents between 45 and 47 percent of the Settlement Class's single damages. That is a remarkable recovery, and it does not even account for the other structural reforms Google has agreed to implement.

The value of the Settlement must also be weighed against the risks of further litigation. Developer Plaintiffs believe their claims are viable, but the path forward is not without peril. "Antitrust cases are particularly risky, challenging, and widely acknowledge[d] to be among the most complex actions to prosecute." *In re Lithium Ion Batteries Antitrust Litig.*, 2020 WL 7264559, at *15 (N.D. Cal. Dec. 10, 2020). "The best case can be lost and the worst case can be won, and juries may find liability but no damages. None of these risks should be underestimated." *Id.*

Two factors multiply the risks here. *First*, Developer Plaintiffs have not yet passed the class certification hurdle. *Second*, Epic previously tried comparable claims under similar legal theories against Apple, and Epic did not prevail on its Sherman Act claims. *See Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1068 (N.D. Cal. 2021). While Epic did obtain more limited injunctive relief under the UCL, that relief was stayed by the Ninth Circuit and cross-appeals are pending. Rulings from the Ninth Circuit adverse to Epic could pose an obstacle to recovery for the Developer

---

[3] Enrollment is optional, but even assuming conservatively that current program enrollment rates persist, redeemed savings to the Settlement Class will be $39.4 million. *See* Williams Decl. ¶ 18.

DEVELOPER PLAINTIFFS' MOTION FOR PRELIMINARY SETTLEMENT APPROVAL
CASE NO. 3:20-cv-05792-JD

Plaintiffs here. The Settlement eliminates these risks, ensuring that the Settlement Class receives meaningful and immediate relief.

### 4. The Settlement Treats Class Members Equitably.

In addition to evaluating the adequacy of the Settlement overall, the Court must consider whether the "proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(c)(2)(D). A plan of allocation is "governed by the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable and adequate." *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 2015 WL 9266493, at *7 (N.D. Cal. Dec. 17, 2015). Courts routinely uphold allocation plans that divide settlement funds on a pro rata basis. *See id.* (collecting cases); *see also In re Resistors Antitrust Litig.*, 2020 WL 2791922, at *2 (N.D. Cal. Mar. 24, 2020) (Donato, J.) (finding plan to allocate "on a pro rata basis based on the dollar value of approved purchases . . . [to be] fair, reasonable, and adequate").

The allocation plan here proposes that the Settlement Fund be allocated to Settlement Class Members on a *pro rata* basis based on the dollar value of service fees these developers paid above the 15% level, with a minimum payment of $250. This *pro rata* allocation is reasonable, aligns with Developer Plaintiffs' theory of damages, and treats all Settlement Class Members equally. *See Pacheco v. JPMorgan Chase Bank, N.A.*, 2017 WL 3335844, at *1 (N.D. Cal. Aug. 4, 2017) (Donato, J.) (preliminarily approving plan to apportion fund "pro rata based upon the amount each settlement class member paid to [defendant] in connection with the allegedly unlawful [conduct]").

### 5. The Settlement Satisfies the Remaining Factors Set Forth in the Northern District's Procedural Guidance

This District's Procedural Guidance for Class Action Settlements ("Procedural Guidance") instructs parties to address certain factors in any motion to preliminarily approve a class settlement.[4] A number of these factors are addressed throughout this submission. The remaining applicable factors are addressed below.

---

[4] *See* https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### a.    The Settlement Class is Appropriately Narrower than the Class Pleaded in the Complaint.

The Procedural Guidance requires that where, as here, a litigation class has not been certified, a motion for preliminary approval must address "any differences between the settlement class and the class proposed in the operative complaint and [provide] an explanation as to why the differences are appropriate in the instant case." Procedural Guidance § 1(a).

Here, the Settlement Class definition is narrower than the class definition in the Second Amended Consolidated Complaint because it is limited to developers with Google Play earnings no greater than $2 million in each year during the 2016-2021 period. Although narrower, the Settlement Class Definition still covers more than 99 percent of the developers in the pleaded class. *See* Williams Decl. ¶ 6. It excludes only 275 developers. *See id.* By definition, the only developers not participating in the Settlement are the very largest developers, such as Microsoft, Match, and Epic. This is similar to the approved Apple developer settlement, which also involved a developer class of smaller developers that was roughly 99% of the pleaded class. *See* Berman Decl. Ex. C at 6-7.

