**Pages 1 - 10**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

```
IN RE GOOGLE PLAY DEVELOPER      )
ANTITRUST LITIGATION             )    NO. 20-md-05792 JD
_____  )
```

San Francisco, California  
Thursday, August 4, 2022

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff Pure Sweat Basketball, Inc:

        HAGENS BERMAN SOBOL SHAPIRO LLP
        715 Hearst Avenue - Suite 202
        Berkeley, California  94710
  **BY:  BENJAMIN J. SIEGEL, ATTORNEY AT LAW**
      **BEN M. HARRINGTON, ATTORNEY AT LAW**

        SPERLING & SLATER P.C.
        55 West Monroe Street - Suite 3200
        Chicago, Illinois  60603
  **BY:  EAMON P. KELLY, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Marla F. Knox, RPR, RMR, CRR
            CSR No. 14421, Official United States Reporter

```
1    APPEARANCES:   (CONTINUED)

2    For Plaintiff Peekya App Services, Inc.:

3                        HAUSFELD LLP
                         1700 K Street NW - Suite 650
4                        Washington, D.C.  20006
                   BY:   MELINDA R. COOLDIGE, ATTORNEY AT LAW
5
     For Defendants:
6
                         MUNGER TOLLES & OLSON LLP
7                        350 South Grand Avenue - 50th Floor
                         Los Angeles, California 90071
8                  BY:   KURUVILLA J. OLASA, ATTORNEY AT LAW
```

| | |
|---|---|
| 1 | **Thursday - August 4, 2022**                                      **11:29 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |

4   **THE CLERK:** Court is back in session. The Honorable
5  James Donato now presiding. Please be seated.
6       Calling Civil 20-5792, In Re: Google Play Developer
7  Antitrust Litigation. Counsel.
8       **MR. HARRINGTON:** Thank you. Ben Harrington for the
9  Developer Plaintiffs from Hagens Berman. I'm joined by my
10 colleague Ben Siegel and my co-counsel Eamon Kelly from
11 Sperling & Slater and Melinda Coolidge from Hausfeld.
12      **THE COURT:** Okay.
13      **MR. OLASA:** Good morning, Your Honor, Kuruvilla Olasa,
14 Munger Tolles and Olson, for Google.
15      **THE COURT:** All right. Well, I just have a couple of
16 questions. How much is each developer going to get?
17      **MR. HARRINGTON:** There is a pro rata distribution.
18 The average payment amount is about $1,800 but the payments
19 range. There is a minimum payment of $250, and then payments
20 go up to above 200,000.
21      That's also the minimum payment amount based on a hundred
22 percent claims rate, which we know we won't achieve. We will
23 have something less so the payments would be somewhat higher.
24      **THE COURT:** Well, I was wondering about that. I mean,
25 you know who all the developers are. So I think you said in

1  some other cases it was like a 14 percent -- why would it be so
2  low?  I mean, just mail the checks out.
3           **MR. HARRINGTON:**  Yeah, so we worked hard on that
4  issue, Your Honor.
5      So the moment we reached an agreement on financial terms
6  with Google, our thought was how are we going to get the money
7  to people.  Our first thought was let's push all the payments
8  out.
9      The problem we ran into -- and it is the same problem we
10 ran into in the *Apple* settlement -- is that there are
11 developers that have multiple accounts.  These can be large
12 developers that would be outside of our class definition.
13     And we understand from Google that there really isn't a
14 systematic way to match all of these developers' accounts.  So
15 if we were to just push payments out, we could end up pushing
16 payments to non-class members.
17     And that's -- that would dilute the settlement fund for
18 legitimate class members.  And it's also a fact that the
19 payments are quite large here.  I mean, we are talking about
20 some payments above $200,000.
21     And so our thought was if we are going to push that type
22 of money out or sending that type of money out, we should have
23 some verification process.  And so we have gone to really
24 trying to streamline the claims form so it's just --
25          **THE COURT:**  Well, 13 percent is too low.  I'm just not

1  going to do that.  I mean, this is developers.  You know who
2  they are.  Google has got reams of data on sales and every
3  possible metric that you can measure.  I'm just not going to do
4  something that is going to result in 80 percent of the class
5  not making a claim.  That is just not -- this is 2022.  These
6  are developers; okay.  I mean, if anybody is on it, it has got
7  to be this group.
8       So I need to hear more about how you are going to get that
9  up to like a 90, 80, 70 percent range.  I'm just not going to
10 do -- I just find that totally unacceptable.  Less than
11 15 percent, it's crazy.
12          **MR. HARRINGTON:**  So what we did in the *Apple*
13 settlement, which we had a claims --
14          **THE COURT:**  Apparently, it wasn't that great because
15 you got less than a 14 percent take rate.
16          **MR. HARRINGTON:**  Well, the 15 percent there is just
17 the 15 percent of developers making claims.  When you look at
18 the total amount of the settlement fund that was claimed, the
19 number is much higher.  So there was in the 30 percent range,
20 and we would expect the same.
21          **THE COURT:**  I want the individuals in this class, the
22 entities in this class, who are going to be subject to giving
23 up their rights to get a check and I'm just -- having a head
24 count of less than 15 percent of those people is just not going
25 to cut it for me.  So how are you going to juice that up?

