Steve W. Berman (*pro hac vice*)
steve@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292

Eamon P. Kelly (*pro hac vice*)
ekelly@sperling-law.com
SPERLING & SLATER P.C.
55 W. Monroe, Suite 3200
Chicago, IL 60603
Telephone: 312-641-3200

*Co-Lead Interim Class Counsel for the*
*Proposed Class and Attorneys for Plaintiffs*
*Pure Sweat Basketball, Inc. and LittleHoots*
*LLC*

Melinda R. Coolidge (*pro hac vice*)
mcoolidge@hausfeld.com
HAUSFELD LLP
888 16th Street, NW, Suite 300
Washington, DC 20006
Telephone: (202) 540-7200

*Co-Lead Interim Class Counsel for the*
*Proposed Class and Attorneys for Plaintiffs*
*Peekya App Services, Inc. and Scaliso LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE GOOGLE PLAY DEVELOPER ANTITRUST LITIGATION | Case No. 3:20-cv-05792-JD<br><br>**DEVELOPER PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY SETTLEMENT APPROVAL**<br><br>Date: November 17, 2022<br>Time: 10:00 a.m.<br>Courtroom: 11, 19th Floor<br>Judge: Hon. James Donato |

1

## NOTICE OF MOTION AND MOTION

2        PLEASE TAKE NOTICE that on November 17, 2022, at 10:00 a.m., or as soon thereafter as

3   the matter can be heard by the above-titled court, in the courtroom of the Honorable James Donato

4   located at the Phillip Burton Federal Building and United States Courthouse, Courtroom 11, 19th

5   Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Developer Plaintiffs will move the

6   Court, pursuant to Federal Rule of Civil Procedure 23, for preliminary settlement approval.

7   Developer Plaintiffs' Motion is based on this Notice and Motion, the Memorandum of Points and

8   Authorities in Support of Motion, declarations filed in support thereof, the complete records and files

9   of this action, all other matters of which the Court may take judicial notice, and any other such

10  evidence and oral argument as may be made at the hearing of this matter.

11

12  Dated:  October 12, 2022                          Respectfully submitted,

13                                          By ___*/s/ Steve W. Berman*_____
                                                Steve W. Berman (*pro hac vice*)
14                                              Robert F. Lopez (*pro hac vice*)
                                                Ted Wojcik (*pro hac vice*)
15                                              **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                                1301 Second Avenue, Suite 2000
16                                              Seattle, WA 98101
                                                Telephone: (206) 623-7292
17                                              Facsimile:  (206) 623-0594
                                                steve@hbsslaw.com
18                                              robl@hbsslaw.com
                                                tedw@hbsslaw.com
19

20                                              Ben M. Harrington (SBN 313877)
                                                Benjamin J. Siegel (SBN 256260)
21                                              **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                                715 Hearst Avenue, Suite 202
22                                              Berkeley, CA 94710
                                                Telephone: (510) 725-3000
23                                              Facsimile:  (510) 725-3001
                                                benh@hbsslaw.com
24                                              bens@hbsslaw.com
25

26                                          By *s/ Melinda R. Coolidge*_____
                                                Melinda R. Coolidge (*pro hac vice*)
27                                              Yelena W. Dewald (*pro hac vice*)
                                                **HAUSFELD LLP**
28                                                      - i -

---
DEVELOPER PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY SETTLEMENT APPROVAL
CASE NO. 3:20-cv-05792-JD

888 16th Street, NW, Suite 300
Washington, DC 20006
Telephone: (202) 540-7200 (main)
Telephone: (202) 540-7144 (direct)
Facsimile:  (202) 540-7201
mcoolidge@hausfeld.com
ydewald@hausfeld.com

Kyle Geoffrey Bates (SBN 299114)
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908 (main)
Facsimile:  (415) 358-4980
kbates@hausfeld.com

Katie R. Beran (*pro hac vice*)
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 985-3270 (main)
Telephone: (267) 702-3215 (direct)
Facsimile:  (215) 985-3271
kberan@hausfeld.com

By ___*/s/ Eamon P. Kelly*_____
     Eamon P. Kelly (*pro hac vice*)
Joseph M. Vanek (*pro hac vice*)
Alberto Rodriguez (*pro hac vice*)
**SPERLING & SLATER, P.C.**
55 W. Monroe Street, 32nd Floor
Chicago, IL 60603
Telephone: (312) 676-5845
Facsimile:  (312) 641-6492
jvanek@sperling-law.com
ekelly@sperling-law.com
arodriguez@sperling-law.com

*Interim Co-Lead Class Counsel and Proposed
Settlement Class Counsel*

DEVELOPER PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY SETTLEMENT APPROVAL
CASE NO. 3:20-cv-05792-JD

**TABLE OF CONTENTS**

<u>Page</u>

I.    PRELIMINARY STATEMENT ................................................................. 1

II.   BACKGROUND .................................................................................... 3

    A.   Proceedings to Date ................................................................... 3

    B.   Parallel Proceedings and Settlement with Apple........................ 5

    C.   The Settlement.......................................................................... 5

        1.   The Settlement Negotiations ........................................... 5

        2.   The Settlement Consideration and Release of Claims ...................................... 6

            a.   Monetary Relief................................................... 6

            b.   Structural Relief................................................... 6

            c.   Settlement Release................................................ 8

        3.   Plan of Allocation............................................................ 8

        4.   Notice and Distribution Plan ........................................... 8

            a.   Notice .................................................................. 9

            b.   Distribution.......................................................... 10

I.    LEGAL STANDARD ........................................................................... 12

II.   THE SETTLEMENT WARRANTS PRELIMINARY APPROVAL...................... 12

    A.   The Settlement is Fair, Reasonable, and Adequate. ................... 12

        1.   The Class Has Been Zealously Represented. .................... 12

        2.   The Settlement Agreement Resulted from Arm's-Length Negotiations................................................ 13

        3.   The Settlement Represents Substantial Relief for the Class. .......... 13

        4.   The Settlement Treats Class Members Equitably. .............. 15

        5.   The Settlement Satisfies the Remaining Factors Set Forth in the Northern District's Procedural Guidance ......... 16

DEVELOPER PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY SETTLEMENT APPROVAL
CASE NO. 3:20-cv-05792-JD

a.    The Settlement Class is Appropriately Narrower than the Class Pleaded in the Complaint. ................................... 16

b.    The Settlement Release Tracks the Claims Alleged in the Complaint. ........................................................ 17

c.    Angeion Was Selected as Settlement Administrator Through a Competitive Bidding Process............................. 18

d.    Counsel Will Request Reasonable Attorneys' Fees and Reimbursement of Costs............................................. 18

e.    Plaintiffs Intend to Request Reasonable Service Awards for Named Plaintiffs. ............................................. 20

f.    Past Settlements ................................................... 20

B.    The Settlement Class Merits Certification. ................................. 21

    1.    Rule 23(a): Numerosity ............................................... 21

    2.    Rule 23(a): The Case Involves Questions of Law or Fact Common to the Class........................................... 21

    3.    Rule 23(a): Plaintiffs' Claims Are Typical of the Claims of the Class. ...................................................... 22

    4.    Rule 23(a): Plaintiffs Will Fairly Represent the Interests of the Class. ...................................................... 22

    5.    Rule 23(b)(2): Injunctive Relief Is Appropriate for the Entire Class. ...................................................... 23

    6.    Rule 23(b)(3): Common Questions of Fact or Law Predominate. ....................................................... 23

    7.    The Superiority Requirement is Met. ................................ 24

C.    The Proposed Notice Program Satisfies Rule 23. ......................... 24

D.    The Court Should Appoint Interim Co-Lead Counsel as Settlement Counsel. ................................................................. 25

E.    Proposed Schedule for Notice and Final Approval ....................... 25

III.    CONCLUSION ............................................................. 25

- iv -

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amador v. Baca*,
  2020 WL 5628938 (C.D. Cal. Aug. 11, 2020) ........................................................ 19

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ........................................................................... 17, 23, 24

*In re Apple Pod iTunes Antitrust Litig.*,
  2008 WL 5574487 (N.D. Cal. Dec. 22, 2008) ........................................................ 23

*B.K. by next Friend Tinsley v. Snyder*,
  922 F.3d 957 (9th Cir. 2019) ........................................................................ 22

*Bolton v. U.S. Nursing Corp.*,
  2013 WL 5700403 (N.D. Cal. Oct. 18, 2013) ........................................................ 20

*Brown v. Hain Celestial Grp., Inc.*,
  2014 WL 6483216 (N.D. Cal. Nov. 18, 2014) ........................................................ 16

*Castro v. Sanofi Pasteur Inc.*,
  134 F. Supp. 3d 820 (D.N.J. 2015) .................................................................. 23

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
  2015 WL 9266493 (N.D. Cal. Dec. 17, 2015) ........................................................ 15

