**Pages 1 - 81**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

| | | |
|---|---|---|
| IN RE GOOGLE PLAY STORE | ) | **NO 21-md-02981-JD** |
| ANTITRUST LITIGATION | ) | |
| ―――――――――――――――――――――――――― | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| Epic Games, Inc. vs. Google LLC, | ) | |
| et al., Case No. 3:20-cv-05671-JD | ) | |
| | ) | |
| In Re Google Play Consumer Antitrust | ) | |
| Litigation, Case No. 3:20-cv-05761-JD | ) | |
| | ) | |
| State of Utah, et al. v. Google LLC, | ) | |
| et al., Case No. 3:21-cv-05227-JD | ) | |
| | ) | |
| Match Group, LLC, et al. vs. Google | ) | |
| LLC, et al., Case No. 3:22-cv-02746-JD | ) | |
| ―――――――――――――――――――――――――― | ) | |

San Francisco, California
Thursday, August 3, 2023


**<u>TRANSCRIPT OF PROCEEDINGS</u>**

**<u>APPEARANCES</u>**:

For Plaintiff Epic Games in C 20-05671 JD:
                         CRAVATH SWAINE AND MOORE LLP
                         Worldwide Plaza
                         825 Eighth Avenue
                         New York, New York 10019
               **BY:  GARY A. BORNSTEIN**
                     **LAUREN A. MOSKOWITZ**
                     **ATTORNEYS AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Stephen W. Franklin, RMR, CRR, CPE
                Official United States Reporter

```
 1   APPEARANCES:  (CONTINUED)

 2   For the Consumer Class Plaintiffs in C 20-05761-JD:
                               KAPLAN FOX AND KILSHEIMER LLP
 3                             850 Third Avenue,  14th Floor
                               New York, New York 10022
 4                        BY:  HAE SUNG NAM
                               ATTORNEY AT LAW
 5
                               BARTLIT BECK, LLP
 6                             1801 Wewatta Street
                               Suite 1200
 7                             Denver, Colorado 80202
                          BY:  KARMA M. GIULIANELLI
 8                             ATTORNEY AT LAW

 9   For the State of Utah and the Plaintiff States in
     C 21-05227-JD:
10                       OFFICE OF THE UTAH ATTORNEY GENERAL
                               160 East 300 South, Fifth Floor
11                             Salt Lake City, Utah 84114
                          BY:  LAUREN M. WEINSTEIN
12                             BRENDAN P. GLACKIN
                               ASSISTANT ATTORNEYS GENERAL
13
     For Match Group, LLC in C 22-02746-JD:
14                             HUESTON HENNIGAN LLP
                               523 West 6th Street, Suite 400
15                             Los Angeles, California 90014
                          BY:  JOSEPH A. REITER
16                             DOUGLAS J. DIXON
                               ATTORNEYS AT LAW
17
     For Defendants:
18                             MORGAN LEWIS & BOCKIUS LLP
                               One Market Street, 28th Floor
19                             Spear Street Tower
                               San Francisco, California 94105
20                        BY:  BRIAN C. ROCCA
                               MICHELLE P. CHIU
21                             ATTORNEYS AT LAW

22                             MUNGER TOLLES & OLSON LLP
                               350 S. Grand Avenue, 50th Floor
23                             Los Angeles, California 90071
                          BY:  GLENN D. POMERANTZ
24                             REBECCA L. SCIARRINO
                               ATTORNEYS AT LAW
25              (APPEARANCES CONTINUED ON FOLLOWING PAGE)
```

1    **APPEARANCES:**  (CONTINUED)

2    For Defendants:

3                          MUNGER, TOLLES & OLSON LLP
                           560 Mission Street, 27th Floor
                           San Francisco, California 94105

4                    BY:  **JUSTIN P.  RAPHAEL**
                         **ATTORNEYS AT LAW**

5                            *  *  *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **Thursday- April 20, 2023**                                    **10:20 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | THE COURT:  Good morning. |
| 5 | VOICES:  Good morning, Your Honor. |
| 6 | THE COURTROOM DEPUTY:  Please be seated. |
| 7 | Calling Civil 20-5671, Epic Games, Inc. versus |
| 8 | Google, LLC; Civil 20-5761, In Re Google Play Consumer |
| 9 | Antitrust Litigation; Civil 21-5227, State of Utah versus |
| 10 | Google, LLC; Multidistrict Litigation 21-2981, In Re Google |
| 11 | Play Store Antitrust Litigation; and Civil 22-2746, Match |
| 12 | Group, LLC, versus Google, LLC. |
| 13 | Counsel. |
| 14 | MR. BORNSTEIN:  Good morning, Your Honor.  Gary |
| 15 | Bornstein for Epic. |
| 16 | MR. REITER:  Good morning, Your Honor.  Joseph |
| 17 | Reiter for the Match plaintiffs. |
| 18 | MS. WEINSTEIN:  Good morning, Your Honor.  Lauren |
| 19 | Weinstein for the states. |
| 20 | MS. NAM:  Good morning, Your Honor.  Hae Sung Nam |
| 21 | for the consumers. |
| 22 | MR. POMERANTZ:  Good morning, Your Honor.  Glenn |
| 23 | Pomerantz for Google.  With me at counsel table are two of my |
| 24 | colleagues, Justin Raphael and Rebecca Sciarino. |
| 25 | MR. ROCCA:  Your Honor, it's Brian Rocca and |

1   Michelle Park Chiu, Morgan Lewis, for Google.

2          THE COURT:  Okay.  All right.  So it was a

3   productive hot tub Tuesday.

4          I've decided I need a little bit of follow-up with

5   respect to Dr. Singer, so here's what I'm going to do.  I'm

6   going to send out a couple of questions by Monday.  If I can

7   do it this week, I will.  It's unlikely, and so by Monday or

8   Tuesday.  And then it would be directed to Dr. Leonard and

9   Dr. Singer, couple things I want them to do for me.  I don't

10  have to have them back in, but I do need sworn declarations so

11  I can treat it like in-court testimony.  I don't have to drag

12  everybody back, but that will be fine.  And they are going to

13  prepare it.  It's not going to be drafted by lawyers; it's

14  going to be just as if they were testifying and aren't doing

15  the hot tub.  So I'll send those questions out.  I'm going to

16  need it fairly quickly.  I want to get this decided by first

17  week of September if I can, because we're getting close to

18  trial date.

19          So it's just going to be Singer and -- Dr. Singer

20  and Dr. Leonard.  Those are the only two who will be involved.

21  Okay?  It won't be that many questions.  It should be actually

22  relatively easy for them to answer, I would hope, but who

23  knows.  So otherwise those are under submission.

24          Let's talk about summary judgment.  I think one or

25  two of these I may be able to give you a disposition from the

1    bench, but let's start with, they're all Google's motions.

2    The one I want to start with is the plaintiffs' claims that

3    Google unlawfully prohibits the distribution of other apps on

4    the Google Play Store.

5              MR. POMERANTZ:  Thank you, Your Honor.  I'm Glenn

6    Pomerantz for Google.

7              Your Honor, what we tried to do in this motion is

8    read your opinions on summary judgment before we ever got

9    here.  So you will see no cussin' or spinnin', and we are

10   going to try to filet this case a little bit, and we think

11   this is one in which the law is clear.

12             So the policy is that a developer can distribute its

13   apps through the Play Store, but it cannot use -- it cannot

14   use Play to distribute a competing app store.  And, Your

15   Honor, the law is clear that we have no obligation to do

16   business with our competitor.

17             THE COURT:  Right.  So, I mean, this is -- this is

18   basically in your view a refusal to deal claim.  There's no

19   duty to deal.  I agree with all that.  But your colleagues on

20   the other side say they're not basing their Section 2 claims

21   on a refusal to deal theory.  So --

22             MR. POMERANTZ:  So, right.  They're saying --

23             THE COURT:  Now, it's okay in my view -- and I'll

24   hear your view.  You know, there's sometimes called the

25   monopoly broth.  It's okay to have carrots, celery, onions and

1    thyme all bubbling in the broth without necessarily calling

2    out the celery as, you know, an offensive conduct element for

3    which you seek relief.  I can't really tell on this record

4    whether there is, in fact, a refusal to deal or not.  It's

5    very hard.

6            Look, here's the thing with contracts, particularly

7    when you have sophisticated entities involved.  They're not

8    going to flat out say you are forbidden to do business with

9    "X".  People are too smart for that.  They're just not going

10   to do that.  But the contract may have that effect.  There may

11   be evidence around the contract that indicates that, in fact,

12   it was intended to accomplish that without necessarily having

13   a smoking gun put right into the content of the document.

14           So I'm also concerned about some fact issues, but

15   look, they're not going to ask for damages based on refusal to

16   deal.  Maybe they'll say that they have this issue, you'll

17   prove at trial that there's no restrictions, that never

18   happened.

19           MR. POMERANTZ:  No, Your Honor.  This is actually

20   not that kind of a case.  We actually do have a restriction

21   right in our contract that says you cannot use Play to

22   distribute a competing app store.  And our argument, Your

23   Honor, is that that cannot be part of the broth as a matter of

24   law.

25           So this is different.  There's no factual dispute.

1   They -- there is a contract, and it says what everybody knows

2   it says.  And so you cannot distribute a competing app store

3   through Play.  That -- and they say, well, that would be

4   lawful if it were in isolation, but, hey, we're throwing it

5   into the broth, and therefore we can use it to support the

6   monopolization claim.  In fact, all of their claims.

7                  Can I hand Your Honor a notebook that has a few

8   things that would be helpful?

9                  THE COURT:  Okay.  Yes.

10                  MR. POMERANTZ:  May I approach, Your Honor?

11                  THE COURT:  Sure, just hand it to Ms. Clark.

12                  THE COURTROOM DEPUTY:  You have an extra one?

13                  MR. POMERANTZ:  I do.  I have two extra ones if you

14   need it.

15                  THE COURT:  Thank you.

16                  MR. POMERANTZ:  So, Your Honor, if you would turn to

17   Tab 1, this is a case, a decision by Judge Pfaelzer in the

18   *Masimo* case.

19                  THE COURT:  Oh, yes, I know it well.

20                  MR. POMERANTZ:  I saw your name there, so I assumed

21   you might remember it.

22                  And if you look at the page, the second page, what

23   Judge Pfaelzer says in that case is that:  "*Masimo* throws into

24   the "mix" every potential allegation of misconduct without

25   regard as to whether such conduct is truly anticompetitive.

1  Despite this Court's willingness to consider a monopoly broth,

2  this Court cannot allow *Masimo* to stretch these holdings

3  beyond their intended purpose."  And then the last sentence

4  that I highlighted here:  "The holding does not allow for

5  clearly legal acts to be thrown into the mix to bolster a

6  plaintiff's antitrust case."

7           THE COURT:  Yes.

8           MR. POMERANTZ:  There is a clearly legal right for

9  any company, even a monopolist -- Judge -- then-Judge Gorsuch

10  said in the Novell case, even a monopolist has the clearly

11  legal right not to do business with its competitor, and

12  here --

13           THE COURT:  Well, but here's the issue,

14  Mr. Pomerantz.  I just ... the plaintiffs say -- and we'll

15  hear from them in just a second -- "plaintiffs do not" -- this

16  is Section 4.5 of the DDA, right?

17           MR. POMERANTZ:  Yes, that's the issue.

18           THE COURT:  That's the overt description.

19           Okay.  This is right out of their opposition brief.

20  This is document number 511-1, page 5:  "Plaintiffs do not

21  assert liability against Google for Section 4.5 of the DDA on

22  its own.  Rather, plaintiffs challenge the thicket of

23  restrictions Google employs to foreclose competing stores,

24  which includes Section 4.5."  So --

25           MR. POMERANTZ:  On its own.  That's the key there.

1  What they're saying is if all we did was to have Section 4.5,

2  well, they wouldn't have a case.  But they can throw this

3  clearly legal act into the broth.

4         *Masimo* says no, and Judge Boasberg in the recent

5  *Facebook* case said no, citing *Masimo*.  In that *Facebook* case,

6  what the FTC alleged was that Facebook had done several things

7  that together constituted a violation of Section 2.  They

8  acquired Instagram, they acquired WhatsApp, and they made

9  their Facebook not interoperable with their -- with Facebook's

10  competitors.  What Judge Boasberg said is that last thing

11  where they made it that it was not interoperable, that's out.