There is nothing remarkable about moving to certify a narrower settlement class than is pleaded in a complaint. "Class definitions are often revised, for example, to reflect the contours of a settlement." *Brown v. Hain Celestial Grp., Inc.*, 2014 WL 6483216, at *6 (N.D. Cal. Nov. 18, 2014). The narrower definition is appropriate here for at least two reasons.

*First*, narrowing the class definition enhances the cohesiveness of the class and, in doing so, eliminates one potential impediment to certification. The Supreme Court has cautioned that aspects of Rule 23 "designed to protect absentees by blocking unwarranted or overbroad class definitions . . . demand undiluted, even heighted attention in the settlement context." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). The reason is that the class definition in litigated proceedings is inherently provisional. The court can always "adjust the class, informed by the proceedings as they unfold." *Id.*; *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 557 (9th Cir. 2019) (en banc). This is not the case with respect to a settlement class, where the finality of the class definition can support, as here, a more circumscribed approach. To be clear, Developer Plaintiffs believe the Court

- 15 -

could properly certify a class containing small developers and the large developers the Settlement excludes, but nothing is certain in litigation.

*Second*, this is not a situation in which the class was redefined to exclude class members with the smallest claims or who otherwise require the class action vehicle to recover. Quite the opposite. The estimated 275 large developers that fall outside the Settlement Class (less than 1 percent of the pleaded class) are, by definition, the developers most capable of bringing their own actions against Google. Indeed, two of them (Epic and Match) already have. Nothing about the Settlement prevents these developers from bringing their own case, with their own counsel, under their own theories.

### b.    The Settlement Release Tracks the Claims Alleged in the Complaint.

The Procedural Guidance also requires identification of "any differences between the claims to be released and the claims in the operative complaint and an explanation as to why the differences are appropriate in the instant case." Procedural Guidance § 1(c). The Settlement release here extends beyond the specific claims asserted in the Second Amended Consolidated Complaint, but only to encompass potential claims that "could have been brought, or arise from the same facts underlying the claims asserted." Berman Decl., Ex. B ¶¶ 13.1, 13.2. This is an appropriate release that tracks the release approved in the Apple developer settlement. *See id.* Ex. C at 4. As the Ninth Circuit has recognized, a release may properly extend to "claims not alleged in the underlying complaint where those claims depended on the same set of facts as the claims that gave rise to the settlement." *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010).

### c.    Angeion Was Selected as Settlement Administrator Through a Competitive Bidding Process.

Prior to engaging Angeion as the notice and claims administrator, interim Class Counsel sent a Request for Proposal ("RFP") to two other leading settlement administrators. The RFP included a carefully drafted outline requiring the respondents to make the same fixed assumptions about notice and administration of the settlements, ensuring an apples-to-apples comparison. All respondents provided comprehensive responses, and comparable bids. All three proposed direct notice through email, with digital payments by email and paper checks. Angeion offered competitive pricing, with the advantage of having served as the administrator for the comparable settlement achieved in the

- 16 -

Apple developer litigation. Developer Plaintiffs ultimately concluded that Angeion would provide the best value for the Settlement Class. *See* Berman Decl. ¶ 9.

In the last two years, Angeion has worked with Class Counsel on 4 other cases. *See id.* ¶ 10. Angeion estimates total administration costs will be approximately $414,000 or around 0.46% of the Settlement Fund. *See* Weisbrot Decl. ¶ 43.

### d.    Angeion Anticipates an Above Average Claims Rate

The claims rate for the comparable Apple developer settlement provides a useful yardstick for estimating the claims rate here. In Apple, 13.21% of settlement class members filed a claim, and these claims accounted for 32.10% of eligible developer proceeds. *See id.* ¶ 42. The Apple notice plan is nearly identical to the one proposed here, and has been described by Angeion as "one of the most comprehensive and robust plans" it has ever implemented. *See Cameron v. Apple Inc,* 19-cv-3074 (N.D. Cal), ECF No. 477 at 4. While Angeion has sought to drive additional claims by simplifying the claim form with a click-through format, *see* Wesibrot Decl. Ex. E. Angeion ultimately estimates a claims rate comparable to what was achieved in Apple. Specifically, Angeion anticipates that approximately 10-15% of class members will likely submit claims and that these claims will account for approximately 33% of eligible developer proceeds. *See id.* ¶ 42.