1       **MR. HARRINGTON:**  We have done it -- we've tried --
2  there's a few things that we have done with the notice process
3  to try to push the number up here.
4       In the *Apple* case we didn't initially have a media notice
5  campaign.  We relied exclusively on direct notice.
6       Whereas here, we are using a pretty substantial social
7  media paid advertisements paid banner program from the get-go.
8  We think that's going to generate something like 1.5 million
9  impressions.  Our hope is that --
10      **THE COURT:**  Let me ask you this -- maybe Google you
11 can help me.  Don't you have an SDK unit or something that
12 interfaces with all the developers?
13      **MR. OLASA:**  Your Honor, we do have, you know, groups
14 at Google that interface with developers.  The issue here,
15 though, is that the class goes back to 2016.  So it is not the
16 case that all developers are active all the time on Google's --
17      **THE COURT:**  Six years, I don't think that is a big
18 deal.  Here is my point:  I want you and Google and all your
19 business units that work with developers, I want you to be
20 telling people "come get your check."  So how are you going to
21 do that?
22      **MR. OLASA:**  We will look into options, Your Honor.
23 I -- the engineering issues here are quite complicated.  We
24 will discuss it with developers and --
25      **THE COURT:**  I'm not talking about engineering.  I'm

...

1  talking about reaching out to a company saying, "We do business
2  together.  You have a check possibly waiting for you.  Let's
3  get this under consideration."  That's all I'm talking about.
4          **MR. RAPHAEL:**  Some sort of notice from Google, is
5  that --
6          **THE COURT:**  I want notice.  Look, in my Facebook
7  biometric case, Facebook did a very good job of using dual
8  notices and maximizing their platform, and we got a great
9  record-breaking consumer settlement.  That's because the
10 company used its context, leveraged its relationships to make
11 it happen.  That's going to happen here.
12         I'm not approving this right now.  I'm not saying it's
13 bad.  I'm just not approving it right now.  I want a
14 comprehensive outreach claim that is Google centric meaning
15 that they are going to leverage their day-to-day interactions
16 with these people that your Play Store depends on.  So I know
17 you can do it.  I want to plan for that.  I want to see this
18 rate be well over 50 percent.  There is just no excuse for that
19 in 2022.  Okay.
20         And, you know, the 90 million, it doesn't seem that much
21 to me.  How did you come up with that?
22         **MR. HARRINGTON:**  Well, 90 million is actually --
23         **THE COURT:**  I understand it is a compromise, but what
24 is sort of the metrics why 90 million is a good number for me
25 to be thinking about?

1  **MR. HARRINGTON:**  Well, for the small developer class
2  that we settled for, 90 million represents between 36 and
3  38 percent of their single damages that they could have
4  recovered had we got past certification and prevailed at trial,
5  which is in our view a pretty high number.
6       It's also -- you know, it's above what is the 19 percent
7  weighted average benchmark that we have seen reported in the
8  Northern District.  And it is slightly better than we did in
9  *Apple* even where the percentage of recovery there was just
10 2 percent less than what we got here.  So from our view it is a
11 very substantial number.
12      **THE COURT:**  Ninety million for all the developers in
13 the Play Store for a six-year period doesn't seem like a
14 substantial number to me.
15      **MR. HARRINGTON:**  Well, the settlement class is
16 comprised of developers who had up to 2 million in sales every
17 year during the class period.  So it includes 99 percent of the
18 settlement class, but it excludes certain very large developers
19 who have, you know, more than 2 million in sales and the
20 ability in our view to bring their own claims.  We settled for
21 the small developer class that requires, you know, the class
22 action vehicle to recover.  And for them 36 to 38 percent in
23 single damages is quite high.
24      **THE COURT:**  How many people opted out -- how many
25 developers opted out in *Apple*?

1   **MR. HARRINGTON:** We had -- help me out with this -- 13
2   opt-outs and one objection.
3   **THE COURT:** Is it the same kind of deal, zero to
4   2 million in sales?
5   **MR. HARRINGTON:** Theirs was up to $1 million and the
6   single damages were slightly higher there.
7   **THE COURT:** What happened to the objector?
8   **MR. HARRINGTON:** The objection was over -- the
9   objection was not really through the settlement itself but I
10  would say more to the other changes that the objector wanted to
11  see in the app store.  And Judge Gonzalez-Rogers overruled that
12  objection.
13  **THE COURT:** All right.  I want a more robust plan for
14  getting checks into developers' hands.
15  **MR. HARRINGTON:** Understood.
16  **THE COURT:** I'm reserving judgment on everything else.
17  I'm not saying no and I'm not signing off on everything else
18  yet.  I do want to see -- we are going to beat it.  I have
19  confidence in both of you.  We are going to beat it.  It is
20  going to be another Northern District success story in terms of
21  getting checks to aggrieved class members; okay.
22  **MR. HARRINGTON:** Understood.
23  **THE COURT:** How much time do you want to do that?
24  **MR. HARRINGTON:** Maybe it makes sense for Counsel to
25  discuss and then propose a date for the Court.  Does that makes

sense?

**MR. RAPHAEL:** May we confer with Counsel, Your Honor? We want to make sure we get you a good plan. And in order to do that, I need to make sure I can talk to the right people at the company as well.

**THE COURT:** That's good, okay. I appreciate that. The clock is ticking. If it breaks down, I'm not delaying the trust schedule for anything.

**MR. HARRINGTON:** We will move quickly.

**THE COURT:** Just remember that. There is no real extra time, so let's get it done. How about three weeks from today as a ballpark; okay. If you need more time, you can tell me; but do it about three weeks from today. Does that seem okay, Plaintiffs?

**MR. HARRINGTON:** That's good here.

**THE COURT:** Google?

**MR. RAPHAEL:** We will aim for that, Your Honor. I want to make sure we get you a good option so you will approve the settlement.

**THE COURT:** I understand. Again, I appreciate that. Anything else for today, Counsel?

**MR. HARRINGTON:** Nothing further.

**MR. RAPHAEL:** No, Your Honor.

**THE COURT:** Okay. Thanks very much.

(Proceedings adjourned at 11:38 a.m.)

### CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Monday, August 8, 2022

*Marla Knox*
_____

Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court - Official Reporter