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
  2016 WL 3648478 (N.D. Cal. July 7, 2016) ......................................................... 13

*Churchill Vill., LLC v. Gen. Elec.*,
  361 F.3d 566 (9th Cir. 2004) ........................................................................ 24

*de Mira v. Heartland Emp't Serv., LLC*,
  2014 WL 1026282 (N.D. Cal. Mar. 13, 2014) ........................................................ 19

*Epic Games, Inc. v. Apple Inc.*,
  559 F. Supp. 3d 898 (N.D. Cal. 2021) .............................................................. 15

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ...................................................................... 22

*Hesse v. Sprint Corp.*,
  598 F.3d 581 (9th Cir. 2010) ........................................................................ 18

*In re High-Tech Emp. Antitrust Litig.*,
  985 F. Supp. 2d 1167 (N.D. Cal. 2013) ........................................................ 21, 22, 24

*Hubbard v. RCM Techs. (USA), Inc.*,
    2020 WL 6149694 (N.D. Cal. Oct. 20, 2020) ................................................. 21

*In re Hyundai & Kia Fuel Econ. Litig.*,
    926 F.3d 539 (9th Cir. 2019) (en banc) ................................................. 17, 21, 24

*Lerwill v. Inflight Motion Pictures, Inc.*,
    582 F.2d 507 (9th Cir. 1978) ................................................................. 22

*In re Linerboard Antitrust Litig.*,
    2004 WL 1221350 (E.D. Penn. June 2, 2004) ........................................... 19

*In re Lithium Ion Batteries Antitrust Litig.*,
    2020 WL 7264559 (N.D. Cal. Dec. 10, 2020). ......................................... 15

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
    2013 WL 5979327 (N.D. Cal. Nov. 8, 2013) ........................................... 23

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) ................................................... 19

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015) ................................................................. 18

*Pacheco v. JPMorgan Chase Bank, N.A*
    2017 WL 3335844 (N.D. Cal. Aug. 4, 2017) ........................................... 16

*In re Resistors Antitrust Litig.*,
    2020 WL 2791922 (N.D. Cal. Mar. 24, 2020) ......................................... 15

*In re Static Random Access (SRAM) Antitrust Litig.*,
    2008 WL 4447592 (N. D. Cal. Sept. 29, 2008) ....................................... 24

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ................................................................. 19

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod.*
    *Liab. Litig.*,
    2013 WL 12327929 (C.D. Cal. July 24, 2013) ....................................... 14

*Vasquez v. USM Inc.*,
    2015 WL 12857082 (N.D. Cal. Apr. 13, 2015) (Donato, J.) ..................... 12

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) ............................................................... 19

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ............................................................................. 21

## FEDERAL RULES

Fed. R. Civ. P. 23 ...............................................................................................*passim*

## OTHER AUTHORITIES

Procedural Guidance for Class Action Settlements (N.D. Cal. 2018)....................................*passim*

University of San Francisco School of Law & The Huntington National Bank, *2018 Antitrust Annual Report* (May 2019).........................................................................19

2 William B. Rubenstein, *Newberg on Class Actions* (5th ed. 2018) ...........................................21

## GLOSSARY OF TERMS

| Term | Definition |
|---|---|
| Berman Decl. | Declaration of Steve W. Berman in Support of Developer Plaintiffs' Renewed Motion for Preliminary Settlement Approval, dated October 12, 2022 (submitted herewith) |
| *Cameron* ECF No. | References to Docket Entries, *Cameron v. Apple Inc.*, Case No. 4:19-cv-03074-YGR (N.D. Cal.) |
| Czeslawski Decl. | Declaration of Richard Czeslawski in Support of Developer Plaintiffs' Motion for Preliminary Settlement Approval, dated June 28, 2022 (previously submitted at ECF No. 218-4 and resubmitted herewith) |
| Einwaechter Decl. | Declaration of Francois Einwaechter in Support of Developer Plaintiffs' Motion for Preliminary Settlement Approval, dated June 16, 2022 (previously submitted at ECF No. 218-6 and resubmitted herewith) |
| Ellis Decl. | Declaration of Lacey Thomas Ellis in Support of Developer Plaintiffs' Motion for Preliminary Settlement Approval, dated June 30, 2022 (previously submitted at ECF No. 218-5 and resubmitted herewith) |
| Named Plaintiffs | Pure Sweat Basketball, Inc., LittleHoots, LLC, Peekya App Services, Inc., and Scalisco LLC |
| SAC | Second Amended Consolidated Class Action Complaint for Violation of the Sherman and Clayton Acts (15 U.S.C. §§ 1, 2, 3, 15, 26), Cartwright Act (Cal Bus. & Prof. Code §§ 16700 et seq.) and Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 et seq.), filed January 24, 2022, ECF No. 182 |
| Scalise Decl. | Declaration of Daniel Scalise in Support of Developer Plaintiffs' Motion for Preliminary Settlement Approval, dated June 29, 2022 (previously submitted at ECF No. 218-7 and resubmitted herewith) |
| Weisbrot Decl. | Declaration of Steven Weisbrot of Angeion Group Regarding the Proposed Notice and Distribution Plan, dated October 12, 2022 (submitted herewith). |
| Williams Decl. | Declaration of Michael A. Williams, Ph.D., dated June 30, 2022 (previously submitted at ECF 218-3 and resubmitted herewith) |

## I.   PRELIMINARY STATEMENT

On June 30, 2022, Developer Plaintiffs initially moved for preliminary approval of their settlement with Google, pursuant to which the Settlement Class would receive $90 million—36-38 percent of single damages—and benefit from structural reforms to the Google Play store. At the August 4, 2022 preliminary approval hearing, the Court reserved judgment pending submission of a supplemental plan that would (a) drive participation in the settlement above the 13% rate Plaintiffs had anticipated and (b) provide "additional methods of notice that will leverage the direct relationship defendant Google has with proposed class members." *See* ECF No. 220.

Working with Angeion, the Settlement Administrator, the Parties reached agreement on a supplemental notice and distribution plan to address each of these concerns.

***First***, to drive settlement participation, the parties have agreed to a process whereby the Settlement Administrator will use information maintained by Google to push payments directly to Settlement Class Members. Under this proposed approach, Settlement Class Members would not need to submit a claim. Rather, they will have the opportunity to elect an electronic payment, but even if a developer does not elect an electronic payment, the Settlement Administrator can send a paper check directly to the address associated with that developer's account.

***Second***, to further leverage its relationship with the Settlement Class, Google has agreed to use its developer contact information to notify Settlement Class Members of the Settlement and direct them to the Settlement Website. Specifically, Google will send Settlement Class Members supplemental notice via the "console" developers access to manage their Google Play apps, which will also trigger a corresponding email to the Settlement Class. This supplemental notice by Google would augment the existing notice plan, which already includes direct email and postcard notice from the Settlement Administrator, as well as a comprehensive media campaign.

Plaintiffs previewed this revised notice and distribution plan in an August 25, 2022 filing (ECF No. 226), and were instructed by the Court to file a renewed motion for preliminary approval reflecting the modified approach. *See* ECF No. 227. Plaintiffs worked diligently with Google and the Settlement Administrator to resolve all details of the revised plan and, with this submission,

1    respectfully request that it be preliminary approved.

2        Beyond the revisions to the notice and distribution plan, the structure and material terms of

3    the Settlement remain unchanged. If approved, the Settlement would resolve the claims of a

4    Settlement Class consisting of nearly 48,000 U.S. Android developers with annual Google Play

5    earnings of $2 million or less during the Settlement Class Period.[1] Nearly all U.S. Android

6    developers earning revenues in the Google Play store—more than 99 percent of the pleaded class—

7    fall within the Settlement Class. These developers populate the Google Play store with apps of all

8    types, improving the functionality, performance, and versatility of Android devices. Under the

9    proposed Settlement, these developers stand to receive substantial monetary payments along with

10   structural relief that, going forward, will improve the Google Play store and help developers better

11   monetize their apps and in-app products.

12       With respect to monetary relief, the proposed Settlement establishes a $90 million non-

13   reversionary fund from which Settlement Class Members will receive distributions. There will be a

14   $250 minimum payment, and further distributions will be *pro rata* based on the dollar value of

15   service fees Settlement Class Members paid to Google above the 15-percent level during the

16   Settlement Class Period. The $90 million Settlement Fund represents between 36 and 38 percent of

17   estimated single damages, an excellent recovery for an antitrust class action settlement.

18       As for structural relief, Google has made a set of material commitments that add further value

19   to the Settlement. In particular, Google has:

20   • Agreed to maintain until at least May 25, 2025 for U.S. Developers, its program, launched in
21     2021, under which developers pay a reduced 15% service fee on their first $1 million in
22     annual revenues, and acknowledged the pendency of this lawsuit was a factor in its
       decision to announce this service fee reduction;

23   • Agreed to develop an "Indie Apps Corner" that highlights apps from independent and small
24     startup developers on the apps tab on the U.S. homepage of the Google Play Store, valuable
       real estate that will help such developers get quality apps discovered;

25   • Committed to revise its Developer Distribution Agreement ("DDA") to make clear that

26

27   [1] The term "Settlement Period" refers to the August 17, 2016 to December 31, 2021 period
     described at ¶ 1.30 of the Settlement Agreement. *See* Berman Decl. Ex. B ¶ 1.30.