12         THE COURT:  Well, let me ask you this:  What is it

13  you're asking?  I mean, I think you may be asking, you can

14  tell me, you're trying to ask for an order saying that the

15  plaintiffs are just forbidden from even mentioning Section 4.5

16  at trial.

17         MR. POMERANTZ:  That's a different question.  What

18  they cannot do --

19         THE COURT:  Well, tell me, what is it you want?  All

20  they're saying is they want to mention it at trial.

21         MR. POMERANTZ:  They cannot mention it.  In

22  mentioning it, they're trying to make it part of the broth.

23  They cannot mention it.

24         THE COURT:  But that's --

25         MR. POMERANTZ:  I don't know that it will come in

1  for any other purpose, Your Honor.

2          THE COURT:  That's the only reason it would ever

3  come up.

4          MR. POMERANTZ:  Then it can't come in.

5          THE COURT:  So you would say they're actually barred

6  from even mentioning Section 4.5?

7          MR. POMERANTZ:  Well, if the only reason -- again, I

8  don't know what else they would argue, but if the only reason

9  for offering it is in order to say it's part of the broth,

10 then it is -- cannot be admitted, because it's a clearly legal

11 act.  That's *Masimo,* that's *Valassis*, that's the *Facebook*

12 case.  All of them say that.

13         The monopoly broth is not there to say anything in

14 the world can go into it.  A clearly legal act cannot.  And we

15 all know from *Trinko* all the way back to *Colgate* more than a

16 century ago, a business has every right to decide who it's

17 going to do business with and who it's not going to do

18 business with.  It's a clearly legal right.

19         In fact, in the *Epic v. Apple* case, what the Ninth

20 Circuit recently decided, when it got to the UCL claim it said

21 even the UCL, it can sweep in a lot of things, but what it

22 can't sweep in is something that's already been determined to

23 be clearly legal, and they specifically gave *Colgate* as an

24 example.

25         THE COURT:  Well, of course.  The UCL prong is

 1  expressly unlawful conduct.  I mean, that is --

 2          MR. POMERANTZ:  I'm sorry.  I --

 3          THE COURT:  The UCL expressly says unlawful conduct,

 4  I understand that.

 5          Okay.  Mr. Bornstein.

 6          MR. BORNSTEIN:  Thank you, Your Honor.  Gary

 7  Bornstein for Epic.

 8          The court reporter asked us every time to make sure

 9  we get the names out there.

10          THE COURT:  Yes, that's a good practice.

11          MR. BORNSTEIN:  So, Your Honor, let me start with

12  what Your Honor has gotten to in the questioning of counsel

13  for Google.  This is an effort to keep information from the

14  jury.  That's what this motion is.  And if the jury is sitting

15  and looking at the full range of conduct that Google has

16  engaged in, the jury needs to understand there are agreements

17  with OEMs that prevent certain methods of distribution of app

18  stores, there are agreements with carriers that have the same

19  effect, there are agreements with developers that have the

20  same effect, and there needs to be an understanding on the

21  part of the jury of Section 4.5 that closes off the last

22  available method for distribution on top of the OEMs, the

23  carriers, the developers and the sideloading.

24          So if the jury is not informed, if this information

25  is kept from them, as Google now has acknowledged is the

1    function of this motion, the jury is going to make a decision

2    about the competitive effects of this conduct in the dark.

3              THE COURT:  Well, how about this.  I'm just thinking

4    out loud here, and I'm sure you're way ahead of me, but I

5    might be able to see a theory of, okay, let's say, you know, a

6    concerted refusal to deal is not in itself actionable, a

7    proposition that you probably agree with.  I won't press you

8    on that right now, but I could see maybe Section 4.5 coming in

9    almost on a state of mind theory just to show Google knew what

10   it was doing.  All these other provisions and this one go to

11   the state of mind of wanting to exclude, in an impermissible

12   fashion according to plaintiffs, competition for the app

13   store.

14             So you're just tendering it to show it's not a

15   mistake or just a coincidence or some kind of random

16   correlation of disparate factors.  It was, in fact, an

17   intentional thought out agenda, and Section 4.5 is part and

18   parcel of the proof that this was intended to be the effect.

19   I could see a state of mind with a limiting instruction.

20             MR. BORNSTEIN:  I don't --

21             THE COURT:  Would that be enough for you?  How about

22   that?  Can you live with that?

23             MR. BORNSTEIN:  I don't think that would be

24   sufficient, Your Honor, for a number of reasons.

25             First of all, the jury's task is going to be on rule

1  of reason claims, which we're talking about right now, to

2  assess the actual competitive effect of the conduct.  The

3  intent of Google may be relevant for the jury to assess what

4  those effects are, but the jury has to know and the jury has

5  to make a conclusion about what the effect of the conduct is.

6  And if we can't say to the jury, for example, if I can't put a

7  witness on the stand to say, I wanted to distribute my store

8  through Google Play and they told me, no.

9         THE COURT:  Under Section 4.5.

10         MR. BORNSTEIN:  Under Section 4.5, that's right.

11         If I can't have -- if the consumers can't have a

12  consumer on the stand and say, I wanted to download something

13  through Google Play, and I was told it wasn't available

14  because of Section 4.5.

15         THE COURT:  Well, how do you get around the

16  brilliant lawyering in *Masimo* that resulted in Judge

17  Pfaelzer's opinion?

18         MR. BORNSTEIN:  Well, Your Honor, I am glad you

19  asked the question, because I am very surprised to see counsel

20  hand up to Your Honor an excerpt of the *Masimo case*.

21         THE COURT:  It did look a little short.

22         MR. BORNSTEIN:  It is a lot short, Your Honor, and

23  it has the language that Google likes, and it omits the

24  language that Google clearly doesn't like.

25         So, Your Honor may recall from your prior life that

1     there were a number of different elements of conduct that were

2     alleged to have been anticompetitive in that case, and Google

3     has pointed the Court to two elements of the conduct that were

4     at issue, which were patent infringement and product

5     disparagement.

6               Another portion of the opinion discusses these

7     equipment financing programs that Tyco had, and the Court

8     says, and I'll read the part that's not in the binder that was

9     given to you.  The Court says that:  "When considered on their

10    own, Tyco's equipment financing programs are arguably not

11    exclusive; however, when viewed in conjunction with" a variety

12    of other conduct the Court then lists, quote, "it is possible

13    that a jury could find the overall combined effect is de facto

14    exclusive and substantially forecloses the market."

15              And what the judge says, Judge Pfaelzer says at the

16    beginning of the opinion, is that the Court needs to exercise

17    some flexibility to assess whether a particular form of

18    conduct should come in as part of the broth or should not.

19    And it's not a bright-line rule.  There is no case with a

20    bright-line rule that says a refusal to deal can never come

21    in.  It's something the Court needs to consider on a

22    case-by-case basis as to whether or not the particular conduct

23    at issue should be considered as part of the broth.  That's

24    what Judge Pfaelzer did in *Masimo* by slicing the conduct in

25    different ways, and that's actually what happened --

1          THE COURT:  The --

2          MR. BORNSTEIN:  I apologize, Your Honor.

3          THE COURT:  I was just going to say -- go ahead,

4    finish that thought.

5          MR. BORNSTEIN:  I was just going to say the same

6    thing happened in the *Klein versus Meta* decision that Your

7    Honor inherited from Judge Koh, where Judge Koh held, and then

8    Your Honor repeated in citing her prior opinion, that even

9    though there were certain activities, which in that case were

10   a refusal to deal that Facebook was engaging in, refusal to

11   access API, the platform, that a plaintiff could "still state

12   a Section 2 claim by alleging a series of practices that are

13   anticompetitive, even if some of the activities would be

14   lawful if viewed in isolation."  That's a direct quote from

15   Your Honor's quote of Judge Koh.

16         THE COURT:  No, I understand, and that is my

17   inclination, but -- so I'm not going to tie your hands.  I

18   know we're 120 days or so away from trial, but so at least

19   you're thinking at this point you're going to have one witness

20   come in and say, I wanted to do "X", but Section 4.5 was held

21   up as -- by Google to say I couldn't do it.

22         MR. BORNSTEIN:  I do intend, Your Honor, to have at

23   least one witness come in and say, we understood we couldn't

24   do it, right, because we read the rules.  I don't know that

25   I'll have someone to say, I asked and I was told this is what

1    the rule says.  I just don't know the answer to that question,

2    Your Honor.

3              THE COURT:  I understand.

4              MR. BORNSTEIN:  And I certainly would intend to

5    examine Google witnesses to draw out the fact in existence of

6    this policy, their intent to enforce it, and so forth.

7              THE COURT:  In conjunction with all those other

8    contracts you intend to put on.

9              SPEAKER:  That's precisely right, Your Honor.

10             THE COURT:  Okay.  Okay.

11             MR. POMERANTZ:  May I respond, Your Honor?

12             THE COURT:  Yes, just closing thoughts.  Then I want

13   to get to the next one.

14             MR. POMERANTZ:  Okay.  There's a difference between

15   an act which the law has determined to be clearly lawful and

16   an act which could or could not be lawful.  Here, when the act

17   has been determined by law to be clearly lawful, the portion I

18   read from *Masimo* is what applies.  What Mr. Bornstein is

19   talking about is where an act could be or could not be lawful

20   depends on other things.

21             Here, there is no dispute that it is clearly lawful

22   under *Trinko*, *Colgate* and a lot of other cases, that we don't

23   have to distribute competing app stores.  That's a clearly

24   legal act.

25             So, Your Honor, it cannot be used as part of the

```
 1    broth.  If they think there's a different way to bring it into
 2    evidence, we'll have to hear it.  I didn't hear it today.  All
 3    of that sounded like he wanted that to be part of the broth.
 4    But if it comes into evidence at all, then we need a clear
 5    instruction to the jury that we have an absolute right to
 6    tell -- not to distribute a competing app store.  The jury
 7    needs to know that so they're not misled and think that that
 8    can be part of the broth, because it cannot be as a matter of
 9    law under *Masimo*, under *Facebook*, under *Valassis*, under
10    *Trinko*, under *Colgate*.  It cannot be part of the broth.
11              THE COURT:  Part of it is I'm not -- I understand
12    what you're saying.  It does sound like it would be coming on
13    the liability end, but it's hard to say so far from trial that
14    would be the only grounds for it to come in.
15              MR. POMERANTZ:  Well, I haven't heard a different
16    ground.  That's why I'm not ruling it out.  All I'm saying is
17    --
18              THE COURT:  Although we're three months away.  I
19    mean, you know.
20              MR. POMERANTZ:  If there was -- yes, if there was --
21              THE COURT:  The nervous owl flies at dusk.  They're
22    going to figure all this out right before trial.
23              MR. POMERANTZ:  All I'm saying is the ruling that
24    we're entitled to is that as a matter of law, it cannot be
25    part of the broth.  If they come in with some other theory
```

1    that Your Honor thinks is relevant, then we'll need a limiting

2    instruction.  We'll need to make -- the jury needs to know it

3    can -- it is a clearly lawful act to refuse to distribute your

4    competitor's store.  That's clear under the law, absolutely

5    clear.

6              THE COURT:  Okay.  That will be under submission.

7    I'll get a short order out on that soon.

8              All right.  Let's go to the per se versus rule of

9    reason labeling for the ...

10             MR. POMERANTZ:  For the Games Velocity Program, Your

11   Honor.

12             THE COURT:  Right.

13             The concern I have is I don't know if I -- there are

14   a lot of fact issues that are packed into that, and I'm not

15   sure at this stage I can do it.  My inclination is to defer it

16   and see what proof at trial looks like, and then we'll just do

17   it before we get the final jury instructions.  So that is -- I

18   mean, I -- I would like to hear what you have to say, but I

19   just, I'm not feeling equipped enough to know what the

20   evidence is going to say, and this is an evidence-based

21   decision.

22             MR. POMERANTZ:  I understand, Your Honor.

23             THE COURT:  In my view.

24             So my inclination is to pass it to, you know, some

25   point in trial, clearly before the jury's instructed, but I

1   don't think I can do it right now.  But what do you think?

2          MR. POMERANTZ:  Okay.  So let me start by saying

3   what we are arguing and we're not.

4          So these agreements, these Games Velocity Program

5   agreements, only Epic and Match are seeking a per se claim

6   here.  The state -- and they added that, if Your Honor

7   remembers, near the end or at I understand of discovery.  The

8   states and the consumer class have not sought a claim based on

9   per se.  They saw the same evidence; they didn't choose to

10  amend their complaint.