### e.    Counsel Will Request Reasonable Attorneys' Fees and Reimbursement of Costs.

When it comes time to evaluate the adequacy of the proposed settlements, the Court also looks to the potentially requested attorney's fees. *See* Fed. R. Civ. P. 23(e)(2)(C)(iii); *see also* Procedural Guidance at § 6. Here, the Settlement Agreement provides that any Court-awarded fees will be paid from the Settlement Fund. *See* Berman Decl., Ex. B ¶ 6.1.2. Plaintiffs will make a request for attorneys' fees of up to $27 million, which represents 24% of the sum of the cash Settlement Fund ($90 million) and structural relief ($22 million) that can be reasonably quantified ($112 million total). This does not account for the other forms of structural relief that were likewise included in the Apple settlement and found, at final approval, to be "valuable to the settlement class." *Id.* Ex. C at 3. The proposed notice advises the Class of Class Counsel's potential fee request, and Google reserves all rights to oppose any fee application made. *See* Weisbrot Decl. Ex. D.

1

2

3

4

5

6

7

8

9

10

Class Counsel's potential fee request is reasonable. When applying the percentage-of-the-fund method, the Ninth Circuit has established a benchmark percentage of 25 percent to be used as the "starting point" for analysis. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949, 955 (9th Cir. 2015). "That percentage amount can then be adjusted upward or downward depending on the circumstances of the case." *de Mira v. Heartland Emp't Serv., LLC*, 2014 WL 1026282, at *1 (N.D. Cal. Mar. 13, 2014). Courts in this district have recognized that "'in most common fund cases, the award *exceeds* the benchmark.'" *Id.* (quoting *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1047 (N.D. Cal. 2008)). Recently, in the 2018 Antitrust Annual Report, Professor Joshua Davis found that among antitrust class action settlements surveyed between 2013 and 2018, the median fee awarded for settlements between $50 and $99 million was 30 percent.[5]

11

12

13

14

15

16

17

18

19

20

21

22

23

24

A fee award of $27 million would represent 30 percent of the $90 million cash Settlement Fund, and thus be well within the range of approved amounts. Moreover, as explained above, the Settlement also provides additional non-monetary relief to the Class. This includes structural relief that locks in Google's 15% service fee program (on the first $1 million earned) until May 2025, and other reforms that will improve app discoverability, facilitate app transactions through competing channels, and enhance transparency. Google's commitments on the 15% program alone will deliver an additional $109.8 in potential savings to the Settlement Class. *See* Williams Decl. ¶¶ 4, 17. Even if Class Counsel's efforts were responsible for just 20 percent of that savings, a conservative assumption, those efforts provide the Settlement Class with $22 million of additional relief. This, and all other forms of non-monetary relief, should be considered in awarding fees. *See Amador v. Baca*, 2020 WL 5628938, at *12 (C.D. Cal. Aug. 11, 2020) (finding an upward adjustment warranted where lawsuit led to institutional policy changes); *Staton v. Boeing Co.*, 327 F.3d 938, 972-74 (9th Cir. 2003) (concluding that "the actual percentage award was much higher" in light of the injunctive relief, which was a "relevant circumstance" in determining a reasonable fee).

25

26

27

28

---

[5] *See* 2018 Antitrust Annual Report: Class Action Filings in Federal Court at 23 (May 2019), available at https://www.huntington.com/-/media/pdf/commercial/antitrust-annual-report-050819.

Through the end of May 2022, Developer Plaintiffs have invested approximately 33,989 hours and approximately $17.48 million in attorneys' fees in this litigation. *See* Berman Decl. ¶ 12. A $27 million attorneys' fee award—the maximum amount requested—would therefore result in a lodestar multiplier of 1.54 (not counting hours after May 2022). That is well within the range of awards in other class action settlements. The Ninth Circuit has affirmed a 6.85 multiplier, holding that it "falls within the range of multipliers that courts have allowed." In *Vizcaino v. Microsoft Corporation*, a leading Ninth Circuit case on attorneys' fees, the Court affirmed a fee award with a 3.66 multiplier. *See* 290 F.3d 1043, 1050-51 (9th Cir. 2002). In *In re Linerboard Antitrust Litigation*, the court explained that "during 2001-2003, the average multiplier approved in common fund class actions was 4.35 and during 30 year period from 1973-2003, [the] average multiplier approved in common fund class actions was 3.89." 2004 WL 1221350, at *16 (E.D. Penn. June 2, 2004).