28

developers may use contact information obtained in-app to communicate with users out-of-app about alternatives to Google Play's billing service for products consumable in-app;

● Agreed to make changes to the Android 12 operating system that allow auto updates from third-party Android app stores and to maintain these changes for three years from implementation, and acknowledged that the pendency of this lawsuit was a factor in its decision to invest in this aspect of Android 12; and

● Agreed to publish an annual transparency report providing developers with meaningful data regarding the operation of the Google Play store.

Although not all of these reforms can be quantified with precision, they are all beneficial to the Settlement Class. Developer Plaintiffs' damages expert, Dr. Michael Williams, conservatively estimates that the 15% tier commitment alone could save Settlement Class Members up to $109.8 million in service fees. *See* Williams Decl. ¶ 4.

The proposed Settlement is the product of arm's-length negotiations among experienced counsel with the assistance of one of the nation's most trusted mediators, Professor Eric D. Green. The Settlement terms are fair and the Settlement Class's monetary recovery (relative to potential damages) compares favorably to antitrust settlements approved in this district and across the country. Antitrust cases are inherently risky and, while Developer Plaintiffs believe their claims are sound, recovery is far from certain. If approved, the Settlement will deliver assured, substantial relief to a Settlement Class that could receive less value, or nothing at all, from a litigated outcome.

Developer Plaintiffs respectfully request an Order that: (1) preliminarily approves the proposed Settlement; (2) certifies the Settlement Class; (3) appoints Hagens Berman Sobol Shapiro LLP, Sperling & Slater, P.C., and Hausfeld LLP as Settlement Class Counsel; and (4) approves the manner and form of notice and proposed plan of distribution to Settlement Class Members.

## II. BACKGROUND

This Court is well-versed in the history of this case. Developers Plaintiffs therefore only briefly summarize the proceedings to date before describing the proposed Settlement and, for comparison purposes, an approved settlement developers secured with Apple on comparable claims.

### A. Proceedings to Date

Developer Plaintiffs filed initial complaints against Google in August 2020, and their

- 3 -

operative Consolidated Second Amended Complaint on January 21, 2021. *See* ECF No. 179. Asserting claims under the Sherman Act, the Cartwright Act, and California's Unfair Competition Law, Developer Plaintiffs contend that Google monopolizes relevant markets for Android app and in-app-product distribution services, including by tying them together. Developer Plaintiffs contend that, as a result of its monopolization and tying conduct, Google charges developers supra-competitive service fees for the distribution of apps and in-app products.

Google moved to dismiss Developer Plaintiffs' complaint, but after briefing was completed, this Court vacated the hearing given Developer Plaintiffs' intention to amend their pleading. *See* ECF No. 123. Google did not move to dismiss subsequent iterations of Developer Plaintiffs' complaint and filed its operative answer on February 11, 2022. *See* ECF No. 189.

Developer Plaintiffs' case was coordinated for pretrial purposes with similar actions brought by consumers and Epic Games (ECF No. 70) and then incorporated into the *In Re: Google Play Store Antitrust Litigation*, which has since expanded to include claims brought by 39 Attorneys General and Match Group, LLC. Case management has been complex, with the parties negotiating more than twenty protocols and joint status submissions, including with respect to discovery coordination, protective orders (several), depositions, and experts. *See* Berman Decl. ¶ 3.

Coordinated discovery has yielded a massive discovery record and required enormous effort. The parties propounded more than 560 Document Requests and Interrogatories. More than 5.7 million documents and 28.7 million pages have been produced. The parties have collectively taken 45 depositions, and Developer Plaintiffs have taken or defended 26 of these. More than 75 third parties have been subpoenaed for either documents or testimony, or both, with third parties alone producing approximately 600,000 documents. Google has produced massive transactional and revenue datasets that total close to 11 terabytes. Three of the Named Plaintiffs responded to 71 document requests each, and a fourth responded to 92. The Named Plaintiffs also responded to eighteen interrogatories and thirteen preservation interrogatories. *See id.* ¶ 4.

Developer Plaintiffs have worked closely with economic, accounting, and technical experts to build their case. After analyzing the record, these experts prepared four opening expert reports, all

- 4 -

1   dated February 28, 2022, addressing issues related to class certification. After Google served two

2   opposition reports on March 31, 2022, Developer Plaintiffs' experts prepared three rebuttal reports,

3   which were served on Google on April 25, 2022. Developer Plaintiffs' expert reports total 723 pages,

4   exclusive of backup files. *See id.* ¶ 5.

5   **B.      Parallel Proceedings and Settlement with Apple**

6           During the pendency of this litigation, Developer Plaintiff Pure Sweat Basketball settled

7   comparable claims asserted against Apple on behalf of a class of developers selling apps and in-app

8   products in Apple's App Store. *See Cameron v. Apple Inc.*, 19-cv-3074 (N.D. Cal.) (YGR). The

9   Apple settlement is similar to the Settlement proposed here.

10          In the Apple case, the settlement class is comprised of small developers earning up to $1

11  million in annual App Store proceeds. *See Cameron* ECF No. 396-1 ¶ 1.27. The plaintiffs estimated

12  damages to the Apple settlement class to be between $289 and $329 million. *See Cameron* ECF No.

13  459-7 ¶ 4. Under the settlement, Apple conveyed $100 million to a Small Developer Assistance

14  Fund. *See Cameron* ECF No. 396-1 ¶ 5.3.1. Apple further agreed to make structural reforms to its

15  App Store that would (as with the Google Settlement proposed here) lock in a 15% tier for small

16  developers, modify Apple's anti-steering guidelines, and commit Apple to improving app

17  discoverability while publishing a transparency report for the benefit of developers. *See id.* ¶ 6.2.

18          The Apple settlement was preliminarily approved by the Honorable Gonzalez Rogers in

19  November 2021 and, following notice, there was only one objection and just 13 opt outs,

20  notwithstanding a settlement class that included 67,440 unique developer accounts. *See Cameron*

21  ECF No. 471-2 ¶¶ 8, 42-43. Judge Gonzalez Rogers granted final approval on June 10, 2022,

22  concluding that the settlement was "fair, adequate, and reasonable." *See* Berman Decl. Ex. C at 1.

23  **C.     The Settlement**

24          **1.      The Settlement Negotiations**

25          The parties engaged in two remote mediation sessions with Professor Eric D. Green. The first

26  occurred on March 8, 2021. *See* Berman Decl. ¶ 6. At that initial session, the parties discussed a

27  potential resolution involving a reduced Google service fee for small developers. Although the

28

1   parties did not reach agreement, Google announced shortly after this initial session that it would be

2   reducing its service fee to 15% for the first $1 million in annual earnings for all developers.

3        After more than another year of intensive litigation, the parties mediated again with Professor

4   Green on May 13, 2022. This second session was conducted after the Apple settlement had been

5   preliminarily approved, which provided a framework for discussions. The parties made substantial

6   progress but, after a full day of negotiations, were unable to reach a final resolution. With a potential

7   settlement within reach, the parties agreed to continue their discussions, and, by the end of day May

8   24, 2022, the parties reached agreement on the principal terms of the Settlement now being presented

9   for preliminary approval. *See id.* ¶ 7. As addressed above, the notice and distribution provisions were

10  subsequently modified in accordance with the Court's instructions.

11       **2.      The Settlement Consideration and Release of Claims**

12       The proposed Settlement provides monetary and structural relief in exchange for a release of

13  claims. These elements of the Settlement are addressed in turn below.

14                **a.      Monetary Relief**

15       Google has committed to pay $90,000,000 into a Settlement Fund for the benefit of the

16  Settlement Class. *See id.*, Ex. B ¶ 5.1. The Settlement Fund is non-reversionary, meaning that no

17  portion of the fund will ever return to Google. *See id.* ¶ 6.3. Payments from the Settlement Fund will

18  be made on a *pro rata* basis with a minimum payment of $250. *See id.* ¶ 6.2.2. The Settlement Fund

19  represents 36 to 38% of the Settlement Class's single damages. *See infra* Section III.A.3.