11         There really is no dispute about what these

12  agreements are.  These agreements are vertical, and in which

13  Google Play says to important customers, their developers who

14  make popular games, and they say, we want you to be in our

15  store.  Our users like your game.  We want you to be in our

16  store.

17         And so what we said to them, and it's crystal clear,

18  it's exhibits -- gave you an example, exhibits 10 and 11, they

19  don't dispute it, that what these agreements say is that if

20  the game developer will give their games, their new games or

21  update to games to Google Play at the same time they give it

22  to the Apple App Store or to another Android store, Android

23  app store, then Google Play will pay them through credits on

24  advertising and cloud services.  And that is classic pro-

25  competitive behavior, paying -- giving your customer a better

1   deal so they continue to do business with you.  Classic pro-

2   competitor.

3           But what the -- what Epic and Match are saying is

4   there was another term to the agreement that wasn't written

5   down, but the parties agreed to it.  And that is that the game

6   developer agreed they would not open up a competing app store.

7   Now, we say that wasn't part of the agreement, they say it

8   was, but we --

9           THE COURT:  Well, that's the issue.

10           MR. POMERANTZ:  For the purposes -- no, it's not.

11   For purposes of this motion, we accept it.  We accept it.  For

12   purposes of this motion, we accept it.

13           So what you have, even under their theory, is an

14   agreement that has a whole bunch of vertical, you know,

15   consideration going back and forth, plus a horizontal one.

16   That's their theory.  And we cited the law that says that when

17   you have that kind of a hybrid case, hybrid agreement, it has

18   vertical components and it has a horizontal component, it

19   cannot be per se unlawful.  Because vertical agreements, as

20   Your Honor knows, you know, there's all sorts of pro-

21   competitive reasons why you might do various things, and the

22   *Frame-Wilson* case and the *Dimidowich* case, they make crystal

23   clear that if you have that kind of a vertical and horizontal

24   hybrid, it cannot be per se unlawful.

25           What the cases say is in order for it to be per se,

1    you need to have a naked horizontal agreement, a garden

2    variety agreement.  And there is no way to look at the Games

3    Velocity Program agreements, even if you tack on their

4    horizontal agreement, even if you tack it on.  And they can't

5    pull out that horizontal agreement and say, hey, we're only

6    challenging that part of it, because it's part of an overall

7    deal.  And their interrogatory responses, it's exhibits 12 and

8    13 to my declaration in support of this motion, they admit

9    that the written agreement is part of the deal, and then there

10   was this added agreement.

11            THE COURT:  Okay.  But I mean, this is just a big

12   bundle of facts, and I'm not really all that comfortable --

13            MR. POMERANTZ:  None of those facts are undisputed.

14   I'm accepting their horizontal agreement solely for purposes

15   of this argument.

16            THE COURT:  All right.  Let's hear from

17   Mr. Bornstein.  Go ahead.

18            MR. BORNSTEIN:  Thank you, Your Honor.

19            I'll start perhaps by making it easy for the Court,

20   but we're obviously quite content to have the Court handle

21   this in the way that Your Honor suggested was your inclination

22   at the beginning of this section of the argument.

23            To respond to some of the observations, I think it

24   makes sense to divide the issues between the fact issues and

25   the legal issues.  I hear Mr. Pomerantz saying, and it does

1   simplify things to say they accept for purposes of this

2   argument that this horizontal agreement does exist not to

3   compete, not to open an alternative app store.  So I will set

4   aside my wonderful argument about what the facts are Your

5   Honor should look at.  You'll trust me that my wonderful

6   argument exists.

7          As to the legal piece of it, there is no hard,

8   bright-line rule of law of the sort that Mr. Pomerantz is

9   advocating, that anytime you have a horizontal agreement not

10  to compete, which we've now said we'll assume for purposes of

11  this discussion, that you can layer in vertical elements and

12  shield it from per se scrutiny.  Complexity is not a defense

13  to per se unlawful behavior, that is clear.

14         For example, the *Palmer* case.  This is a Supreme

15  Court decision.  It has vertical elements; it has horizontal

16  elements.  The Supreme Court said this is an agreement that

17  should be reviewed under per se scrutiny.  And there are cases

18  that Mr. Pomerantz has referred to just now, like *Frame-Wilson*

19  and *Dimidowich* which are easily distinguishable.  I mean,

20  *Frame-Wilson*, for example, was strictly a vertical agreement

21  between Amazon --

22         THE COURT:  I'll take care of that.

23         Let me ask you this.  What are you planning, just at

24  a high level, not tying your hands, how are you planning to

25  present this at trial?  What are you going to do with it?

1          MR. BORNSTEIN:  Sure.  What we intend to do, Your

2    Honor, through the witnesses we're able to bring, and that's

3    something we're still working out, and maybe we'll get to the

4    pretrial exchange portion of this discussion later, is put on

5    evidence that shows that Google and these third parties, the

6    ones we've identified in our papers, reached an agreement not

7    to compete; that these horizontal potential competitors would

8    not open an app store.

9          I mean, if I could point Your Honor, for example, to

10   one thing which I will introduce in evidence and I can't

11   currently say in open court because of the claim of

12   confidentiality, but it's sitting there on page 7, line 12 of

13   our brief.  It is a direct quote from a Google document that I

14   will put into evidence that makes clear there was an agreement

15   according to Google's own language.  So we will put in

16   documents like that, and we will solicit testimony from

17   relevant witnesses showing that this agreement exists, and we

18   will, to the extent necessary, rely on the legal arguments to

19   show why that should be addressed as a per se matter.

20         THE COURT:  All right.

21         MR. BORNSTEIN:  I think ultimately the jury will

22   have to decide what the facts are, and with the benefit of

23   Your Honor's instruction, they will know which standard to

24   apply, whether to apply a per se standard if they find facts

25   to be "X", or a rule of reason standard if they find the facts

1    to be "Y".

2              THE COURT:  Okay.

3              MR. POMERANTZ:  Your Honor, if I could just briefly

4    respond?

5              THE COURT:  Very briefly, yes.

6              MR. POMERANTZ:  Whether a case is subject to the per

7    se rule or the rule of reason is not something you leave to

8    the jury to decide, like Mr. Bornstein just said.  It is

9    typically decided either at the motion to dismiss or summary

10   judgment stage, because lawyers need to know how to try the

11   case.  If it's per se, what they're saying is all we need to

12   prove is the agreement.  But they have a rule of reason claim

13   on this very same thing, so we know we're going to be putting

14   in evidence about the anticompetitive effects, the pro-

15   competitive benefits of this agreement, all things considered.

16   So that's going to the jury.

17             So the question is would the jury ever be instructed

18   that, hey, if you reach an agreement you don't need to

19   consider all the rest of this stuff, and that's just not the

20   law.

21             THE COURT:  Well, look, the most I might do, the

22   most -- and I'm going to take this under submission and I'll

23   reflect -- the most I might do is make a highly preliminary

24   decision that may be changed as evidence is introduced at

25   trial.  So that's the most you're going to get, because I

1   don't think this is something that is readily disposable of on

2   the facts as I currently have them.

3              Okay.  That's under submission.

4              Now, the early Android carrier agreements.

5              MR. POMERANTZ:  Thank you, Your Honor.

6              THE COURT:  Well, the plaintiffs have said that they

7   don't -- this is in Docket 511-1, page 14, note 7.  Plaintiffs

8   say that no plaintiff is going to use those facts about the

9   carrier agreements to seek damages prior to the four-year

10  limitations period.  So problem solved.  They're not going to

11  do it.

12             MR. POMERANTZ:  Your Honor, they shouldn't be

13  allowed to point to those in support of their claim.  They --

14  what they're trying to say is we're not going to seek damages

15  before 2016, but of course they can't seek damages before

16  2016.  There's a four-year limitations period.

17             THE COURT:  They can use some table setting.  I

18  mean, I don't have any problem with a little bit of table

19  setting.  Plaintiffs have expressly renounced they're going to

20  make any argument for damages or anything else based on those

21  older agreements.

22             MR. POMERANTZ:  Okay.  Your Honor, if you could turn

23  to page 7 -- tab 7 in the binder, and I'll take whatever

24  blame.  I have chosen to give you just the relevant excerpts

25  in order for Your Honor not to have so much paper.  If you

1   tell me the next time you want me to put the whole case in

2   there with the tab --

3              THE COURT:  No, no, no.

4              MR. POMERANTZ:  -- I'll be happy to do that.

5              THE COURT:  We have this wonderful thing called

6   Westlaw, where I can get all of this for free.

7              MR. POMERANTZ:  And law clerks, too.  So you got

8   both of those.

9              THE COURT:  Yes.

10             MR. POMERANTZ:  So here's the *Klehr* case from the

11  Supreme Court, and the language --

12             THE COURT:  But let me just jump in.

13             This is not a bootstrap.  This is just -- this is

14  table setting.  This happens all the time.  Here has been the

15  pattern and practice.  Now, we can't get -- for reasons that

16  the jury will be told, they can only get damages for this

17  period of time, but it's been a long -- just speaking off the

18  top of my head, this has been a longtime practice of the

19  company, make no mistake, this is part and parcel of who they

20  are and how they do business.  It started here, it ended

21  there.  We're talking in this case about this specific time

22  period.  I mean, they don't need to have a straitjacket on a

23  little of the table setting.

24             MR. POMERANTZ:  No.  But if it's going to come in,

25  Your Honor, it can only come in with a clear instruction based

1  on Klehr.  That is, the jury -- but they can't do --

2          THE COURT:  No, that's not true.

3          You will say in your closing argument, you heard

4  about these, what are they, Android -- early Android carrier

5  agreements.  Those are not part of anything you should take

6  into account in determining damages, if any, that you're going

7  to hold my client responsible for, or words to that effect.

8  Okay?  They don't need -- this is not that complicated, so ...

9          MR. POMERANTZ:  But then, Your Honor, I just think I

10 need an instruction that says that what I'm saying is in fact

11 correct, because it's part of the instructions in the case.

12         THE COURT:  You can ask as we get through the

13 evidence at trial.  We'll see how it goes, we'll see what the

14 plaintiffs actually end up doing with it, but that one is

15 denied.  There will be no further written order on that.  I'll

16 have some notes in the minute order.

17         So the plaintiffs, that's with your understanding --

18 sorry, you can add something.  It seems relatively clear in

19 the footnote, but I don't want to deny you an opportunity.

20         First of all, you embrace the footnote, right?

21 Page 14, note 7, that's the plaintiffs' pledge, all

22 plaintiffs.  You're not going to use --

23         SPEAKER:  No plaintiff in this case is seeking

24 damages -- I'm sorry, Hae Sung Nam for the consumer

25 plaintiffs.

 1          No plaintiff in this case is seeking damages beyond

 2   the limitations period.

 3          THE COURT:  And you're just going to use it as kind

 4   of a, as I said, I've been calling it table setting, you can

 5   call it whatever you want, but part of the story.  It's part

 6   of the narrative art.

 7          MS. NAM:  You're correct, Your Honor.  It is part of

 8   the story, and we have not alleged that, you know the carrier

 9   agreements were the sole cause of plaintiffs' harm.  However,

10   you know, based on the continuing violation doctrine, it is a

11   continuous course of conduct that starts in 2009 with these

12   agreements and continues to this day.  So we believe that any

13   damages -- if, if the -- to the extent the carrier agreements

14   are found to be anticompetitive and cause foreclosure,

15   plaintiffs' damages would flow from that conduct.

16          THE COURT:  Well, okay.  Look, I'm banking on

17   Footnote 7.  Okay?  So that's -- I'm going to hold you to

18   that, which means you can talk about this a little bit in the

19   narrative art, but that's it.  Okay?  And we'll see what you

20   say at trial.  I'll be listening carefully.  But that will be

21   the disposition.  Okay?

22          All right.  Thank you.

23          MS. NAM:  Thank you, Your Honor.

24          THE COURT:  Okay.  Now, the last one -- oh, no, two

25   more.  Okay.  Antitrust standing for IAP damages claims.

```
1                 Mr. Pomerantz.

2                 MR. POMERANTZ:  Yes, Your Honor.

3                 So this argument is based on the markets that the

4     plaintiffs have defined in their complaints and that their

5     experts have testified about, and if you turn to tab 13, I

6     have a little description of those markets, pictorial

7     description, that I think would aid you.

8                 So the plaintiffs alleged two markets.  The first is

9     what they call their Android app distribution market.  So I'm

10    going to take a moment to describe it.  This is not the focus

11    of this part of our motion.  This is not part -- what we're

12    arguing, this first market.  In this market, this is the

13    two-sided market, and the consumers and the developers are

14    both dealing directly with Google Play in order to consummate

15    a transaction between them.

16                It's clear from the way plaintiffs have pled this

17    case and the way their experts have defined it that this has

18    nothing to do with in-app purchases.  So what this involves is

19    how do you get the app onto your phone, how do you get your

20    app onto the device.  That's what this market is about.

21                THE COURT:  Again, I've spent a lifetime with these

22    reports.

23                MR. POMERANTZ:  Okay.  So let's get that -- I'm

24    sorry.

25                THE COURT:  So what is the IAP point?
```

1          MR. POMERANTZ:  Let's go to the next market, because

2    that's what's going on here.  That's where this action's at.