Developer Plaintiffs will also request reimbursement of certain costs and expenses, not to exceed $6.5 million. *See* Procedural Guidance at § 6 (instructing class counsel to state "whether and in what amounts they seek payment of costs and expenses, including expert fees"). Those expenses include approximately $5 million or more in expert costs. *See* Berman Decl. ¶ 12. The funds spent on experts were critical to achieving the Settlement, which came after Developer Plaintiffs' four experts filed reports supporting class certification, and after three were deposed.

### f. Plaintiffs Intend to Request Reasonable Service Awards for Named Plaintiffs.

Pursuant to § 7 of the Procedural Guidance, Developer Plaintiffs intend to request Service Awards of $10,000 for each of the four Named Plaintiffs. These service awards are warranted.

Named Plaintiffs have been actively involved in the litigation, and because they operate businesses, their involvement and discovery obligations have been more onerous than what is common for consumer class representatives. Each Named Plaintiff reviewed pleadings and consulted with interim Class Counsel regarding case developments. All but one were deposed and devoted numerous hours to preparing for deposition. All conducted document searches and collected

materials, producing approximately 46,000 documents in total. *See* Berman Decl. ¶ 13; Czeslawski

Decl. ¶ 3; Ellis Decl. ¶ 3; Scalise Decl. ¶ 4; Einwaechter Decl. ¶ 4. No Named Plaintiff derived a

personal benefit beyond any recovery to the Settlement Class. In addition, a $10,000 service award

represents just 0.01 percent of the Settlement Fund, such that Named Plaintiffs do not stand to

recover substantially more than other Settlement Class Members. *See Bolton v. U.S. Nursing Corp.*,

2013 WL 5700403, at *6 (N.D. Cal. Oct. 18, 2013) (approving $10,000 service award where average

settlement recovery was estimated to be $595.91).

### g.   Past Settlements

The Procedural Guidance, at § 11, instructs class counsel to provide certain information "for

at least one of their past comparable class settlements." The charts below identify three cases in

which Class Counsel was lead or co-counsel: *Cameron v. Apple Inc.,* 19-cv-03074-YGR (N.D. Cal.);

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation* ("*In re DRAM IPP Antitrust*

*Case"*), No. 02-md-01486-PJH (N.D. Cal.); and *Edwards v. National Milk Producers Federation*

*("In re Milk IPP Antitrust Case")*, No. 11-cv-04766-JSW (N.D. Cal.):

**CAMERON V. APPLE, INC.**
*All figures are best estimates based on public records*

| | % Total Settlement |
|---|---|
| **Settlement:** $100 million + Structural Relief | 100% |
| **Claims Paid:** TBD* | |
| Class members sent notice: 67,440 | |
| Actual claims: 8,910 | 13.21% |
| Opt Outs: 13 (0.019%) | |
| Average recovery per claimant: TBD | |
| Residual: TBD | |
| Cy pres Distribution: TBD | |
| **Attorney Fee Awarded:** $26 million | |
| 26% (of cash fund): TBD | |
| Portion of distributed fund: TBD | |
| **Attorney Costs:** $3.5 million | |
| **Administrative Costs:** TBD | |

*Distributions have not occurred as of date of this filing.

**In re DRAM IPP Antitrust Case**
*All figures are best estimates based on public records*

| | % Total Settlement |
|---|---|
| **Settlement** $310.72 million | 100% |
| **Claims paid** $188,872,426 | 61% |
| Class members sent notice 175.5 million* | |
| Actual claims 445,554 (0.25%) | |
| Opt-outs 5 (0.0%) | |
| Average recovery per claimant $423.90** | |
| **Residual** $2.3 million | 0.75% |
| Cy pres distribution $0 | |
| Reversion $0 | |
| **Attorney fees awarded** $78.3 million | 25% |
| Portion of distributed fund 41% | |
| **Attorney Costs** $11.8 million | 4% |
| **Administrative costs** $1.047 million | 0.3% |

*No direct notice to class members; publication only.
**Median recovery not available.