20                **b.      Structural Relief**

21       The Settlement also provides valuable structural relief in five areas.

22       **Service Fees**. As part of the Settlement, Google acknowledges that this litigation was a factor

23  in its decision to reduce its service fees to 15% on the first $1 million of developer earnings each

24  year. *See* Berman Decl. Ex. B ¶ 2.6. The Settlement requires that Google maintain this program for

25  U.S. developers through at least May 25, 2025. *See id.* ¶ 5.2.1. This is valuable relief, particularly

26  because it applies to the first $1 million of earnings, regardless of the developers' total annual

27  earnings. As discussed below, Dr. Williams estimates that Google's adoption and extension of its

28

15% program could save the Settlement Class $109.8 million in service fees. *See infra* at Section III.A.3. Named Plaintiffs extol the savings this program will deliver. *See* Czeslawski Decl. ¶¶ 5-8; Ellis Decl. ¶ 5; Scalise Decl. ¶¶ 6-11; Einwaechter Decl. ¶¶ 6-10.

**Discoverability**. One of the most significant challenges for small developers is getting their apps discovered. The Settlement improves discoverability by requiring Google to create an "Indie Apps Corner" on the apps tab on the U.S. homepage of Google Play and maintain it for at least two years following final approval. *See* Berman Decl. Ex. B ¶ 5.2.4. This feature will spotlight a revolving roster of apps created by independent and small startup developers. Developers within the Settlement Class will be able to submit their apps for inclusion in the Indie Apps Corner, and Google will select qualifying apps based on objective criteria. *See id.*; *see also* Czeslawski Decl. ¶ 9 (describing value of "Indie Apps Corner"); Ellis Decl. ¶ 6 (same); Scalise Decl. ¶ 12 (same).

**Competing Stores**. Developer Plaintiffs have alleged that one impediment to distributing apps outside of Google Play is that apps downloaded from other Android app stores do not automatically update. *See* SAC ¶¶ 143. The Android 12 operating system, released by Google on October 4, 2021, facilitates auto updates by allowing "installer apps to perform app updates without requiring the user to confirm the action." *See* Berman Decl. Ex. B ¶ 5.2.3. As part of the Settlement, Google has acknowledged that this litigation was a factor behind this feature of Android 12 and agreed to maintain the changes for at least three years following final approval. *See id.* ¶ 2.7.

**Steering**. Developers that distribute their apps on the Google Play store can sell digital content (e.g., subscriptions for in-app content) on their own websites without paying Google a service fee for the transaction. While Google has indicated that it allows developers to use contact information obtained in-app to communicate out-of-app about this option, this is not facially apparent from Google's Developer Distribution Agreement ("DDA"), which states: "You may not use user information obtained via Google Play to sell or distribute Products outside Google Play." *See id.* ¶ 5.2.2. As part of the Settlement, Google agrees to strike this clause from the DDA, and to continue to allow developers to use contact information obtained in-app to communicate with users out-of-app for a period of at least three years following final approval. *See id*.

**Transparency**. For at least three years from final approval, Google will publish an annual "transparency report" that (at a minimum) will convey meaningful statistics such as apps removed from Google Play, account terminations, and objective information regarding how users interact with Google Play. *See id.* ¶ 5.2.5.

### c.      Settlement Release

In exchange for the monetary and structural relief just described, the Settlement Class would release Google from all past, present, and future claims "that were brought, could have been brought, or arise from the same facts underlying the claims asserted in [this action]." *See id.* ¶¶ 14.1, 14.2. The proposed Release does not relinquish claims of any developer not within the Settlement Class.

### 3.      Plan of Allocation

Developer Plaintiffs propose allocating settlement funds on a *pro rata* basis to Settlement Class Members, based on the dollar value of service fees they paid to Google above the 15-percent level during the Settlement Class Period, with a minimum payment of $250. *See id.* ¶ 6.2.2. That aligns with Developer Plaintiffs' theory of liability and damages because Dr. Williams estimates damages to Settlement Class Members based on the difference between service fees they paid above the 15-percent level and the lower fees they allegedly would have paid but for Google's allegedly unlawful conduct. *See* Williams Decl. ¶ 8. For example, assume for the purposes of illustration only that Settlement Class Members paid a total of $100 million in service fees above 15 percent during the Settlement Class Period. Also assume that Settlement Class Member A paid $1 million of those service fees to Google. In this hypothetical example, Class Member A would be allocated approximately 1 percent of the net settlement funds available for distribution to the Settlement Class. In addition, all Settlement Class Members will receive at least $250. Estimated minimum payments for some class members will exceed $200,000. *See* Weisbrot Decl. Ex. D at 1.

### 4.      Notice and Distribution Plan

As reflected in the accompanying declaration from the Settlement Administrator, the parties have agreed to a revised notice and distribution plan addressing the issues raised by the Court at the initial preliminary approval hearing.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### a.  Notice

In accordance with the Court's guidance, the revised notice plan leverages Google's relationship with the Settlement Class. Developers that distribute apps through the Google Play store, publish those apps through the Google Play Console, an online platform operated by Google. The console provides tools that developers can use to manage and monetize their apps, and also allows Google to communicate with developers. To alert developers to the Settlement, Google will post a supplemental notice through the Google Play Console for Settlement Class members. To maximize impact and minimize confusion, the supplemental notice will be streamlined to refer developers to the Settlement Website for settlement details. This console message will automatically trigger a corresponding email to be sent to the email address associated with Settlement Class Members' Google Play Developer accounts. Weisbrot Decl. ¶ 24 & Ex. D.

Google's console notice will supplement a multifaceted notice campaign to be administered by Angeion, which was detailed in Developer Plaintiffs' initial preliminary approval motion and recounted here. Angeion's proposed notice program will provide direct notice to all reasonably identifiable Settlement Class Members via email and mail, combined with a state-of-the-art digital notice campaign, and the implementation of a dedicated website and a toll-free telephone line where Settlement Class Members can learn more about the Settlement and their options. *See id.* ¶¶ 12-38.

For direct notice, Angeion will send individual direct notice by email to all of the nearly 48,000 members of the proposed Settlement Class. To this end, Google has already provided Angeion with email address information it maintains for all potential Settlement Class members. Angeion will also employ additional methods to help ensure that as many Settlement Class Members as possible receive notice via email, including an email updating process. *See id.* ¶¶ 12-17. The content of the direct notice emails will be the Summary Email Notice attached to the Weisbrot Declaration as Exhibit B. Angeion will also send Summary Postcard Notices to each Settlement Class Member with an address on record. Angeion will again employ best practices to maximize the deliverability of the Summary Postcard Notice. *See id.* ¶¶ 18-23. The proposed Summary Postcard Notice is attached to the Weisbrot Declaration as Exhibit C.

1       Angeion will establish a case-specific toll-free hotline and a case-specific website, with the

2  domain reserved as www.googleplaydevelopersettlement.com. *See id.* ¶¶ 36-38. On the Settlement

3  Website, Settlement Class Members will be able to view general information about this class action,

4  read relevant Court documents, and review important dates and deadlines pertinent to the Settlement.

5  For example, the detailed long form notice (Long Form Notice) will be available for download on

6  the website. *See id.* ¶ 36 & Ex. E. The settlement website will be designed to be user-friendly and

7  enable Settlement Class Members to easily find information about the Settlement. The website will

8  also have a "Contact Us" page where Settlement Class Members can send an email with any

9  additional questions to a dedicated email address. *See id.* ¶ 37.

10      The direct notice campaign will be supplemented with a robust digital campaign to ensure

11  that all potential Settlement Class Members receive notice. Angeion will utilize a form of internet

12  advertising known as Programmatic Display Advertising, which is the leading method of buying

13  digital advertisements in the United States. It employs an algorithm to identify and examine

14  demographic profiles and uses advanced technology to place advertisements on the websites where

15  members of the audience are most likely to visit (these websites are accessible on computers, mobile

16  phones, and tablets). *See id.* ¶¶ 25-28. The digital notice campaign will also include a social media

17  campaign utilizing Twitter, Facebook, and Instagram. The plan will include a paid search campaign

18  on Google to help drive Class Members who are actively searching for information about the

19  Settlement to the settlement website. *See id.* ¶¶ 29-33. The campaign will be purchased on an arms'

20  length basis from Google, and is an effective element of notice campaigns that Angeion has used in

21  many past notice efforts. *See id.* ¶ 32. The costs of notice and administration will be paid from the

22  Settlement Fund. *See* Berman Decl. Ex. B ¶ 6.1.1.

23              **b.      Distribution**

24      Under the modified distribution plan, Settlement Class members can be issued payments

25  without submitting a claim. Each form of Summary Notice (Email and Postcard) will contain

26  individualized credentials that Settlement Class Members can input on the Settlement Website to

27  review their estimated payment and the total amount of paid service fees on which the payment is

28

based. *See* Weisbrot Decl. ¶ 39. Settlement Class Members will also be able to elect a digital payment on the website (PayPal, Venmo or virtual prepaid card) by verifying membership in the Settlement Class. *See id.* Settlement Class Members who do not elect a digital payment will automatically be issued a physical check for their payment amount. *See id.* ¶ 40.