3          THE COURT:  All right.

4          MR. POMERANTZ:  What our argument is in this is that

5    the consumers do not have standing to bring a claim based on

6    this market definition because they are too remote from --

7    they were not -- their injury does not arise in the market

8    that the plaintiffs are alleging was where competition was

9    suppressed.

10         So what's going on here in this market is that

11   the --

12         THE COURT:  Well, but the consumers say that they

13   paid overcharges for IAPs and subscriptions --

14         MR. POMERANTZ:  Yes, Your Honor.

15         THE COURT:  -- because they bought them through the

16   Play Store, so ...

17         MR. POMERANTZ:  Right.  That's the market you see at

18   the bottom with the horizontal arrow.  The developers are

19   selling in-app purchases and subscriptions to the consumer,

20   but that's not the market that they're alleging is restrained.

21   What they're saying is we have to get our in-app billing

22   services only from Google Play; we have to use Google Play

23   billing.  Instead, we'd rather be able to go to PayPal or to

24   some other company that provides in-app billing services.  And

25   so those in-app billing services are a different market than

1    the market in which IAPs and subscriptions are sold.

2              And I'm not just making this up.  This is exactly

3    what Dr. Rysman and Dr. Singer say in their reports.  There

4    are two different markets here.  One is the market to buy

5    in-app billing services.  That's the market they say was

6    restrained by Google tying its billing system to its Play

7    Store, to the store.

8              And so because the injury to the plaintiffs is not

9    in the same market under *American Ad Management*, which is a

10   Ninth Circuit case, and *Feitelson* and a lot of other cases,

11   *DRAM*, the consumers do not have standing.  We are not

12   challenging whether the consumers have standing in the first

13   market, and we're not challenging whether Epic and Match have

14   standing in the second market, because they're the developers.

15             THE COURT:  I know what you're challenging.

16             Okay.  All right.  Plaintiffs.  Is it Ms. Weinstine

17   (phonetic)?

18             MS. WEINSTEIN:  Ms. Weinstein, yes.  Thank you.

19             THE COURT:  Weinstein, okay.  Yes.

20             MS. WEINSTEIN:  Your Honor, there is no legal or

21   factual distinction that is relevant to this standing issue

22   between initial app distribution, which Google concedes that

23   consumers and states have standing to pursue damages on, and

24   in-app downloads.  The critical inquiry is not whether

25   consumers are -- consumers are competitors in the relevant

1   market, it's the relationship between the defendant's harm and

2   the injury to consumers.  And as you point out, consumers

3   purchase in-app downloads from Google.  They pay an overcharge

4   directly to Google.  And the reason they are overcharged is

5   because of Google's monopolization of app distribution.  The

6   foreclosure of competition in that market is what allows

7   Google to tie billing services and require consumers to pay

8   Google directly every time they make an in-app purchase.

9          A simple example illustrates the point.  Let's say

10  you want to download Monopoly from the Play Store.  You pay

11  $3.99 to Google directly.  Any overcharge Google concedes can

12  be collected by consumers as damages on that initial app

13  download.

14         Now, let's say you want to play Monopoly Atlantic

15  City addition.  You download that as an in-app purchase.  You

16  pay Google directly for that in-app purchase $3.99, as well.

17  Same as the initial app download.  Consumers should be

18  permitted and are under the law permitted to collect whatever

19  overcharge they paid Google directly on that in-app purchase.

20  "When a consumer is a direct purchaser of a monopolist and

21  overpays that monopolist because of the monopolist's anti-

22  competitive conduct, they have standing to pursue the full

23  overcharge as damages."  That's *Apple versus Pepper*, which

24  addressed the exact industry at issue here.

25         Nothing in that analysis turned on whether Apple was

1    a retailer, as Google points out.  What it turned on was

2    whether there was any intermediary.  There's no intermediary

3    here between Google and the consumer in initial app downloads.

4    Likewise, no intermediary in in-app downloads, and consumers

5    have standing to pursue damages for both transactions.

6              THE COURT:  Let me ask you this.  Are you all going

7    to -- are you all discussing stipulating to the relevant

8    product markets for trial, or is this going to be -- is this

9    going to be an issue in dispute?

10             MS. WEINSTEIN:  I believe it will be an issue in

11   dispute, though if Google would agree to our relevant product

12   markets, I think we could resolve it.

13             Google defines a market where in-app downloads and

14   app distribution, initial app downloads, are the same.

15   Dr. Tucker says that our distinction between those two are

16   superficial.  So under Google's interpretation of the market,

17   we have standing to pursue damages for in-app downloads.  This

18   is a reason why there's no case that says you have to do a

19   fullblown market definition to determine standing.

20             THE COURT:  Well, let me just jump in.

21             So what I'm thinking is this might also be something

22   I need to take a look at once I see the evidence.  If you all

23   were in full agreement on what the potential relevant product

24   markets are, I might be able to kind of take it from there,

25   but if you're going to fight about what the markets are, I'm

1    going to need to hear the facts, and I think that might

2    actually have a big impact on this issue.

3              MS. WEINSTEIN:  Yes.  As Your Honor points out,

4    there's a factual dispute over market definitions.

5              THE COURT:  I thougt -- okay.  I thought you --

6              MS. WEINSTEIN:  Thank you, Your Honor.

7              THE COURT:  I hadn't heard that before.  So this is

8    going to be a big issue.

9              MS. WEINSTEIN:  We agree that there's a

10   disagreement.

11             MR. POMERANTZ:  We agree to disagree on that point.

12             But Your Honor, what we're seeking in this motion is

13   that under their defined market, the consumers do not have

14   standing.  If they want to concede our market, we'll withdraw

15   it as --

16             THE COURT:  Well, there is also the issue of proof

17   at trial, and I'm not going to start closing doors until

18   they've had an opportunity to -- if the relevant markets are

19   in dispute -- look, they don't have to have completely

20   100 percent rock solid.  They have to have enough to make it

21   past pleadings issues.  And so they don't have to have a fully

22   concrete specific and perfected definition of relevant market.

23   There are facts that will come up for trial, the issues that

24   have to be decided.  So, I mean, I'm kind of inclined, and I

25   may just have to wait a little bit and see what you all are

1   going to do at trial before I pull the trigger on this.

2          MS. WEINSTEIN:  Yes, Your Honor.

3          THE COURT:  It doesn't mean --

4          MR. POMERANTZ:  May I give you one --

5          THE COURT:  Doesn't mean you're going to win or

6   lose.  I just don't know yet.  Okay?

7          MS. WEINSTEIN:  Understood, Your Honor.

8          THE COURT:  Yeah.  Go ahead, Mr. Pomerantz.

9          MR. POMERANTZ:  So if Your Honor would go back and

10  look at what Dr. Singer said in the exhibits that we attached

11  to our motion and compare it to the argument that counsel just

12  made, they're night and day.  What Dr. Singer said is what we

13  are arguing, that there are -- the market is just described

14  just the way I outlined it in that pictorial tab 13.

15          *Apple versus Pepper*, Your Honor, it's really

16  important to see the difference between our case and *Apple*

17  *versus Pepper*.  So in *Apple versus Pepper*, three to four times

18  Justice Kavanaugh cites the way the parties define the market

19  there, and they did define it the way that counsel describes.

20  In that case, they said that the consumer was buying directly

21  from Apple, the Apple App Store.  That is not what they chose

22  to do here.  They chose instead to say that the consumer is

23  buying from the developer.  That's a -- and that was their

24  choice.

25          I'll tell you why they made that choice.  Epic filed

1     the first complaint, and they wanted to have a tying claim.

2     And in order to have a tying claim, you can't have the

3     consumers buying directly from Google.  So Epic alleged that

4     the consumer buys from the developer, and the developer goes,

5     gets in-app billing services from in-app billing service

6     providers.  So they made a choice.  The states, the consumers,

7     Match, they all agreed with Epic's market definition.  And

8     while that does work for Epic and that does work for Match, it

9     does not as a matter of law work for the consumers, because

10    their injury is in a different market as they've defined it.

11          The sale of IAPs and subscriptions from the

12    developer to the consumer is not the market that they alleged

13    was supp -- competition was suppressed.  That's the in-app

14    billing service market.

15          So that's a pure question of law, because they chose

16    how to define the market, and having defined it that way, the

17    consumers can't bring a claim based on that second market.

18          THE COURT:  All right.

19          MS. WEINSTEIN:  May I just respond briefly?

20          THE COURT:  Yes, just very briefly.

21          MS. WEINSTEIN:  It is not correct that our case --

22    that we say that we buy directly from developers.  We buy

23    directly from the Play Store, and there's nothing in

24    Dr. Singer or Rysman's reports that say that consumers are not

25    participants in this market.  That's just a fiction.

 1   Consumers pay Google directly for in-app purchases under *Apple*
 2   *versus Pepper*, *Ad Management*, *Glen Holly*, a whole series of
 3   cases we have standing to pursue damages for that overcharge
 4   paid directly to monopolist.
 5            Thank you, Your Honor.
 6            THE COURT:  Okay.  All right.
 7            MR. POMERANTZ:  Your Honor, just so that it was
 8   clear what Dr. Singer said, I put a box at the bottom of my
 9   chart, my little pictorial, that says crystal clear what he
10   said under oath, and it is not what counsel just said.
11            THE COURT:  All right.  That's submitted.
12            And last one.  Now, the time claims.
13            MR. POMERANTZ:  So Your Honor --
14            THE COURT:  Google and Google Play billing not being
15   sufficiently distinct as products to be subjected to tying.
16   Go ahead.
17            MR. POMERANTZ:  So after we filed our brief, the
18   Ninth Circuit issued its decision in *Epic versus Apple*.  And
19   so that decision makes clear one of our arguments, which is
20   that the per se portion of the tying claim cannot stand.
21            THE COURT:  Can I read to you my quote from *Epic*?
22            MR. POMERANTZ:  Yeah.
23            THE COURT:  Here's the quote, which is on page 996.
24   Quote:  "Here, the district court found that there was no tie
25   because app distribution and IAP are not separate products.

1   We base this finding on four rationales -- each of which is

2   either clearly erroneous or incorrect as a matter of law,"

3   closed quote.

4            So ...

5            MR. POMERANTZ:  Right.  So --

6            THE COURT:  I don't think *Epic* is a huge help for

7   you.

8            MR. POMERANTZ:  No, no.  Your Honor, I agree with

9   you except for one aspect of it, except for one aspect.  The

10  Court made crystal clear that there's no per se claim.  That's

11  behind Tab 17.  No, I'm sorry, that's wrong.

12           THE COURT:  Yeah, but that's all premised on your

13  belief that there's no coercion behind the tying, and that's a

14  fact issue.

15           MR. POMERANTZ:  No, no, no.

16           THE COURT:  I can't decide now.

17           MR. POMERANTZ:  Your Honor, it's Tab 23.  If you

18  look at Tab 23, and what the Ninth Circuit said there is:  "We

19  join the D.C. Circuit in holding that per se combination is

20  inappropriate for ties involving software that serves as a

21  platform for third-party applications.  It is only after

22  considerable experience with certain business relations that

23  courts classify them as per se."

24           So what we're saying here, Your Honor, is, you know,

25  most of the battle in our opening brief was about tying writ

1   large, whether it was rule of reason or per se.  What *Epic*

2   says, *Epic versus Apple* says, is it can't be per se as a

3   matter of law.  It can't be per se.  They allege both per se

4   and rule of reason.  So per se has to go out under *Epic versus*

5   *Apple*.

6          THE COURT:  You know, you're saying that *Epic* says

7   per se, it can't be per se.  It's not saying that.  It's just

8   saying act with caution and humility until there's a clear

9   record about the industry.

10          MR. POMERANTZ:  I don't believe --

11          THE COURT:  Okay?  So maybe this clear record is

12   here now today.