**In re Milk IPP Antitrust Case**
*All figures are best estimates based on public records*

| | % Total Settlement |
|---|---|
| **Settlement** $52 million | 100% |
| **Claims paid** $35,316,020 | 68% |
| Class members sent notice 186.2 million* | |
| Actual claims 3,542,640 (1.9%) | |
| Opt-outs 1 (0.0%) | |
| Average recovery per claimant** | |
| **Residual** 0 | |
| Cy pres distribution $0 | |
| Reversion $0 | |
| **Attorney fees awarded** $13 million | 25% |
| Portion of distributed fund 37% | |
| **Attorney Costs** $2.4 million | 4.61% |
| **Administrative costs** $1.5 million | 2.81% |

*No direct notice to class members; publication only.
**$7.51 for individuals and $210.28 for organizations.

## B.   The Settlement Class Merits Certification.

Preliminary approval also requires the Court to determine whether it is likely to "certify the

class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B)(ii). While the Court

must assess all applicable requirements of Rule 23, they are "applied differently in litigation classes

and settlement classes." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d at 556. A critical

distinction is that, in the settlement context, the Court need not be concerned with the manageability at trial because "by definition, there will be no trial." *See id.* at 557. This can have profound implications on, *inter alia*, the predominance and superiority inquiries. "A class that is certifiable for settlement may not be certifiable for litigation if the settlement obviates the need to litigate individualized issues that would make a trial unmanageable." *See id.* at 558; *see also* 2 William B. Rubenstein, *Newberg on Class Actions* § 4:63 (5th ed. 2018) ("Courts ... regularly certify settlement classes that might not have been certifiable for trial purposes because of manageability concerns.").

### 1. Rule 23(a): Numerosity

The numerosity requirement is generally satisfied if the class contains 40 members. *See Hubbard v. RCM Techs. (USA), Inc.,* 2020 WL 6149694, at *1 (N.D. Cal. Oct. 20, 2020). The Settlement Class here has nearly 48,000 members. *See* Williams Decl. ¶ 6. That satisfies numerosity.

### 2. Rule 23(a): The Case Involves Questions of Law or Fact Common to the Class.

To satisfy the commonality requirement, "[e]ven a single [common] question will do," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). "Antitrust liability alone constitutes a common question that will resolve an issue that is central to the validity of each class member's claim in one stroke." *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013). To establish antitrust liability here, Developer Plaintiffs must identify a relevant market and Google's monopoly power. These are manifestly common questions, as is the question of whether the Settlement Class has been injured. The commonality requirement is met.

### 3. Rule 23(a): Plaintiffs' Claims Are Typical of the Claims of the Class.

Typicality requires that the Named Plaintiffs' claims be "reasonably coextensive with those of absent class members; they need not be substantially identical." *B.K. by next Friend Tinsley v. Snyder*, 922 F.3d 957, 969-70 (9th Cir. 2019). "In antitrust cases, typicality usually will be established by plaintiffs and all class members alleging the same antitrust violations by defendants." *High-Tech,* 985 F. Supp. 2d at 1181.

Here, while Developer Plaintiffs could have obtained certification of the class defined in the SAC, the narrower Settlement Class definition obviates typicality challenges and coheres the class.

- 21 -

Named Plaintiffs, like all members of the Settlement Class, are developers earning less than $2 million annually through Google Play. *See* Williams Decl. ¶ 7. Named Plaintiffs have an interest in maintaining the structural reforms provided by the Settlement, including Google's reduced 15% service fee on the first $1 million earned, as do all Settlement Class Members. *See* Czeslawski Decl. ¶¶ 5-8; Ellis Decl. ¶ 5; Scalise Decl. ¶¶ 6-11; Einwaechter Decl. ¶¶ 6-10. Named Plaintiffs are typical of the Settlement Class.

### 4. Rule 23(a): Plaintiffs Will Fairly Represent the Interests of the Class.

The adequacy requirement of Rule 23(a) entails two separate inquiries: (a) whether the class representatives have interests that are antagonistic to or in conflict with the interests of the class and (b) whether the representatives are represented by counsel of sufficient diligence and competence to fully litigate the case. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998); *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir.1978). Both requirements are met here.

*First*, Named Plaintiffs have been actively involved at each step of this litigation, as already addressed. *See supra* at Section III.A.5.f. They have no conceivable conflict of interest with the Settlement Class. Named Plaintiffs have suffered the same alleged injury as all Settlement Class Members. To the extent Named Plaintiffs prevail on their claims, they will establish liability and antitrust injury for the entire Settlement Class.