Angeion will direct physical checks to the legal entity and legal address Google maintains for the Settlement Class Member, with the Summary Notice specifying this contact information and allowing any corrections. To the extent Google does not maintain valid or complete address information for any Settlement Class Member, Angeion will undertake reasonable efforts to obtain a valid address to which a physical check can be sent. *See id.*

Prior to sending physical checks, Angeion will follow best practices to ensure that the checks are securely delivered to current addresses. In addition, before sending any checks exceeding $20,000,000, Angeion will use reasonable efforts to contact the individual or entity receiving the check to confirm class membership, contact information and payment instructions. As with digital payments, Settlement Class Members will be required to certify membership in the Settlement Class in order to endorse their physical checks. *See id.* ¶¶ 40-41.

While claims will not be required, the Settlement Website will contain an optional claim form that developers can complete to pursue a payment. *See id.* ¶ 42. The Settlement Website will also give Settlement Class members the option to contest their estimated payment amount if they believe they paid service fees that exceed the amount Angeion has on record. *See id.* ¶ 43

Following the initial distribution, Angeion will implement a telephone outreach campaign to encourage developers to cash any uncashed checks. *See id.* ¶ 44. Checks uncashed after six months will be cancelled and the funds returned to the Settlement Fund. Plaintiffs will then submit for Court approval a plan for making additional distributions to Settlement Class Members that elected a digital payment or cashed their check. *See id.* Any funds remaining after a second distribution will be provided to Code.org. *See* Berman Decl. Ex. B ¶¶ 6.2.2 – 6.2.4; Berman Decl. ¶ 16 (describing Code.org). Under no circumstances will unclaimed funds revert to Google. *See id.* Ex. B ¶ 6.3.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.   LEGAL STANDARD

Federal Rule of Civil Procedure 23(c) requires judicial approval of any compromise or settlement of class action claims. Preliminary approval is not a dispositive assessment of the fairness of the proposed settlement; rather, preliminary approval assesses only whether the proposed settlement falls within the "range of possible approval." *Vasquez v. USM Inc*., 2015 WL 12857082, at *2 (N.D. Cal. Apr. 13, 2015) (Donato, J.).[2] A settlement may preliminarily be approved upon a "showing that the court will likely be able to (i) approve the proposal under Rule 23(c)(2); and (ii) certify the class for purposes of judgement on the proposal." Fed. R. Civ. P. 23(c)(1). Factors courts consider under Rule 23(c)(2) include whether:

(A)   the class representatives and class counsel have adequately represented the class;

(B)   the proposal was negotiated at arm's length;

(C)   the relief provided for the class is adequate, taking into account:

    (i)   the costs, risks, and delay of trial and appeal;

    (ii)   the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

    (iii)   the terms of any proposed award of attorney's fees, including timing of payment; and

    (iv)   any agreement required to be identified under Rule 23(c)(3); and

(D)   the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(c)(2). All preliminary approval requirements are met here.

## II.   THE SETTLEMENT WARRANTS PRELIMINARY APPROVAL

### A.   The Settlement is Fair, Reasonable, and Adequate.

#### 1.   The Class Has Been Zealously Represented.

As described above, interim Class Counsel have aggressively pursued this case. Class Counsel prepared a thorough complaint and briefed a motion to dismiss that Google did not renew when the complaint was amended. *See* ECF Nos. 71, 80, 81, 95. After devoting enormous resources to negotiate discovery parameters and protocols, Class Counsel obtained and analyzed a massive discovery record, which includes more than five million documents and terabytes of transactional

---

[2] Internal quotation, bracket and ellipses marks omitted here and throughout.

DEVELOPER PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY SETTLEMENT APPROVAL
CASE NO. 3:20-cv-05792-JD

data. Class Counsel have conducted and/or defended more than 25 depositions and participated in extensive third-party discovery that has yielded more than 600,000 documents. To prepare for class certification and merits proceedings, Class Counsel retained prominent economic, accounting, and technology experts who prepared thorough reports and rebuttal reports. *See* Berman Decl. ¶¶ 3-5. As their accompanying declarations attest, Named Plaintiffs likewise have furthered the interests of the class by reviewing submissions, conferring with Class Counsel, producing documents, and sitting for depositions. The Settlement Class has been adequately represented.

> **2.      The Settlement Agreement Resulted from Arm's-Length Negotiations.**

The Settlement is the product of sustained negotiations between experienced counsel. Negotiations occurred at arm's length, over several sessions, including before one of the nation's leading mediators. Having worked on this case for years, as well as parallel litigation against Apple, Class Counsel understand both the risks and potential recovery of further litigation.

> **3.      The Settlement Represents Substantial Relief for the Class.**

Preliminary approval requires consideration of whether the "relief provided for the class is adequate." Fed. R. Civ. P. 23(2). It is here.

The $90 million Settlement Fund is itself substantial and more than adequate relief. For context, if the Settlement Class were to obtain class certification, survive summary judgment and prevail at trial, its members would stand to recover between approximately $236 million and $248 million in single damages. *See* Williams Decl. Table 1. The Settlement Fund represents between 36 and 38 percent of these single damages. That is a substantial monetary recovery, particularly in comparison to other antitrust settlements. In *In re Cathode Ray Tube (CRT) Antitrust Litig.*, for example, the court approved a settlement representing 20% of single damages, citing a survey of 71 settled antitrust cases which showed a weighted mean settlement of 19%. *See* 2016 WL 3648478, at *7 & n.19 (N.D. Cal. July 7, 2016). The settlement fund in the approved Apple developer settlement represented 30 to 34 percent of asserted damages, slightly below the ratio this settlement secures.

Moreover, the relief afforded by this Settlement is not limited to the Settlement Fund. The Settlement's structural relief elements (individually and collectively) confer additional economic and

practical benefits on the Settlement Class. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2013 WL 12327929, at \*29. N.7 (C.D. Cal. July 24, 2013) (in valuing a settlement, "Plaintiffs' experts appropriately have included the non-monetary benefits"). As set forth above, Google has made substantial commitments to (a) maintain its reduced 15% tier for the first $1 million in annual earnings through at least May 25, 2025; (b) improve app discoverability for small developers by establishing the "Indie App Corner"; (c) maintain changes to Android 12 that make app distribution through rival Android stores more viable; (d) clarify in its guidelines that developers may use contact information obtained in-app to communicate out-of-app about alternative distribution options; and (e) issue an annual transparency report. Judge Gonzalez Rogers found that similar non-monetary relief in the Apple settlement had "significant value." Berman Decl. Ex. C at 13; *id*. at 3. As set forth above, and in the accompanying declarations of Named Plaintiffs, these are important commitments that will allow Settlement Class Members to better monetize their apps and in-app products. *See supra* Section II.C.2.

Developer Plaintiffs do not attempt to quantify the value of each aspect of the structural relief. The 15% tier commitment, however, can be valued and it is appropriate to do so given Google's acknowledgment that this case was a factor behind the program's adoption. Dr. Williams shows that the 15% program, coupled with Google's commitment to maintain it through at least May 25, 2025, has the potential to save the Settlement Class $109.8 million. *See* Williams Decl. ¶¶ 4, 17.[3]

Developer Plaintiffs recognize that this litigation may not be solely responsible for Google's 15% program on the first $1 million in earnings. In announcing the program, Google also cited its interest in helping developers reinvest in their apps to "scale up." *See* Berman Decl. Ex. A. Weighing the two factors equally would be reasonable, but even assuming the litigation played a lesser role, it still conferred millions of additional dollars. For example, even if the litigation was 20 percent responsible for the 15% tier, that would mean that the litigation delivered an additional $22 million in redeemable value to the Settlement Class. Combining this available savings with the $90 million

---

[3] Enrollment is optional, but even assuming conservatively that current program enrollment rates persist, redeemed savings to the Settlement Class will be $39.4 million. *See* Williams Decl. ¶ 18.

1   Settlement Fund yields a total of $112 million, which represents between 45 and 47 percent of the

2   Settlement Class's single damages. That is a remarkable recovery, and it does not even account for

3   the other structural reforms Google has agreed to implement.

4   The value of the Settlement must also be weighed against the risks of further litigation.

5   Developer Plaintiffs believe their claims are viable, but the path forward is not without peril.

6   "Antitrust cases are particularly risky, challenging, and widely acknowledge[d] to be among the most

7   complex actions to prosecute." *In re Lithium Ion Batteries Antitrust Litig*., 2020 WL 7264559, at *15

8   (N.D. Cal. Dec. 10, 2020). "The best case can be lost and the worst case can be won, and juries may

9   find liability but no damages. None of these risks should be underestimated." *Id.*

10   Two factors multiply the risks here. *First*, Developer Plaintiffs have not yet passed the class

11   certification hurdle. *Second*, Epic previously tried comparable claims under similar legal theories

12   against Apple, and Epic did not prevail on its Sherman Act claims. *See Epic Games, Inc. v. Apple*

13   *Inc*., 559 F. Supp. 3d 898, 1068 (N.D. Cal. 2021). While Epic did obtain more limited injunctive

14   relief under the UCL, that relief was stayed by the Ninth Circuit and cross-appeals are pending.