13          MR. POMERANTZ:  I would ask Your Honor --

14          THE COURT:  This is not the first case.  This is now

15   the second case.

16          MR. POMERANTZ:  I would ask Your Honor to --

17          THE COURT:  This is now the same type of conduct in

18   the second case.  At least that's the way plaintiffs allege

19   it.

20          MR. POMERANTZ:  If Your Honor --

21          THE COURT:  There is no per se barrier in *Epic* that

22   forevermore this cannot be considered per se.  I don't think

23   it's a fair reading of what the court said.  It said let's

24   take baby steps.  I'll put it informally.  That's what it

25   said.  And I think you're asking to say maybe it just hit the

1   wall, but there's no wall in *Epic*.

2          MR. POMERANTZ:  Your Honor, I would just urge Your

3   Honor to spend one more time reading page 997.

4          As to the rule of reason claim, what happened in

5   *Epic* is that Epic never mention the *Rick-Mik* case.  It's

6   another Ninth Circuit case.  They didn't overrule it.  They

7   didn't even mention it.

8          So we're now sitting there with *Epic v. Apple* and

9   *Rick-Mik*.  We are making our argument, because at some point

10  the Ninth Circuit's going to have to decide whether *Rick-Mik*

11  is still good law in view of *Epic*.  They say it's limited to

12  franchise cases.  I don't think that's a fair reading of it.

13  Yes, it was a franchise case, but the reasoning doesn't depend

14  on whether it's a franchise or not.

15         So what we're left with is that at some point Your

16  Honor and the Ninth Circuit will have to think about whether

17  *Epic v. Apple* is the law in the Ninth Circuit or *Rick-Mik* is

18  the law in the Ninth Circuit.  And we are simply preserving

19  that issue.  If Your Honor disagrees with us it will be teed

20  up to the Ninth Circuit.

21         THE COURT:  All right.  Plaintiff.

22         MR. REITER:  Your Honor, I'll be brief.  Joseph

23  Reiter for the Match plaintiffs.  I'll address the per se

24  argument first, and I have two responses to that.

25         The first is that this argument was not made in

1   Google's opening brief, it was made for the first time in

2   their reply brief.  You don't have a developed record or

3   argument on this issue, and for that reason it should not be

4   decided now.

5          Second --

6          THE COURT:  Well, I'm inclined to deny, and you're

7   pulling the rug out from under me by saying wait.  Do you want

8   me to wait?  What do you want me to wait on?

9          MR. REITER:  I -- Your Honor, there's no need --

10          THE COURT:  Did you not hear the quote I read from

11  *Epic*?  So if you want me to wait, I'll wait.  Okay?  And if

12  you think the issue's not ripe, then what do you want to do

13  with it?

14          MR. REITER:  Your Honor, I believe you can deny the

15  argument now for the reason you mention.

16          If you continue reading the next paragraph in the

17  *Epic* decision, the Ninth Circuit made clear that its finding

18  in that case was based on the record.  And if there's a

19  consistent theme from our arguments today, it is that a

20  determination of whether the per se or the rule of reason

21  standard applies depends on the facts that will be presented

22  at trial.

23          THE COURT:  Well, look, we're getting close to a

24  giant trial.  Okay?  We can't -- I'm not going to get hung up

25  on order of argument.  So do you want to just withdraw your

1    suggestion that this isn't ripe?

2              MR. REITER:  Yes, Your Honor.

3              THE COURT:  Okay.  We just have to get this thing

4    done.  I have plenty of ammunition.  Is there anything you

5    want to add that you think you did not have a chance to add?

6              MR. REITER:  No, Your Honor.

7              THE COURT:  Okay.  Because the plaintiff certainly

8    had -- I mean, the defendant certainly had its opportunity.

9              Okay.  All right.  Anything else to add on that?

10             MR. POMERANTZ:  No, Your Honor.

11             THE COURT:  Okay.  That will be under submission.

12             All right.  Now, let's talk about what's going to

13   happen.  I had hoped to have more specifics, and this is with

14   respect to trial planning, more specifics from you all about

15   what exactly we're going to do.  You keep saying all jury

16   issue -- all issues subject to jury trial will be tried to a

17   jury.  I need more than that.

18             I mean, here's what I want you to do in short order.

19   Go through all of the complaints and just make a list of what

20   we're going to try on November 6th.  Okay?  What are, in your

21   view, your joint agreement on these are the jury issues that

22   we're going to ask the jury to resolve on November 6th.  Okay?

23   Now, let's just start with that, because I'm unclear about the

24   specifics.  I need that.

25             So, now, having said that, I really -- there was

```
 1   some thoughts about, you know, having a jury basically be on
 2   tap for months, and months, and months on end as we go
 3   through, you know, bifurcations and phases.  I don't want to
 4   do that.  We can't -- it's not realistic.  We can't do that.
 5   Okay?  I can't -- this is not a grand jury that I can have for
 6   six months, you know, warehoused.  We can't do that.
 7            So the goal is to have all the jury trials done at
 8   once, damages and liability all at the same time, and I need
 9   you to spell out specifically what those claims will be.  All
10   right?  Just each case cite and say from the consumers'
11   complaint, here are the ones from the Epic complaint, from
12   Match, from the states, here's what we're going to do.
13            Counterclaims.  Okay, we're going to, you know,
14   we'll talk about counterclaims later, but just put them in for
15   now.  You all are coming back I think later for the
16   counterclaims.
17            All right.  So let's do that.
18            Now, I don't know what to do, let's just talk out
19   loud among friends here about the consumers.  Okay?  I just, I
20   don't -- I can't have two separate trials on the same
21   antitrust claims.  We can't do that.  That's just a recipe for
22   disaster.  Okay?  So I understand the attraction of saying,
23   oh, we'll just wait on the consumer claim and we'll do it
24   later, which you agree with.  What does that mean?  I mean, I
25   can't -- these allegations are almost completely coterminous
```

1   substantively, so I can't have one trial where a jury decides

2   whether Google violated Section 2 in its operation of the Play

3   Store and then have another trial three months later or five

4   months later on exactly the same issue as if the first one

5   never happened.  We can't do that.

6           MR. POMERANTZ:  So, Your Honor, I understand the

7   situation you're in, and we asked for a stay and didn't get

8   that from Your Honor to move all the cases back, so we went to

9   the Ninth Circuit and we asked to expedite the appeal.

10          THE COURT:  I know that.  It's going to be heard in

11  a, you know, couple of weeks.

12          MR. POMERANTZ:  In September.  It's going to be

13  heard in September.

14          THE COURT:  September 11th, yes.

15          MR. POMERANTZ:  And so one thing Your Honor -- we

16  hope the Ninth Circuit will rule as quickly as it can, we

17  really do.  We don't control, you don't control the Ninth

18  Circuit.

19          We have another issue that I wanted to raise, and

20  it's somewhat related, which is Google is a party to a case in

21  D.C. Your Honor's family with.  The DOJ is suing.

22          THE COURT:  That's also in September, right?

23          MR. POMERANTZ:  Yes.  And what happened is last time

24  we were in front of Your Honor, it -- we understood it was

25  going to be five or six weeks.  So it would end sometime in

```
 1    the middle of October.
 2             Judge Mehta has now allowed 200 hours of, as I
 3    understand it --
 4             THE COURT:  Per side or total?  Total.
 5             MR. POMERANTZ:  And so what that means is it pushes
 6    that trial into the middle of November.
 7             So one of the thing -- I -- you know, I'm bringing
 8    it up in part because we're going to have -- we could have
 9    witness availability issues starting November 6th.
10             THE COURT:  So you're going to do a hundred hours
11    each in --
12             MR. POMERANTZ:  Not here.
13             THE COURT:  No, in D.C., starting --
14             MR. POMERANTZ:  I don't think it's a hundred hours
15    each, but I think it's a total of 200.
16             THE COURT:  A hundred hours per side, right?
17             MR. POMERANTZ:  No, I think he's actually giving the
18    plaintiffs more because the states -- I'm not in that case,
19    Your Honor, but I think because the DOJ and states have
20    different theories of the case --
21             THE COURT:  Plaintiffs are getting more time?
22             MR. POMERANTZ:  Yes, I think that's what's going on.
23             THE COURT:  Is anybody here on the D.C. case?
24             MR. GLACKIN:  That's about right, Your Honor.  I
25    think that -- I'm sorry, Brendan Glackin on behalf of the
```

1   state attorneys general.

2          My recollection is that the plaintiffs in that case

3   are getting 135 hours total, and then Google is getting 65

4   hours.  And the time as between the state AGs in that case and

5   the federal government is split, but most of the time I think

6   going to the Feds and then some amount going to the states.  I

7   don't have that number at the top of my --

8          THE COURT:  When does that trial start?

9          MR. POMERANTZ:  September 11th or 12th.

10         MR. GLACKIN:  First week -- second week of

11  September.

12         MR. POMERANTZ:  And so, Your Honor, one thing we

13  could consider is --

14         THE COURT:  Well, that's going to go through

15  December then, right?  I mean ...

16         MR. POMERANTZ:  It could.  We don't -- it could.

17         THE COURT:  Does Judge Mehta do five days a week

18  9:00 to 5:00?  Do you know how --

19         MR. GLACKIN:  I don't know.

20         THE COURT:  We do 9:00 to 2:00 four days a week.  So

21  if I did a hundred hours, that's going to go for three months.

22         MR. GLACKIN:  I don't know how Judge Mehta does

23  trial.

24         MR. BORNSTEIN:  Gary Bornstein.

25         Your Honor, Judge Mehta's order, which we can try

1   and find for Your Honor from June 30th, about a month ago,

2   actually spells out the days --

3            THE COURT:  Oh --

4            MR. BORNSTEIN:  -- in which he will be sitting, the

5   days he won't be sitting, and his projection at least is that

6   the trial will run, as Mr. Pomerantz said, through about

7   November 15th.

8            THE COURT:  So the expectation, it will be done

9   around the second week of November.

10           MR. BORNSTEIN:  That's what's in the Court's order,

11   yes.

12           THE COURT:  And Mr. Pomerantz, you and your team are

13   not on deck in that trial?

14           MR. POMERANTZ:  No, I'm not, Your Honor.

15           THE COURT:  Okay.  So there's no issue with counsel.

16           MR. POMERANTZ:  It's no issue with counsel, Your

17   Honor, not with outside counsel.  There are some overlap on

18   the inside, but not on the outside.

19           THE COURT:  I understand.  For the trial lawyers

20   there's no issue here.

21           MR. POMERANTZ:  That's correct.

22           THE COURT:  So you're just worried about what?

23           MR. POMERANTZ:  Well, I'm worried about witness

24   availability, because to the extent that the plaintiffs want

25   to call Google witnesses in their case and those witnesses are

1   involved and testify --

2           THE COURT:  We're going to have an overlap of one

3   week, because this trial starts --

4           MR. POMERANTZ:  Two weeks.

5           THE COURT:  Now, this trial starts November 6th,

6   doesn't it?

7           MR. POMERANTZ:  Yes, Your Honor.

8           THE COURT:  And the projected the 15th, that's

9   basically seven trial days.

10          MR. POMERANTZ:  Yeah, it's -- there is an issue

11  there.  And first of all, I just want to alert --

12          THE COURT:  Well, I don't know what -- I don't see

13  the issue.  They're going to have -- that's the tail end of

14  the trial in D.C. will be just when we're starting.  I can't

15  imagine there will ever be a situation where even if some

16  witness on your end needed to be in Washington on

17  November 11th and needed to be here, we'll just pass the

18  witness until later in our case.

19          MR. POMERANTZ:  Okay, Your Honor.

20          THE COURT:  You're going to get -- I'm going to

21  break all my personal and practice rules, and you're going to

22  get a large chunk of time.  So you're going to have plenty of

23  time.  I suspect I'll probably do something, you know, close

24  to 75, hundred hours per side, and I'm not going to -- going

25  to let you allocate it.  I don't want to be too intrusive.  I

```
 1    do think some parity is important between defense and --
 2              MR. POMERANTZ:  We've actually had a proposal to
 3    Your Honor.  It's in Docket 165.
 4              THE COURT:  Oh, trial statement?
 5              MR. POMERANTZ:  Yeah.  And we proposed I think a
 6    total of a hundred hours combined, and --
 7              THE COURT:  Oh, 50 hours per side.
 8              MR. POMERANTZ:  And we would take 50.  I think
 9    that's --
10              MR. GLACKIN:  That is what we proposed, Your Honor.
11    We heard your prior guidance about --
12              THE COURT:  Fifty hours per side.
13              MR. GLACKIN:  Yes.
14              THE COURT:  Well, okay.  So that's -- if we start
15    November 6th and we do my typical trial day, you know, you get
16    maybe -- with breaks and everything you'll get maybe, if
17    you're fortunate, four and a half to five hours of testimony
18    per day four days a week.  So let's say you're getting 20
19    hours per week.  That's a five-week trial.  That means through
20    Thanksgiving and probably closing right before the, you know,
21    holiday break at the end of the year.
22              MR. POMERANTZ:  I think we thought we'd be closing
23    sometime in the middle of December, middle of December.
24              MR. GLACKIN:  Yeah, when we mapped it out, we
25    thought we could get it to the jury by the end of the second
```

1    week of December.