*Second*, Class Counsel have extensive experience in antitrust and complex litigation, including in this Court, and have leveraged that experience to zealously advance the Settlement Class's interests. Class Counsel are committed to prosecuting this action to maximize the Settlement Class's recovery and have a proven track record of litigating efficiently and strategically to achieve that outcome. *See* ECF Nos. 55 & 79. Rule 23(a)(4)'s requirements are met.

### 5. Rule 23(b)(2): Injunctive Relief Is Appropriate for the Entire Class.

Certification under Rule 23(b)(2) is appropriate where the defendant "has acted or refused to act on ground that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Google's restraints and conduct challenged in this litigation apply generally and the Settlement's structural

- 22 -

relief would benefit all Settlement Class Members. Certification under Rule 23(b)(2) is appropriate.

### 6.     Rule 23(b)(3): Common Questions of Fact or Law Predominate.

Class certification is appropriate under Rule 23(b)(3) when "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. This "is a test readily met in certain cases alleging . . . violations of the antitrust laws." *Id.* at 625.

Establishing liability in this action will require resolution of a series of threshold issues that are common to the Settlement Class.[6] The Court must determine whether Developer Plaintiffs have identified relevant markets, a common question. *See In re Apple Pod iTunes Antitrust Litig.*, 2008 WL 5574487, at *4 (N.D. Cal. Dec. 22, 2008). The Court must determine whether Google maintains monopoly power in those markets, a common question. *See id.*; *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 846 (D.N.J. 2015). Next the Court must determine whether the challenged restraints can be upheld with procompetitive justifications, another common question. *See In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 2013 WL 5979327, at *4 (N.D. Cal. Nov. 8, 2013). The impact of Google's conduct on the settlement class can likewise be established with common proof, including expert analysis based on a common methodology. Because this is a settlement class, the Court need not evaluate any manageability issues arising from class treatment, nor are there substantial manageability issues in this case anyway. *See In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d at 556. The predominance requirement is met.

### 7.     The Superiority Requirement is Met.

The superiority inquiry requires assessment of whether a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This requires assessment of whether the settlement will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated without sacrificing

---

[6] Google has indicated that it disagrees that the questions identified here are common questions that could be proved through common evidence at a trial or that a class could be certified for litigation, and it has indicated that, in the absence of this settlement, it would contest class certification.

procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615.

Here, it would be inefficient to litigate the predominately common issues in countless individual proceedings. *See High-Tech*, 985 F. Supp. 2d at 1228-29 ("[T]he nature of Defendants' alleged overarching conspiracy and the desirability of concentrating the litigation in one proceeding weigh heavily in favor of finding that class treatment is superior . . . ."). Moreover, the Settlement Class is comprised only of developers with annual earnings of less than $2 million and for many of them, if not all, damages are too small to justify individual litigation. Class treatment is superior to ensure that these Settlement Class Members have "the opportunity of meaningful redress." *In re Static Random Access (SRAM) Antitrust Litig.*, 2008 WL 4447592, at *7 (N. D. Cal. Sept. 29, 2008).

**C.      The Proposed Notice Program Satisfies Rule 23.**

Rule 23(e)(1) requires that a court approving a class action settlement "direct notice in a reasonable manner to all class members who would be bound by the proposal." In addition, for a Rule 23(b)(3) class, the court must "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004); *see also* Fed. R. Civ. P. 23(c)(2)(B) (describing specific information to be included in the notice).

The notice plan proposed here is the best practicable plan under the circumstances and, given the contact information available, should reach an unusually large segment of the Settlement Class. As set forth in the accompanying declaration of Steven Weisbrot, Angeion will use contact information provided by Google to direct email and/or mail notice to all or virtually all Settlement Class Members. Angeion will employ email verification tools to facilitate delivery, and further notice will be provided pursuant to a robust digital notice campaign. *See* Weisbrot Decl. ¶¶ 12-34.