15   Rulings adverse to Epic could pose an obstacle to recovery for the Developer Plaintiffs here. The

16   Settlement eliminates these risks, ensuring meaningful and immediate relief.

17          **4.     The Settlement Treats Class Members Equitably.**

18   In addition to evaluating the adequacy of the Settlement overall, the Court must consider

19   whether the "proposal treats class members equitably relative to each other." Fed. R. Civ. P.

20   23(c)(2)(D). A plan of allocation is "governed by the same standards of review applicable to

21   approval of the settlement as a whole: the plan must be fair, reasonable and adequate." *In re:*

22   *Cathode Ray Tube (CRT) Antitrust Litig*., 2015 WL 9266493, at *7 (N.D. Cal. Dec. 17, 2015).

23   Courts routinely uphold allocation plans that divide settlement funds on a pro rata basis. *See id.*

24   (collecting cases); *see also In re Resistors Antitrust Litig*., 2020 WL 2791922, at *2 (N.D. Cal. Mar.

25   24, 2020) (Donato, J.) (approving pro rata distribution plan).

26   The allocation plan here proposes that the Settlement Fund be allocated to Settlement Class

27   Members on a *pro rata* basis based on the dollar value of service fees these developers paid above

28

1   the 15% level, with a minimum payment of $250. This *pro rata* allocation is reasonable, aligns with

2   Developer Plaintiffs' theory of damages, and treats all Settlement Class Members equally. *See*

3   *Pacheco v. JPMorgan Chase Bank, N.A.*, 2017 WL 3335844, at *1 (N.D. Cal. Aug. 4, 2017)

4   (Donato, J.) (preliminarily approving pro rata distribution plan).

5           **5.      The Settlement Satisfies the Remaining Factors Set Forth in the Northern**
                      **District's Procedural Guidance**

6           This District's Procedural Guidance for Class Action Settlements ("Procedural Guidance")

7   instructs parties to address certain factors at preliminarily approval. A number of these factors are

8   addressed throughout this submission. The remaining applicable factors are addressed below.

9           **a.      The Settlement Class is Appropriately Narrower than the Class Pleaded**
                      **in the Complaint.**

10          The Procedural Guidance requires that where, as here, a litigation class has not been certified,

11  a motion for preliminary approval must address "any differences between the settlement class and

12  the class proposed in the operative complaint and [provide] an explanation as to why the differences

13  are appropriate in the instant case." Procedural Guidance § 1(a).

14          Here, the Settlement Class definition is narrower than the class definition in the Second

15  Amended Consolidated Complaint because it is limited to developers with Google Play earnings no

16  greater than $2 million in each year during the 2016-2021 period. Although narrower, the Settlement

17  Class Definition still covers more than 99 percent of the developers in the pleaded class. *See*

18  Williams Decl. ¶ 6. It excludes only 275 developers. *See id.* By definition, the only developers not

19  participating in the Settlement are the very largest developers, such as Microsoft, Match, and Epic.

20  This is similar to the approved Apple developer settlement, which also involved a developer class of

21  smaller developers that was roughly 99% of the pleaded class. *See* Berman Decl. Ex. C at 6-7.

22          There is nothing remarkable about moving to certify a narrower settlement class than is

23  pleaded in a complaint. "Class definitions are often revised, for example, to reflect the contours of

24  a settlement." *Brown v. Hain Celestial Grp., Inc.*, 2014 WL 6483216, at *6 (N.D. Cal. Nov. 18,

25  2014). The narrower definition is appropriate here for at least two reasons.

26          ***First***, narrowing the class definition enhances the cohesiveness of the class and, in doing so,

- 16 -

eliminates one potential impediment to certification. The Supreme Court has cautioned that aspects of Rule 23 "designed to protect absentees by blocking unwarranted or overbroad class definitions . . . demand undiluted, even heighted attention in the settlement context." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). The reason is that the class definition in litigated proceedings is inherently provisional. The court can always "adjust the class, informed by the proceedings as they unfold." *Id.*; *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 557 (9th Cir. 2019) (en banc). This is not the case with respect to a settlement class, where the finality of the class definition can support, as here, a more circumscribed approach. To be clear, Developer Plaintiffs believe the Court could properly certify a class containing small developers and the large developers the Settlement excludes, but nothing is certain in litigation.

  ***Second***, this is not a situation in which the class was redefined to exclude class members with the smallest claims or who otherwise require the class action vehicle to recover. Quite the opposite. The estimated 275 large developers that fall outside the Settlement Class (less than 1 percent of the pleaded class) are, by definition, the developers most capable of bringing their own actions against Google. Indeed, two of them (Epic and Match) already have. Nothing about the Settlement prevents these developers from bringing their own case, with their own counsel, under their own theories.

  **b.**  **The Settlement Release Tracks the Claims Alleged in the Complaint.**

  The Procedural Guidance also requires identification of "any differences between the claims to be released and the claims in the operative complaint and an explanation as to why the differences are appropriate in the instant case." Procedural Guidance § 1(c). The Settlement release here extends beyond the specific claims asserted in the Second Amended Consolidated Complaint, but only to encompass potential claims that "could have been brought, or arise from the same facts underlying the claims asserted." Berman Decl., Ex. B ¶¶ 14.1, 14.2. This is an appropriate release that tracks the release approved in the Apple developer settlement. *See id.* Ex. C at 4. As the Ninth Circuit has recognized, a release may properly extend to "claims not alleged in the underlying complaint where those claims depended on the same set of facts as the claims that gave rise to the settlement." *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

c.       **Angeion Was Selected as Settlement Administrator Through a Competitive Bidding Process.**

Prior to engaging Angeion, interim Class Counsel sent a Request for Proposal ("RFP") to two other leading settlement administrators. The RFP included a carefully drafted outline requiring the respondents to make the same fixed assumptions about notice and settlement administration. All respondents provided comparable bids. All three proposed direct notice through email, with digital payments by email and paper checks. Angeion offered competitive pricing, with the advantage of having served as the administrator for the comparable settlement achieved in the Apple developer litigation. Developer Plaintiffs concluded that Angeion would provide the best value for the Settlement Class. *See* Berman Decl. ¶ 11. In the last two years, Angeion has worked with Class Counsel on 5 other cases. *See id.* ¶ 12. Angeion estimates total administration costs will be approximately $310,000 or around 0.34% of the Settlement Fund. *See* Weisbrot Decl. ¶ 51.

d.       **Counsel Will Request Reasonable Attorneys' Fees and Reimbursement of Costs.**

Plaintiffs intend to make a request for attorneys' fees of up to $27 million, which represents 24% of the sum of the cash Settlement Fund ($90 million) and structural relief ($22 million) that can be reasonably quantified ($112 million total). This does not account for the other forms of structural relief that were likewise included in the Apple settlement and found, at final approval, to be "valuable to the settlement class." Berman Decl. Ex. C at 3. The proposed notice advises the Class of this potential fee request, and Google reserves all rights to oppose any application made. *See* Weisbrot Decl. Ex. D. Any Court-awarded fees will be paid from the Settlement Fund. *See* Berman Decl., Ex. B ¶ 6.1.2.

Class Counsel's potential fee request is reasonable. When applying the percentage-of-the-fund method, the Ninth Circuit has established a benchmark percentage of 25 percent to be used as the "starting point" for analysis. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949, 955 (9th Cir. 2015). "That percentage amount can then be adjusted upward or downward depending on the circumstances of the case." *de Mira v. Heartland Emp't Serv., LLC*, 2014 WL 1026282, at *1 (N.D. Cal. Mar. 13, 2014). Courts in this district have recognized that "'in most common fund cases, the award *exceeds* the benchmark.'" *Id.* (quoting *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d

- 18 -

1    1036, 1047 (N.D. Cal. 2008)). Recently, in the 2018 Antitrust Annual Report, Professor Joshua

2    Davis found that among antitrust class action settlements surveyed between 2013 and 2018, the

3    median fee awarded for settlements between $50 and $99 million was 30 percent.[4]

4         A fee award of $27 million would be well within the range of approved amounts, particularly

5    given the structural relief the Settlement provides on top of the $90 million monetary fund. This

6    includes structural relief that locks in Google's 15% service fee program (on the first $1 million

7    earned) until May 2025, and other reforms that will improve app discoverability, facilitate app

8    transactions through competing channels, and enhance transparency. These forms of non-monetary

9    relief should be considered in awarding fees. *See Amador v. Baca*, 2020 WL 5628938, at *12 (C.D.

10   Cal. Aug. 11, 2020) (finding an upward adjustment warranted where lawsuit led to institutional

11   policy changes); *Staton v. Boeing Co.*, 327 F.3d 938, 972-74 (9th Cir. 2003) (concluding that "the

12   actual percentage award was much higher" in light of the injunctive relief).