2              THE COURT:  All right.  They're going to have to

3    have a good long time to deliberate.  Okay?  I mean, getting

4    it to the jury on the 23rd or something is not ideal.  And

5    look, it's happened.  If we need to do it, we'll do it.  It's

6    not in my view an impediment, I just want to be somewhat

7    thoughtful about the jury, that's all.

8              MR. POMERANTZ:  Your Honor, to go back, then, to the

9    question you raised, which is what do we do about the consumer

10   class.  So the Ninth Circuit --

11             THE COURT:  Before we do that, all right, so I don't

12   see a timing issue with DC.  I just don't.  Okay?

13             Now, here is the concern.  Let me just be crystal

14   clear.  I just cannot have two separate jurors addressing the

15   same liability issues.  It can't happen.  Maybe there are all

16   sorts of, you know, interesting niches of the law with respect

17   to preclusion.  That in itself would be a massive sideshow,

18   you know, whether somebody's precluded based on a jury

19   finding.  Those are not easy questions.  I have wrestled with

20   them.  You may have, as well.  It's rather complicated.  And

21   then you're trying -- you know, if Google loses, it's not

22   clear to me, you know, what the preclusive effect is going to

23   be in round two.  And if Google wins, same issue.

24             So what's the solution?

25             MR. POMERANTZ:  Well, Your Honor, you know, the

1   Ninth Circuit --

2          THE COURT:  I have one in mind, but I want to hear

3   yours first.

4          MR. POMERANTZ:  I hope the one you have in mind is

5   not to have the consumer class be part of the trial in

6   November, because the Ninth Circuit has indicated to us --

7          THE COURT:  No, no.  Let's just assume the consumers

8   aren't there.  I do have an idea of how I might --

9          MR. POMERANTZ:  Then I definitely --

10          THE COURT:  Do you have any idea?

11          MR. POMERANTZ:  No.  I mean, no, other than ideas

12   that we've proposed previously that Your Honor has rejected.

13          THE COURT:  Well, here's my thought.  I'm just

14   thinking out loud, now.  I have tried consumer class actions

15   as a lawyer.  I've certainly presided over a number of them

16   here as a judge.  They're not -- aside from literally one jury

17   instruction in the beginning of the case saying this is a

18   class action, it never comes up again.  It never comes up

19   again.  Okay?  So, in terms of liability at least.  Now,

20   damages maybe.  But in terms of the liability, it never --

21   what's true for one member of the class if you win is true for

22   all 21 million members of the class.

23          So why not think about trying the whole case with

24   just the consumer individuals, okay.  Consumers would then, if

25   they prevailed we would just have a damages hearing.  You

 1  know, see the class, you know, if the class is certified, the

 2  class is still standing, we just have a damages hearing based

 3  on what would be due to the consumer class.

 4          Now, you know, this is not -- this is just thinking

 5  off the top of my head here.  There will be some complications

 6  with, you know, making sure there aren't duplicative verdicts

 7  and recovery and so on, so there might, you know, have to have

 8  a little posttrial action.  But, you know, and if Google wins,

 9  then that's it.  Consumer class, you know, if the individuals

10  lose, then the classes lose and the consumers would be bound

11  by that.

12          I haven't fully thought through the whole absent

13  class member thing.  I don't think it's an issue.  I'd like to

14  think about that and get your advise on it.

15          So my sense is you would just live or die by what

16  happens to the individuals on November 6th.

17          MS. GIULIANELLI:  Your Honor, I think as a practical

18  matter -- oh, Karma Giulianelli from the consumer class.

19          As a practical matter, I think that Your Honor's

20  correct, and that's very I think similar to what we are

21  planning on doing, which is having an individual at the trial

22  in November, and then we'll see what the Ninth Circuit does.

23          Now, if the Ninth Circuit affirms before November, I

24  think we could -- we'd have to give the appropriate amount of

25  time for class notice to be done, but I hope that we could do

```
 1    that expeditiously, probably not by November 6th, but perhaps

 2    --

 3              THE COURT:  I'm not sure that will work.  So

 4    let's -- it will take them at least, you know, we should

 5    assume at least a week.

 6              MS. GIULIANELLI:  Yeah.

 7              THE COURT:  And that's not highly unrealistic based

 8    on my own limited experience of sitting on this circuit, but

 9    let's say at least a week, but maybe it takes more.  And we

10    certainly, you know, we're not rushing anyone, judges.  I'm

11    certainly not rushing anyone.

12              So the notice, though, I mean, how long would you

13    contemplate the notice period being?

14              MS. GIULIANELLI:  I think that it could be done

15    pretty quickly, within a couple of months, but I think that

16    Your Honor's suggestion about dealing with the consumer-

17    specific damages later could work, and we indeed plan to have

18    individuals, not the class, at the November trial.

19              THE COURT:  Well, that's almost always the case.

20    It's always just the named plaintiffs even if the class is at

21    the trial.

22              Okay.  Well, so I'm not going to lock anybody in,

23    but you're tentatively comfortable with that Ms. Giulianelli?

24              MS. GIULIANELLI:  Correct.

25              MR. POMERANTZ:  I'm not, but I -- we need to talk to
```

1   our client.

2          But I think what one of the problems here, and let

3   me start with the states.  The states don't have to certify a

4   class, but they will have to prove injury and damages on an

5   individual basis, and what they say they're going to do is

6   they're going to offer Dr. Singer's analysis to prove it.

7          THE COURT:  Okay.  Look, before we do that, let's

8   just talk about, so the consumers are willing to go forward.

9   Just finish that thought.

10         MR. POMERANTZ:  I can't agree to that without

11  consulting with my client, because as Your Honor says, there's

12  a lot of, you know, preclusion issues that one would have to

13  think about, and I just can't agree to that.

14         THE COURT:  Well, no.  This would eliminate the

15  preclusion issues.  It's all going to be done -- this is

16  basically just agreeing everyone will treat this one trial as

17  a proxy for a class if there is a class.  If there's no class

18  it doesn't matter.

19         MR. POMERANTZ:  No, but if they --

20         THE COURT:  You're done.  But if there is a class,

21  and it doesn't get resolved or notice isn't given or

22  something, we'll have to deal with notice separately.  But,

23  you know, you -- they would live or die by the verdict for the

24  class.

25         MR. POMERANTZ:  Right.  But if we have the

```
 1    opportunity -- let's say we lose the first trial.  If we are
 2    not precluded from relitigating that issue with the consumer
 3    class because they weren't there -- and again, as Your Honor
 4    said, we'll have to brief, if we ever got to that point,
 5    preclusive effect.  But if you're asking me to give up that
 6    point right now, I don't have the authority to do it and I
 7    can't do that.
 8            THE COURT:  Well, it's not -- I'm not asking you to
 9    give up anything.  I'm asking to just, we need a way of
10    solving the problem.  Now, I can't imagine why you -- if you
11    lose the first trial, you understand that you're not getting a
12    complete redo at a second trial.  I hope you understand that.
13    You're not just walking into the second trial as if the first
14    trial never happened.  That's just not going to happen.
15            MR. POMERANTZ:  And if we lose --
16            THE COURT:  So you may be going in with not just
17    having one arm tied behind your back, but, you know, all but a
18    single digit tied behind your back.
19            MR. POMERANTZ:  And I take it what Ms. Giulianelli
20    is saying is that if we win that first trial, we're going to
21    hear from the consumer class.
22            THE COURT:  Then they're done.  They're not going to
23    come back either and get that.  It's bilateral.  Okay?  That's
24    what I'm proposing, it's bilateral.  You're both going to be
25    bound.
```

1          MS. GIULIANELLI:  Your Honor, the one issue is we do

2    need to make sure in order to bind the class, that the class

3    has adequate notice and due process --

4          THE COURT:  Oh, of course.  That goes without

5    saying.

6          SPEAKER:  -- before that.

7          THE COURT:  And my job is as the protector of the

8    absent class members.  I do that diligently and I do that

9    faithfully.  So don't worry about that.  I agree.  We're

10   not -- and if that means we start a couple weeks later, if we

11   have everything else lined up that probably will be just fine.

12   Okay?  So we're going to -- no one's going to get railroaded

13   on class notice, absolutely not.

14         MR. POMERANTZ:  Your Honor, I think --

15         THE COURT:  So now you understand it's bilateral,

16   all right, it's a one and done with some --

17         MR. POMERANTZ:  I will discuss it with my client.

18         THE COURT:  -- nuts and bolts common sense

19   agreements.

20         MR. POMERANTZ:  Your Honor, I understand you're not

21   asking me today to commit my client to anything.  I would have

22   to talk to my client about this.

23         THE COURT:  No, but you are counsel, and that is ...

24         MR. POMERANTZ:  I will advise them.  I will advise

25   them.  That's all I do.

1          But I would say that to me, one of the risks here is

2     it's treating the trial as if the class had been certified.

3          THE COURT:  No, it's not.

4          MR. POMERANTZ:  It is, because you're trying to get

5     us both bound by --

6          THE COURT:  No, Mr. Pomerantz, not at all.  That is

7     completely wrong.  It does not presume anything about the

8     existence of the class.  It is completely agnostic about the

9     existence of a class.  All you are doing is both the class

10    and, if there is one, and you, Google, are going to agree to

11    be bound by the outcome.  That's it.  It doesn't matter one

12    way or the other whether a class is certified or not.  Nothing

13    is presumed.  And in fact, if anything, the benefit of the

14    doubt will go to you, because the jury will never even hear,

15    if the Ninth Circuit hasn't acted yet, will never even hear

16    that there is a potential class.  They won't get a word about

17    that.

18         MR. POMERANTZ:  All right.  And just so I under --

19         THE COURT:  And you will come out ahead arguably.

20         MR. POMERANTZ:  And just is it your view, then, that

21    if we go to trial in that way, notwithstanding the fact that

22    the Ninth Circuit hasn't ruled, that Dr. Singer's approach to

23    damage -- injury and damages will be admitted in front of the

24    jury while the Ninth Circuit is considering it?

25         THE COURT:  I have the merits Daubert motions before

1    me right now.  I haven't ruled on the merits Daubert motions

2    with respect to that issue yet.  Okay?

3                    MR. POMERANTZ:  All right.  Thank you, Judge.  I

4    understand.

5                    THE COURT:  So one -- let's beat one mule at a time.

6    All right?

7                    MR. POMERANTZ:  I will discuss it with my client,

8    Your Honor.

9                    THE COURT:  That's all I'm asking.

10                   MR. POMERANTZ:  Okay.  I will discuss it.

11                   THE COURT:  Now, does everybody on the plaintiffs'

12   side understand what I'm saying?  Is there anybody on the

13   plaintiffs' side that has any heartburn about this

14   possibility?  It's just a possibility at this point.

15                   Let me just say this.  If we don't do this, I don't

16   know what we're going to do.  I don't know what we're -- what

17   are we going to do if we don't do this, Ms. Giulianelli?

18                   MS. GIULIANELLI:  Well, I think there is a

19   conundrum, so I think as long as the class is not bound before

20   any notice goes out or --

21                   THE COURT:  Of course --

22                   MS. GIULIANELLI:  -- as a matter of due process

23   that --

24                   THE COURT:  Absolutely, yes.  Don't be troubled

25   about that.  Nobody's going to be bound without everything

1  that Rule 23 guarantees them and my personal vigilance, and

2  I -- you can ask around.  I am very vigilant about absent

3  class members.

4          Now, but what is it?  What are we going to do if

5  this doesn't work out?  I'm looking at you, yes.

6          MS. GIULIANELLI:  For instance, if the Ninth Circuit

7  decertifies?

8          THE COURT:  No, no, no.  If we do not have a

9  consensus about what happens on November 6th and there is no

10  decision beforehand, what are we going to do?