Notice will be provided in plain terms and easy-to-understand language. To encourage engagement, Angeion's initial Summary Notice (email and postcard) will be short-form versions of the Long Form Notice, which will be accessible on a settlement website. *See id.* All forms of notice

- 24 -

will contain the information required by Rule 23(c)(2)(B) and the Procedural Guidance. *See* Procedural § 3 (Notice); Weisbrot Decl. Exs. B-D. The Summary Email Notice and Summary Postcard Notice will provide unique identification numbers to potential Settlement Class Members and direct them to the Settlement Website where they can identify their minimum settlement distribution, make a claim, and obtain additional information about the Settlement.

These notice provisions satisfy Rule 23 and will provide the Settlement Class with a fair opportunity to review and respond to the proposed Settlement.

**D.     The Court Should Appoint Interim Co-Lead Counsel as Settlement Counsel.**

Rule 23(c)(1)(B) provides that "[a]n order that certifies a class action . . . must appoint class counsel under Rule 23(g). All Rule 23(g) factors weigh in favor of appointing (a) Hagens Berman Sobol Shapiro LLP, (b) Sperling & Slater, P.C., and (c) Hausfeld LLP as Settlement Class Counsel. If appointed, counsel will continue to vigorously pursue this action and devote all necessary resources toward obtaining the best possible result for the Settlement Class.

**E.     Proposed Schedule for Notice and Final Approval**

| Event | Proposed Deadline |
|---|---|
| Entry of Order Granting Preliminary Approval and Directing Notice | Subject to Court's Discretion |
| Notice Campaign and Claims Period Begins ("Notice Date") | 60 Days from Preliminary Approval Order |
| Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards | 30 Days from Notice Date |
| Exclusion and Objection Deadline | 65 Days from Notice Date |
| Motion for Final Approval and Response to Objections | 93 Days from Notice Date |
| Claims Period Closes | 120 Days from Notice Date |
| Final Approval Hearing | At least 135 Days from Notice Date (at the convenience of the Court) |

**IV.     CONCLUSION**

Developer Plaintiffs respectfully request that the Court enter the accompanying Proposed Order preliminarily approving the Settlement and directing notice to the Settlement Class.

Dated:  June 30, 2022                     Respectfully submitted,

By ___*/s/ Steve W. Berman*_____
    Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
Ted Wojcik (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com
tedw@hbsslaw.com

Ben M. Harrington (SBN 313877)
Benjamin J. Siegel (SBN 256260)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
benh@hbsslaw.com
bens@hbsslaw.com

By *s/ Bonny E. Sweeney*_____
    Bonny E. Sweeney (SBN 176174)
Kyle Geoffrey Bates (SBN 299114)
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908 (main)
Telephone: (415) 633-1953 (direct)
Facsimile:  (415) 358-4980
bsweeney@hausfeld.com
kbates@hausfeld.com

Melinda R. Coolidge (*pro hac vice*)
Yelena W. Dewald (*pro hac vice*)
**HAUSFELD LLP**
888 16th Street, NW, Suite 300
Washington, DC 20006
Telephone: (202) 540-7200 (main)
Telephone: (202) 540-7144 (direct)
Facsimile:  (202) 540-7201
mcoolidge@hausfeld.com

DEVELOPER PLAINTIFFS' MOTION FOR PRELIMINARY SETTLEMENT APPROVAL
CASE NO. 3:20-cv-05792-JD

1

ydewald@hausfeld.com

2

Katie R. Beran (*pro hac vice*)
**HAUSFELD LLP**

3

325 Chestnut Street, Suite 900
Philadelphia, PA 19106

4

Telephone: (215) 985-3270 (main)
Telephone: (267) 702-3215 (direct)

5

Facsimile:  (215) 985-3271

6

kberan@hausfeld.com

7

By ____*/s/ Eamon P. Kelly*_____

8

Eamon P. Kelly (*pro hac vice*)
Joseph M. Vanek (*pro hac vice*)

9

Alberto Rodriguez (*pro hac vice*)
**SPERLING & SLATER, P.C.**

10

55 W. Monroe Street, 32nd Floor
Chicago, IL 60603

11

Telephone: (312) 676-5845
Facsimile: (312) 641-6492

12

jvanek@sperling-law.com

13

ekelly@sperling-law.com
arodriguez@sperling-law.com

14

15

*Interim Co-Lead Class Counsel and Proposed
Settlement Counsel*

16

17

18

19

20

21

22

23

24

25

26

27

28

DEVELOPER PLAINTIFFS' MOTION FOR PRELIMINARY SETTLEMENT APPROVAL
CASE NO. 3:20-cv-05792-JD