13        Through the end of May 2022, Developer Plaintiffs invested approximately 33,989 hours and

14   approximately $17.48 million in attorneys' fees in this litigation. *See* Berman Decl. ¶ 14. A $27

15   million attorneys' fee award—the maximum amount requested—would therefore result in a lodestar

16   multiplier of 1.54 (not counting hours after May 2022). That is well within the range of awards in

17   other class action settlements. The Ninth Circuit has affirmed a 6.85 multiplier, holding that it "falls

18   within the range of multipliers that courts have allowed." In *Vizcaino v. Microsoft Corporation*, a

19   leading Ninth Circuit case on attorneys' fees, the Court affirmed a fee award with a 3.66 multiplier.

20   *See* 290 F.3d 1043, 1050-51 (9th Cir. 2002). In *In re Linerboard Antitrust Litigation*, the court

21   explained that "during 2001-2003, the average multiplier approved in common fund class actions

22   was 4.35 and during 30-year period from 1973-2003, [the] average multiplier approved in common

23   fund class actions was 3.89." 2004 WL 1221350, at *16 (E.D. Penn. June 2, 2004).

24        Developer Plaintiffs will also request reimbursement of certain expenses not to exceed $6.5

25   million. Those expenses include approximately $5 million or more in expert costs. *See* Berman Decl.

26

27        [4] *See* 2018 Antitrust Annual Report: Class Action Filings in Federal Court at 23 (May 2019),
     available at https://www.huntington.com/-/media/pdf/commercial/antitrust-annual-report-050819.

28

¶ 14. The funds spent on experts were critical to achieving the Settlement, which came after Developer Plaintiffs' four experts filed reports, and after three were deposed.

### e.   Plaintiffs Intend to Request Reasonable Service Awards for Named Plaintiffs.

Pursuant to § 7 of the Procedural Guidance, Developer Plaintiffs intend to request Service Awards of $10,000 for each of the four Named Plaintiffs. These service awards are warranted.

Named Plaintiffs have been actively involved in the litigation, and because they operate businesses, their discovery obligations have been more onerous than what is common for consumer class representatives. Each Named Plaintiff reviewed pleadings and consulted with interim Class Counsel regarding case developments. All but one was deposed and devoted numerous hours to preparing for deposition. All conducted document searches and collected materials, producing approximately 46,000 documents in total. *See* Berman Decl. ¶ 15; Czeslawski Decl. ¶ 3; Ellis Decl. ¶ 3; Scalise Decl. ¶ 4; Einwaechter Decl. ¶ 4. No Named Plaintiff derived a personal benefit beyond the Settlement Class's recovery. A $10,000 service award also represents just 0.01 percent of the Settlement Fund, such that Named Plaintiffs will not receive substantially more than other Settlement Class Members. *See Bolton v. U.S. Nursing Corp.*, 2013 WL 5700403, at *6 (N.D. Cal. Oct. 18, 2013) (approving $10,000 service award where average recovery was estimated to be $595.91).

### f.   Past Settlements

The Procedural Guidance, at § 11, instructs class counsel to provide certain information "for at least one of their past comparable class settlements." The charts below identify three cases in which Class Counsel was lead or co-counsel: *Cameron v. Apple Inc.,* 19-cv-03074-YGR (N.D. Cal.); *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation* ("*In re DRAM IPP Antitrust Case*"), No. 02-md-01486-PJH (N.D. Cal.); and *Edwards v. National Milk Producers Federation* ("*In re Milk IPP Antitrust Case*"), No. 11-cv-04766-JSW (N.D. Cal.):

| CAMERON V. APPLE, INC. All figures are best estimates based on public records | |
|---|---|
| | % Total Settlement |
| Settlement: $100 million + Structural Relief | 100% |
| Claims Paid: TBD* | |
| Class members sent notice: 67,440 | |
| Actual claims: 8,910 | 13.21% |
| Opt Outs: 13 (0.019%) | |
| Average recovery per claimant: TBD | |
| Residual: TBD | |
| Cy pres Distribution: TBD | |
| Attorney Fee Awarded: | $26 million |
| | 26% (of cash fund) |
| Portion of distributed fund: TBD | |
| Attorney Costs: $3.5 million | |
| Administrative Costs: TBD | |

*Distributions have not occurred as of date of this filing.

| In re DRAM IPP Antitrust Case All figures are best estimates based on public records | |
|---|---|
| | % Total Settlement |
| Settlement: $310.72 million | 100% |
| Claims paid $188,872,426 | 61% |
| Class members sent notice 175.5 million* | |
| Actual claims 445,554 (0.25%) | |
| Opt-outs 5 (0.0%) | |
| Average recovery per claimant $423.90** | |
| Residual $2.3 million | 0.75% |
| Cy pres distribution $0 | |
| Reversion $0 | |
| Attorney fees awarded $78.3 million | 25% |
| Portion of distributed fund 41% | |
| Attorney Costs $11.8 million | 4% |
| Administrative costs $1.047 million | 0.3% |

*No direct notice to class members; publication only.
**Median recovery not available.

| In re Milk IPP Antitrust Case All figures are best estimates based on public records | |
|---|---|
| | % Total Settlement |
| Settlement $52 million | 100% |
| Claims paid $35,316,020 | 68% |
| Class members sent notice 186.2 million* | |
| Actual claims 3,542,640 (1.9%) | |
| Opt-outs 1 (0.0%) | |
| Average recovery per claimant** | |
| Residual 0 | |
| Cy pres distribution $0 | |
| Reversion $0 | |
| Attorney fees awarded $13 million | 25% |
| Portion of distributed fund 37% | |
| Attorney Costs $2.4 million | 4.61% |
| Administrative costs $1.5 million | 2.81% |

*No direct notice to class members; publication only.
**$7.51 for individuals and $210.28 for organizations.

## B.     The Settlement Class Merits Certification.

Preliminary approval also requires the Court to determine whether it is likely to "certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B)(ii). While the Court must assess all applicable requirements of Rule 23, they are "applied differently in litigation classes and settlement classes." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d at 556. "A class that is certifiable for settlement may not be certifiable for litigation if the settlement obviates the need to litigate individualized issues that would make a trial unmanageable." *See id.* at 558; *see also* 2 William B. Rubenstein, *Newberg on Class Actions* § 4:63 (5th ed. 2018) ("Courts ... regularly certify settlement classes that might not have been certifiable for trial purposes.").

### 1.     Rule 23(a): Numerosity

The numerosity requirement is generally satisfied if the class contains 40 members. *See Hubbard v. RCM Techs. (USA), Inc.,* 2020 WL 6149694, at *1 (N.D. Cal. Oct. 20, 2020). The Settlement Class here has nearly 48,000 members. *See* Williams Decl. ¶ 6. That satisfies numerosity.

### 2.     Rule 23(a): The Case Involves Questions of Law or Fact Common to the Class.

To satisfy the commonality requirement, "[e]ven a single [common] question will do," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). "Antitrust liability alone constitutes a common question that will resolve an issue that is central to the validity of each class member's claim in one stroke." *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013). To establish antitrust liability here, Developer Plaintiffs must identify a relevant market and Google's

- 21 -

monopoly power. These are manifestly common questions, as is the question of whether the Settlement Class has been injured. The commonality requirement is met.

### 3.      Rule 23(a): Plaintiffs' Claims Are Typical of the Claims of the Class.

Typicality requires that the Named Plaintiffs' claims be "reasonably coextensive with those of absent class members; they need not be substantially identical." *B.K. by next Friend Tinsley v. Snyder*, 922 F.3d 957, 969-70 (9th Cir. 2019). "In antitrust cases, typicality usually will be established by plaintiffs and all class members alleging the same antitrust violations by defendants." *High-Tech,* 985 F. Supp. 2d at 1181. Here, named Plaintiffs, like all members of the Settlement Class, are developers earning less than $2 million annually through Google Play. *See* Williams Decl. ¶ 7. Named Plaintiffs and the Settlement Class assert the same claims and maintain the same interest in the relief provided by the Settlement. *See* Czeslawski Decl. ¶¶ 5-8; Ellis Decl. ¶ 5; Scalise Decl. ¶¶ 6-11; Einwaechter Decl. ¶¶ 6-10. Named Plaintiffs are typical of the Settlement Class.

### 4.      Rule 23(a): Plaintiffs Will Fairly Represent the Interests of the Class.

The adequacy requirement of Rule 23(a) entails two separate inquiries: (a) whether the class representatives have interests that are antagonistic to or in conflict with the interests of the class and (b) whether the representatives are represented by counsel of sufficient diligence and competence to fully litigate the case. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998); *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir.1978). Both requirements are met here.