11          MS. GIULIANELLI:  Well, I suppose what Your Honor

12  clearly does not want, the other possibility would be for

13  consumers, if this trial goes forward with everybody else, the

14  Ninth Circuit affirms later, and then the consumers would have

15  a right to a trial --

16          THE COURT:  I cannot see how that works.  I just

17  cannot see how you can have a separate trial without getting

18  into just a hopelessly complicated thicket of preclusion

19  issues, which are terribly complicated.  I don't know if

20  you've ever dealt with them.  I guarantee you whoever's on the

21  losing end of the verdict is going to have a million reasons

22  why not a single line in the verdict form is going to stick to

23  them.  Okay?  And to go through all of that is just a mountain

24  of work.

25          MR. POMERANTZ:  Your Honor --

1          THE COURT:  This verdict form is going to be

2   complicated.

3          MR. POMERANTZ:  As Ms. Giulianelli didn't have an

4   answer you probably wanted, I'll give you one that would work,

5   but you've turned it down before, which is if -- now that we

6   have the Ninth Circuit hearing it in September, if the trial

7   instead went the first quarter of 2024, all these problems

8   would probably be resolved, because we would have clear

9   guidance from the Ninth Circuit.

10          THE COURT:  No, I understand that, and I'm really

11   hoping to avoid that, because, you know, these complaints, the

12   first one was filed in 2020.  Okay?  I mean, it's just we do

13   have to get this done.  If it's a matter of four months, who

14   knows, maybe that's not so bad.

15          MR. POMERANTZ:  We will be ready on November 6th if

16   that's what Your Honor wants, but now that we are where we are

17   with the Ninth Circuit and the hearing date and the appeal,

18   it -- you know, there is some merit to moving it to the first

19   quarter of 2024.

20          THE COURT:  I'm not going to do that new.  I'm just

21   not.

22          MR. GLACKIN:  I don't think there's any guarantee

23   that the Ninth Circuit is going to get anything done in time

24   for the first quarter of 2024.

25          THE COURT:  Well, they may be -- you may be --

1          MR. GLACKIN:  I famously had an experience where the

2   Ninth Circuit spent 18 months reviewing a preliminary

3   injunction where, I mean, supposedly an urgent matter.  So the

4   Ninth Circuit could do it in two weeks, or the Ninth Circuit

5   could do it in six months.

6          THE COURT:  I understand.

7          Well, let's just at least have a dialogue on that

8   first proposal, okay, just as backup, okay, to see how things

9   go, and then I think we just have to get towards the end of

10  September to see where we are before making -- don't stop

11  trial prep.  Nothing has been stayed, so be ready to go.  Have

12  everything ready to go.

13          Okay.  Anything else for today, plaintiffs?

14          MR. GLACKIN:  Your Honor, I just, I want to address

15  one thing you brought up at the beginning, which is the

16  figuring out which claims go to the jury and which claims go

17  to the Court --

18          THE COURT:  Yes.

19          MR. GLACKIN:  -- and which issues within claims.

20          We have a process right now in place between the

21  parties where we exchange both jury instructions and drafts of

22  the pretrial statement.  And I would imagine, or our plan had

23  been to work this issue out through those exchanges of drafts

24  so that when you get the final instructions and the final

25  pretrial statement, it will be teed up to you in terms of

1  which claims go to the jury and what are the appropriate

2  instructions on those claims and what disagreements are there,

3  if any, in the instructions, and then in the pretrial

4  statement you will have the list of claims and issues that go

5  to Your Honor.

6          So we have a process in place for that right now

7  that involves us exchanging drafts over the next three weeks.

8          THE COURT:  Oh.

9          MR. GLACKIN:  And I think tell get worked out.

10         THE COURT:  Oh, are you say at the end of this

11  you're going to have an exact roadmap of everything?

12         MR. GLACKIN:  That's the goal.

13         I think by the time we have the -- I sort of

14  personally view the final instructions to the Court and the

15  final joint pretrial statement as kind of the point by which

16  this has to be figured out.

17         THE COURT:  All right.  Y'all agree on the

18  plaintiffs' side?  Okay.

19         MR. POMERANTZ:  Your Honor, Mr. Glackin and I

20  actually talked about this last night, and so I think what, if

21  I understand, give us until early September to get back to

22  you, is that what you're saying?

23         MR. GLACKIN:  I'm sorry.  I mean, I think we have to

24  give you a draft -- excuse me.  I don't mean to talk to

25  Mr. Pomerantz.

1          THE COURT:  Well, let me ask you this.  When you say

2     three weeks, that's to get it to the defendant, or in three

3     weeks you're going to be done?

4          MR. GLACKIN:  Our first -- actually, our first

5     exchange, the plaintiffs are due to give Google their draft

6     instructions and their draft of the joint pretrial statement

7     August 24th, I believe, which I think will have this

8     information in it.  And then there's a fairly rapid --

9          THE COURT:  That's three weeks from today.

10         MR. GLACKIN:  Right.

11         There's a fairly rapid back and forth of exchanges

12    between the parties that follows that, so I don't have the

13    final date.  I believe the final -- I don't have the final

14    dates in mind at the moment, but I think it all gets wrapped

15    up sometime in --

16         THE COURT:  I tell you what, why don't you just keep

17    doing that.  Okay?  That sounds perfectly fine.  I don't need

18    to interfere with that.  But I need your guarantee that as of

19    the first week of October, I am going to be completely clear

20    on what's being tried and what's not.  All right?  I don't --

21    I don't want to have someone come to me on October 15th and

22    say, we're not really sure what the trial's going to look like

23    because we can't agree on the following five claims are going

24    to be tried or not.  All right?  So you need to -- I need to

25    know with certainty, let's just say by the first Monday in

Stephen W. Franklin, RMR, CRR, CPE
Official United States Reporter
Northern District of California

1   October that you all have this under control and I'm not going

2   to be asked at the last minute to make all sorts of decisions

3   about what the jury's actually going to be doing.

4           MR. GLACKIN:  So understood, Your Honor, and we'll

5   do that.

6           And apropos of the keeping the pretrial changes on

7   track, I mean, there's -- we, the plaintiffs, had a suggestion

8   that I previewed for Mr. Pomerantz, which is, you know, we

9   had -- we thought it might be wise to put a control date on

10  the calendar, a possible hearing in front of Your Honor

11  sometime in September, so that if there are any issues with

12  the pretrial exchanges we could present them, and if not --

13  hopefully there won't be.

14          THE COURT:  Well, I tell you what, I cannot have you

15  back on the -- so the counterclaims motion, I can't have you

16  back that week.  I need to have you back the next week.  So

17  how about I think that is -- is that September 6th?

18          MR. GLACKIN:  Yes, Your Honor.

19          THE COURT:  First Thursday?

20          Okay.  So just September 6th.  How about is that?

21          MR. GLACKIN:  Terrific.

22          THE COURT:  Will you know by then with some degree

23  of certainty where you are?

24          MR. GLACKIN:  I think so.

25          And then the -- I'm sorry to continue.

```
 1              THE COURT:  Wait just one second.

 2              Oh, that's September 7th, sorry.  September 7th,

 3   Thursday, yeah.

 4              Okay.  But I just need to know that you're going to

 5   have -- doesn't have to be completely carved in stone, but

 6   it's close to being carved in stone.

 7              MR. GLACKIN:  Then the one last --

 8              THE COURT:  We're agreed on that?  That's going to

 9   be enough time?

10              MR. POMERANTZ:  September 7th works for me, Your

11   Honor.

12              THE COURT:  Okay.  But not just you can be here, but

13   that we're going to have a deal on the table September 7th.

14              MR. GLACKIN:  Yes.  Or if --

15              THE COURT:  Or you can tell me there are huge

16   issues.

17              MR. GLACKIN:  We're going to tell you there are

18   problems.

19              THE COURT:  Okay.

20              MR. GLACKIN:  Or there won't be.

21              MR. POMERANTZ:  That's fine with us, Your Honor.

22              THE COURT:  Okay.  Good.

23              MR. GLACKIN:  And then I am sorry to be the one

24   continuing to burden Your Honor, but --

25              THE COURT:  You're not burdening me.  We've got to
```

```
 1   get into these things.  I'm going to talk to you a little
 2   about a couple other details, too, but go ahead.
 3              MR. GLACKIN:  Well, the other issue we wanted to
 4   raise, not on the merits but just as a process matter, is the
 5   question of the sanction related to the chats motion that you
 6   already heard.  When you issued your order on that, you said
 7   that you would determine the appropriate sanction closer to
 8   trial.  And so we just wanted to bump that issue, as it
 9   were --
10              THE COURT:  Well, when do you want to raise this?
11              MR. GLACKIN:  Well, I mean we -- one idea we had was
12   to raise it on the September 7th date, to use that date also
13   to decide the chats issue.
14              THE COURT:  That might be a little early and a
15   little much for that day.
16              First of all, I mean, you need to tell Google what
17   you're thinking, and they need to have an opportunity to
18   respond.
19              MR. GLACKIN:  We would be fine responding -- we
20   would be fine doing it later, Your Honor.  We just wanted to
21   raise it.
22              MR. POMERANTZ:  And, Your Honor, if I -- I'll
23   discuss --
24              THE COURT:  Can I ask you before we do that, are you
25   going to ask for preclusion sanctions?  Is that -- if it's
```

1    just money~--- the money part got done, right?  Didn't the

2    money part --

3            MR. GLACKIN:  Your Honor, I think when last we left

4    our hero, so to speak, we were talking about a possible

5    instruction.  And so --

6            THE COURT:  Oh, right.

7            Okay.  All right.  So that's going to be it, then,

8    just the possibility of an adverse inference instruction?

9            MR. GLACKIN:  Correct, Your Honor.

10           THE COURT:  Oh, okay.  Well, that's relatively

11   straightforward.

12           MR. POMERANTZ:  And Your Honor, well, so one of the

13   things we were thinking about was Your Honor had indicated

14   that you were going to likely let them put on some evidence,

15   not a lot, but some evidence to the jury about --

16           THE COURT:  Yes.

17           MR. POMERANTZ:  -- this issue.

18           THE COURT:  Now, the only question is am I going to

19   take the next step and say you are free to draw an adverse

20   inference from that.

21           MR. POMERANTZ:  And so one suggestion we would have

22   is that, actually consistent with some of the things you were

23   dealing with on summary judgment, perhaps the issue of whether

24   you're going to issue an instruction, if so, what it should

25   be, should it wait seeing how the evidence is.  You combine it

1   with what you already know from the proceeding, and then you

2   decide whether you're going to structure the jury, and if so,

3   what that instruction should be, so that while we could each

4   propose some instructions to Your Honor, your decision about

5   what the instruction should be could be made nearer to the end

6   of trial like in a lot of other decisions, you wait to see

7   what the evidence is and you --

8           THE COURT:  That's not a bad idea.

9           MR. GLACKIN:  I do think -- let me put it this way.

10   I think for planning purposes in terms of getting ready for

11   the trial, it would be helpful to have at least some

12   additional information about how this is going to be addressed

13   even if a final decision hasn't been made.

14           THE COURT:  Well, here's the information.  You won

15   your sanctions motion.  Okay.  So the only issue is now am I

16   going to give an adverse instruction.  You can certainly raise

17   it.  To me, I'm just, the way I would see it -- you're much

18   deeper in the case than I am, so you may know better.  But the

19   only question in my mind now is if the adverse instruction is

20   going to await showing at trial, am I just going to have three

21   people talk about it, or am I going to do 30 people.  That to

22   me -- in other words, do I have to prove it up as if it were

23   an issue in the case, or can I do proof light.

24           MR. GLACKIN:  That's the piece --

25           THE COURT:  And Mr. Pomerantz is I think not

1   unreasonably suggesting, let's see.

2          Now remember, the reason I said that, you know, I do

3   a lot of orders.  Remind me if I'm not recalling my own order

4   correctly.  But the reason I said that is I'm not entirely

5   sure -- it was egregious; I found that.  It was intentional; I

6   found that.  It's not entirely clear to me that you got truly

7   stiffed on essential things given the mountain of other

8   evidence.  So I just wanted to see everything so I could be

9   proportionate, as I am required to do.  That was why I think

10  there's some appeal to seeing all the evidence.  It will help

11  me calibrate the extent to which this intentional default by

12  Google hurt you.  You see what I'm saying?

13          MR. GLACKIN:  I see that, Your Honor.

14          The one thing I have to throw into the mix is that

15  your order did contemplate, and it did happen, in that there

16  was additional discovery taken, some of it related to this

17  issue.  And I'm -- you know, in terms of we're going to want

18  to present what we've now learned from that discovery to Your

19  Honor in terms of making the argument about what exactly the

20  inference should say and what we have to prove and don't

21  prove.  Doing that during the trial might be -- I mean, might

22  be an unnecessary lift, so to speak.  We don't need to resolve

23  this now.  We don't need to resolve it in September.  I do

24  think it would be prudent to have some kind of a process by

25  which we gin this up.