*First*, Named Plaintiffs have been actively involved at each step of this litigation, as already addressed. *See supra* at Section III.A.5.e. They have no conceivable conflict of interest with the Settlement Class. Named Plaintiffs have suffered the same alleged injury as all Settlement Class Members. To the extent Named Plaintiffs prevail on their claims, they will establish liability and antitrust injury for the entire Settlement Class.

*Second*, Class Counsel have extensive experience in antitrust and complex litigation, including in this Court, and have leveraged that experience to zealously advance the Settlement Class's interests. Class Counsel are committed to prosecuting this action to maximize the Settlement Class's recovery and have a proven track record of litigating efficiently and strategically to achieve

1   that outcome. *See* ECF Nos. 55 & 79. Rule 23(a)(4)'s requirements are met.

2   ### 5.   Rule 23(b)(2): Injunctive Relief Is Appropriate for the Entire Class.

3   Certification under Rule 23(b)(2) is appropriate where the defendant "has acted or refused to

4   act on ground that apply generally to the class, so that final injunctive relief or corresponding

5   declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Google's

6   restraints and conduct challenged in this litigation apply generally and the Settlement's structural

7   relief would benefit all Settlement Class Members. Certification under Rule 23(b)(2) is appropriate.

8   ### 6.   Rule 23(b)(3): Common Questions of Fact or Law Predominate.

9   Class certification is appropriate under Rule 23(b)(3) when "questions of law or fact common

10   to class members predominate over any questions affecting only individual members." Fed. R. Civ.

11   P. 23(b)(3). The predominance requirement "tests whether proposed classes are sufficiently cohesive

12   to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. This "is a test readily met in

13   certain cases alleging . . . violations of the antitrust laws." *Id.* at 625.

14   Establishing liability in this action will require resolution of a series of threshold issues that

15   are common to the Settlement Class.[5] The Court must determine whether Developer Plaintiffs have

16   identified relevant markets, a common question. *See In re Apple Pod iTunes Antitrust Litig.,* 2008

17   WL 5574487, at *4 (N.D. Cal. Dec. 22, 2008). The Court must determine whether Google maintains

18   monopoly power in those markets, a common question. *See id.*; *Castro v. Sanofi Pasteur Inc.*, 134 F.

19   Supp. 3d 820, 846 (D.N.J. 2015). Next the Court must determine whether the challenged restraints

20   can be upheld with procompetitive justifications, another common question. *See In re NCAA*

21   *Student-Athlete Name & Likeness Licensing Litig.,* 2013 WL 5979327, at *4 (N.D. Cal. Nov. 8,

22   2013). The impact of Google's conduct on the settlement class can likewise be established with

23   common proof, including expert analysis based on a common methodology. Because this is a

24   settlement class, the Court need not evaluate any manageability issues arising from class treatment,

25   nor are there substantial manageability issues in this case anyway. *See In re Hyundai & Kia Fuel*

26

27   ---
[5] Google has indicated that it disagrees that the questions identified here are common questions
that could be proved through common evidence at a trial or that a class could be certified for
28   litigation, and it has indicated that, without this settlement, it would contest class certification.

1    *Econ. Litig.*, 926 F.3d at 556. The predominance requirement is met.

2          **7.      The Superiority Requirement is Met.**

3          The superiority inquiry requires assessment of whether a "class action is superior to other

4    available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

5    This requires assessment of whether the settlement will "achieve economies of time, effort, and

6    expense, and promote . . . uniformity of decision as to persons similarly situated without sacrificing

7    procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615.

8          Here, it would be inefficient to litigate the predominately common issues in countless

9    individual proceedings. *See High-Tech*, 985 F. Supp. 2d at 1228-29. Moreover, the Settlement Class

10   is comprised only of developers with annual earnings of less than $2 million and for many of them, if

11   not all, damages are too small to justify individual litigation. Class treatment is superior to ensure

12   that these Settlement Class Members have "the opportunity of meaningful redress." *In re Static*

13   *Random Access (SRAM) Antitrust Litig.*, 2008 WL 4447592, at *7 (N. D. Cal. Sept. 29, 2008).

14   **C.      The Proposed Notice Program Satisfies Rule 23.**

15         Rule 23(e)(1) requires that a court approving a class action settlement "direct notice in a

16   reasonable manner to all class members who would be bound by the proposal." In addition, for a

17   Rule 23(b)(3) class, the court must "direct to class members the best notice that is practicable under

18   the circumstances, including individual notice to all members who can be identified through

19   reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Notice "is satisfactory if it generally describes the

20   terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to

21   come forward and be heard." *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004);

22   *see also* Fed. R. Civ. P. 23(c)(2)(B) (describing specific information to be included in the notice).

23         The notice plan proposed here is the best practicable plan under the circumstances and, given

24   the contact information available, should reach an unusually large segment of the Settlement Class.

25   As set forth above and in the accompanying declaration of Steven Weisbrot, Angeion will use

26   contact information provided by Google to direct email and/or mail notice to all or virtually all

27   Settlement Class Members. Angeion will employ email verification tools to facilitate delivery, and

28

- 24 -

further notice will be provided through (a) a robust digital notice campaign and (b) by Google itself through the Google Play console and by email. *See* Weisbrot Decl. ¶¶ 12-34.

To encourage engagement, Angeion's initial Summary Notice (email and postcard) will be short-form versions of the Long Form Notice, which will be accessible on a settlement website. *See id.* All forms of notice will contain the information required by Rule 23(c)(2)(B) and the Procedural Guidance. *See* Procedural § 3 (Notice); Weisbrot Decl. Exs. B-E.

These notice provisions satisfy Rule 23 and will provide the Settlement Class with a fair opportunity to review and respond to the proposed Settlement.

**D.      The Court Should Appoint Interim Co-Lead Counsel as Settlement Counsel.**

Rule 23(c)(1)(B) provides that "[a]n order that certifies a class action . . . must appoint class counsel under Rule 23(g). All Rule 23(g) factors weigh in favor of appointing (a) Hagens Berman Sobol Shapiro LLP, (b) Sperling & Slater, P.C., and (c) Hausfeld LLP as Settlement Class Counsel. If appointed, counsel will continue to vigorously pursue this action and devote all necessary resources toward obtaining the best possible result for the Settlement Class.

**E.      Proposed Schedule for Notice and Final Approval**

| Event | Proposed Deadline |
|---|---|
| Entry of Order Granting Preliminary Approval and Directing Notice | Subject to Court's Discretion |
| Notice Campaign and Claims Period Begins ("Notice Date") | 60 Days from Preliminary Approval Order |
| Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards | 30 Days from Notice Date |
| Deadline for Objections, Exclusions, and to Contest Estimated Payment Amount | 65 Days from Notice Date |
| Motion for Final Approval and Response to Objections | 93 Days from Notice Date |
| Deadline for any Claims | 120 Days from Notice Date |
| Final Approval Hearing | At least 135 Days from Notice Date (at the convenience of the Court) |

**III.      CONCLUSION**

Developer Plaintiffs respectfully request that the Court enter the accompanying Proposed Order preliminarily approving the Settlement and directing notice to the Settlement Class.

- 25 -

Dated:  October 12, 2022                          Respectfully submitted,

By ___*/s/ Steve W. Berman*_____
    Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
Ted Wojcik (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com
tedw@hbsslaw.com

Ben M. Harrington (SBN 313877)
Benjamin J. Siegel (SBN 256260)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
benh@hbsslaw.com
bens@hbsslaw.com

By *s/ Melinda R. Coolidge*_____
    Melinda R. Coolidge (*pro hac vice*)
Yelena W. Dewald (*pro hac vice*)
**HAUSFELD LLP**
888 16th Street, NW, Suite 300
Washington, DC 20006
Telephone: (202) 540-7200 (main)
Telephone: (202) 540-7144 (direct)
Facsimile:  (202) 540-7201
mcoolidge@hausfeld.com
ydewald@hausfeld.com

Kyle Geoffrey Bates (SBN 299114)
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908 (main)
Facsimile:  (415) 358-4980
kbates@hausfeld.com

Katie R. Beran (*pro hac vice*)
**HAUSFELD LLP**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 985-3270 (main)
Telephone: (267) 702-3215 (direct)
Facsimile:  (215) 985-3271
kberan@hausfeld.com

By ____*/s/ Eamon P. Kelly*_____
     Eamon P. Kelly (*pro hac vice*)
Joseph M. Vanek (*pro hac vice*)
Alberto Rodriguez (*pro hac vice*)
**SPERLING & SLATER, P.C.**
55 W. Monroe Street, 32nd Floor
Chicago, IL 60603
Telephone: (312) 676-5845
Facsimile: (312) 641-6492
jvanek@sperling-law.com
ekelly@sperling-law.com
arodriguez@sperling-law.com

*Interim Co-Lead Class Counsel and Proposed
Settlement Counsel*

DEVELOPER PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY SETTLEMENT APPROVAL
CASE NO. 3:20-cv-05792-JD