1          THE COURT:  Well, why don't you two just see what

2  you can think.  Okay?  You can talk about it.

3          Come up, Mr. Bornstein.

4          MR. BORNSTEIN:  If I may be heard briefly, Gary

5  Bornstein, Your Honor.

6          Two things on that.

7          One is if we do reserve this for trial, it does

8  change the nature of the trial presentation that we had.  We

9  were all here on January, we took a lot of Your Honor's time,

10  we had witnesses.  We've already proven the prejudice, we've

11  already proven the intent, Your Honor has found that.

12          THE COURT:  Yeah, but I'm just trying to scale the

13  remedy, that's all.

14          MR. BORNSTEIN:  Exactly.  I mean, the issue you left

15  was proportionality.  We are prepared to make a showing as

16  Your Honor contemplated through further proceedings of what

17  the proportionate remedy should be.  That's not something we

18  think we ought to have to do through witnesses in front of the

19  jury, it's a decision for Your Honor on how to do that, and we

20  can --

21          THE COURT:  Well, you would make a proffer, in other

22  words, basically.

23          MR. BORNSTEIN:  That's correct, Your Honor, and we

24  can take advantage of the additional material that we've

25  gotten and additional facts that we've learned.

1          And I do want to just put out there for Your Honor's

2    awareness, one of the things that we think would be

3    appropriate, subject to Your Honor's decision of course, is to

4    have this be part of the preliminary instructions to the jury

5    rather than save it to the end.

6          THE COURT:  Adverse inference?

7          MR. BORNSTEIN:  Well, no.  An instruction, Your

8    Honor, about what happened to certain documents and why

9    they're not here.

10          THE COURT:  Yeah.

11          MR. BORNSTEIN:  So that --

12          THE COURT:  That we'll save for later.

13          Look, talk about a proffer.  If we can do it that

14    way, fine.  Just -- but just use the benchmark.  I'm just

15    looking for a way to be proportionate.  All right?  There will

16    be something.  I don't know what it will be.  You've already

17    got your fees worked out, right?  That's all done, okay.  So

18    we need to figure out what the next part will be.  Okay?

19          Now, but no matter what, you can certainly bring it

20    up at trial.  Whether you get an instruction or not, you can

21    examine witnesses about it.  That's perfectly fair.  And, you

22    know, you can argue it in closing.  Now, we're just talking

23    about the next step.

24          Now, before we go I just wanted to raise a couple

25    things, because this is going to be a massive undertaking.

1          The first is cameras in the courtroom.

2          Now, the district courts as a whole, it is not my

3     preference or the preference of many other individual district

4     judges, but the district courts as a whole are not permitting

5     realtime broadcasts of proceedings.  I have strong feelings

6     about that, but that is the rule, okay, and I can't change

7     that rule.

8          We do have this so-called pilot program, even though

9     it's been around for a while, where the proceedings are

10    recorded.  I have an opportunity to look at them, and then

11    they're, through this very elaborate process, uploaded out of

12    the national office in D.C. to be available in kind of a

13    YouTube-like format.  I don't think it's actually YouTube, but

14    it's close.  It's completely different from the live realtime

15    YouTube platform-based broadcasting of circuit arugments.  We

16    don't do that because that is the will, I am told, of the

17    district judges as a whole.

18         So part of this pilot program makes the situation

19    even more difficult by saying any one of you can veto this.

20    It just takes one person to say, "no".

21         Now, I think this case is of great interest to a lot

22    of people.  I think the cameras, I have done it once before.

23    I had some parties who weren't put off, as I don't think you

24    should be by the idea of having these tapes.  And in fact it

25    was an MDL antitrust trial just like this one, MDL antitrust

1    price fixing.

2            And once the cameras are here you don't even see

3    them.  There's a little camera here.  You just forget about

4    it.  The jury's obviously never featured, I'm never featured,

5    nobody will see the jury.  It will just be what happens here.

6            So I need you to think about that, because if we do

7    do it, I have to do some technical work.  I -- it's totally up

8    to you, and if someone says "no," that's the end of the matter

9    and I forget about it and it's perfectly fine.  But I do think

10   you should think about it, okay, because this is the kind of

11   case that is getting a lot of attention these days, as you

12   know probably better than I do, and it would be nice to let

13   people have access to it who can't necessarily be in the

14   courtroom.

15           So that's number one.

16           So tell me on September 7th.  Okay?  You just file

17   something.  You don't have to tell me in open court, you just

18   file.

19           The second thing is we're doing this written

20   questionnaire screening of potential jurors.  Typically I and

21   most judges in this district have kind of a rough formula.

22   It's not always true, but it has been more often than not.

23   You lose about a juror every week to 10 days of trial time.

24   Just things happen.  People get sick, something happens.  So

25   we need a minimum of six, which I prefer not to hit the

1   minimum, but if we do have to, we can.

2          But with a trial of this length, particularly

3   towards the end of the year if that's how we end up going, I

4   think we're going to have to call in a ton of people, because

5   I'm probably going to end up sitting 12, okay, just to make

6   sure.  Because if you take 12 and amortize them over the life

7   of the trial, you know, we'll probably end up with eight.  I

8   hope not, but that could be the way it is.

9          MR. POMERANTZ:  And, Your Honor, just so I

10  understand, would -- whoever remains at the end, they would

11  all deliberate?

12          THE COURT:  Yes, yeah.  There are no alternates.

13  You know, civil side no alternates.  You seat 12.  You have to

14  have at least six.  Now, you all can stipulate to less than

15  that, but we don't have to deal with that right now.

16  Statutory minimum is six unless you all agree to go below ot.

17          But in any event, what I'm saying is we're going to

18  have this written questionnaire.  Now, it's -- we're going to

19  have to send out probably to a couple hundred people.  It

20  really -- the questionnaire was really the fruit of the COVID

21  era trying to screen people for health issues and vaccination

22  status and so on, so that we didn't become a super-spreader

23  site by having jury trials.

24          Now, the national COVID emergency has been

25  terminated by the federal government, California state has

1  terminated its COVID manager.  We, as a court, have terminated

2  it for the most part.

3          So here's the issue, two issues.

4          One is typically this questionnaire is very nuts and

5  bolts about demographics and health status and maybe one or

6  two questions about the case.  In this kind of case it might

7  be, have you ever worked for the defendant, or, you know, have

8  you ever worked for one of the plaintiffs.  Okay?  Not too

9  much more past that.  But it may be that we do a little bit

10  more, because there will be so many people, and in-court

11  venire will be so slow, we might want to have a longer one.

12  So just start thinking about that.

13          Now, I am not at all, I do not want, I will not send

14  a 30-page, you know, torture session to these poor people in

15  the jury pool to fill out.  Okay?  But if you can come up

16  with, say, 10 salient questions that you think would really

17  help streamline the voir dire in court, that would be great.

18  Okay?  Ten's just a number, but that's kind of the end of the

19  scale you should be on.

20          MR. POMERANTZ:  Your Honor, when do you need that

21  by?

22          THE COURT:  This is all -- you just think about it

23  between now and September 7th.  Okay?  If you don't want to do

24  it, I'm just saying, you maybe don't want to do it, that's

25  fine.  If you want to do it, this is the time to start

1    thinking about it.

2          Here's the third thing.  We have been respecting --

3    I'm starting a trial on Monday.  We've had all these, you

4    know, COVID things.  Typically with the parties' agreement, we

5    have not been calling any people who are not fully vaccinated

6    or who decline to state.  There is, you may have seen press

7    coverage, you may know personally, there is a little bit of a

8    COVID resurgence now.  You know, it's just going up and down.

9    That appears to be the way it's going to happen.

10          The question is:  Do you want to do anything about

11   COVID at all.  Okay?  Do you even want to ask anymore?  I'll

12   leave it up to you.  All right?  So maybe you can tell me, you

13   two get together and think, you don't even want to ask about

14   vaccine status, you don't want to ask about health issues.

15   Maybe this is the time, by the time we get to November, maybe

16   it's just, we can do that.  All right?  I'll leave it up to

17   you.  Okay?

18          My concern is I don't want jurors to be thinking

19   that they're going to get COVID.  And I do talk with them

20   about it, and I will say I've had three trials this year.

21   About half the jurors in each of those trials wore masks.  I

22   leave that as an option.

23          So remember, you're in the bay area, so distinctive

24   jury pool in some ways.  So the goal is I'm not so concerned

25   about transmission, because there's no evidence that

```
 1  courtrooms have been, it's just an evidence-based assessment.
 2  But I am concerned about I don't want jurors sitting there not
 3  paying attention because he or she is freaking out about I'm
 4  going to get COVID from the person next to me.  Okay?  That's
 5  what I'm looking to manage.
 6            So you two, you all think about that and decide what
 7  you want to do.  You can tell me maybe on the 7th.  Okay?
 8  Just 7th is preliminary thoughts.  You don't have to have any
 9  deals.
10            Okay.  Then the last thing is I do do 9:00 to 2:00.
11  I'm willing to go longer if you want to.  Okay?  I will just
12  tell you, and I'm sure you know from your own experience, I do
13  think diminishing returns set in in the afternoon, and we do
14  have the phenomenon of bay area traffic, so I wouldn't want to
15  go past 4:00.  I mean, to be honest, even at 4:00 it's
16  starting to get bad, but I wouldn't want to go past 4:00.  So
17  we could do 9:00 to 4:00 with the lunch break, or we could do
18  9:00 to 2:00 with no break.  So let's just start thinking
19  about nuts and bolts about mechanics like that.
20            MR. POMERANTZ:  Your Honor, what about Thursdays?
21  Have you ... what's your view on --
22            THE COURT:  You mean Fridays?
23            MR. POMERANTZ:  I thought you --
24            THE COURT:  I do Fridays are dark.
25            MR. POMERANTZ:  Oh, Fridays are dark?
```

1          THE COURT:  Yeah.  You know, I could probably do

2    that -- I can't just not do anything for three months, so I

3    have to have some days when I have, you know, criminal

4    calendar and other things.  So, but maybe we could do, you

5    know, alternate weeks Monday through Friday, 9:00 to 4:00,

6    maybe the next week just Monday through Thursday so I have a

7    day to catch up.  You know, some -- just think about that.

8    Okay?

9          MR. POMERANTZ:  What is your practice about the week

10   of Thanksgiving?  We're probably going to go through

11   Thanksgiving, so what is your --

12         THE COURT:  Well, I would have you here until

13   Tuesday, I think.

14         MR. POMERANTZ:  So Monday and Tuesday of that week?

15         THE COURT:  Yeah, Monday and Tuesday, and you can

16   have Wednesday off.

17         When I was in practice, I had this one judge in

18   Massachusetts who just did not want to try my case.  And so

19   she set me for the Monday after Thanksgiving and made sure

20   that we didn't close until January 2nd.  And we did it, yes,

21   but I'm not doing that to you, but we do have to take those

22   things into account.

23         MR. POMERANTZ:  Thank you, Your Honor.

24         THE COURT:  All right.  Anything else from the

25   parties for today?

1            MR. GLACKIN:  No, Your Honor.

2            THE COURT:  All right.  Defendants?

3            MR. POMERANTZ:  No, Your Honor.

4            THE COURT:  All right.  Great.

5            Thanks for coming in.  I will have those expert

6  follow-up things out as soon as I can.

7        (Proceedings concluded at 1:51 p.m.)

8                        * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        * * * * *

 2                        I N D E X

 3   Motions Hearing

 4                        * * * * *

 5                    E X H I B I T S

 6   (None.)

 7                        * * * * *

 8                 CERTIFICATE OF REPORTER

 9        I, Stephen W. Franklin, Registered Merit Reporter, and

10   Certified Realtime Reporter, certify that the foregoing is a

11   correct transcript, to the best of my ability, from the record

12   of proceedings in the above-entitled matter.

13        Dated this 5th day of AUGUST, 2023.

14

15        /s/Stephen W. Franklin

16        _____
          Stephen W. Franklin, RMR, CRR

17

18

19

20

21

22

23

24

25
```